Christina M. Jepson (Utah Bar No. 7301)
Corey J. Hunter (Utah Bar No. 18964)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
CJepson@parsonsbehle.com
CHunter@parsonsbehle.com

Adam R. Rosenthal (*Pro Hac Vice* pending)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
12275 El Camino Real, Suite 100
San Diego, CA 92130
Tel: (858) 720-8900
Fax: (858) 509-3691
arosenthal@sheppardmullin.com

Victoria W. Hubona (*Pro Hac Vice* pending)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (313) 499-6301
vhubona@sheppardmullin.com

Attorneys for Plaintiffs

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RED CAT HOLDINGS, INC. and TEAL DRONES, INC., | **VERIFIED COMPLAINT** |
| Plaintiffs, | Case No. 2:25-cv-646 |
| vs. | Judge:<br>Magistrate Judge: |
| GEORGE MATUS and VECTOR DEFENSE INC., | JURY DEMANDED |
| Defendants. | |

Plaintiffs Red Cat Holdings, Inc. ("Red Cat") and Teal Drones, Inc. ("Teal") (together, "Red Cat/Teal" or "Plaintiffs") for their Verified Complaint against Defendants George Matus ("Matus") and Vector Defense, Inc. ("Vector") (together, "Defendants") state as follows:

## INTRODUCTION

1.     With the war in Ukraine showing the world that, on the modern battlefield, drones are increasingly replacing machine guns in determining the outcome of armed conflicts, and with drone companies competing for long-term and lucrative U.S. Department of Defense ("DoD") contracts to equip our warfighters, along with our allies, with the most advanced and durable U.S. designed and made drones, Matus hatched a plan to illegally compete and sabotage his former employer Red Cat/Teal.  Before his illegal plan unraveled, Matus implemented this plan with calculated precision, believing that through lies, sabotage, and subterfuge, he and his co-founders at Vector could outmaneuver Red Cat/Teal.

2.     *First*, he covertly founded and joined a competitive business, Vector, while serving as Red Cat's Chief Technology Officer ("CTO") and the Chief Executive Officer ("CEO") of Red Cat's biggest subsidiary, Teal.  *Second*, he spent approximately the last eight (8) months as an executive at Red Cat/Teal sabotaging his employer's business deals and operations, while at the same time, forming relationships on behalf of Vector.  *Next*, when he announced he was leaving Red Cat/Teal to join Vector, in order to avoid raising concerns regarding his enforceable restrictive covenants/non-compete obligations, he intentionally misrepresented Vector's business and plans, telling Red Cat/Teal that Vector was not a competitor in the drone space but would, in fact, become a Red Cat/Teal customer, purchasing Red Cat/Teal's drones as part of the "warfare-as-a-service" model it was going to market and sell to the military.  *Then*, he and Vector spent months soliciting Red Cat/Teal employees away in waves and likely mining Red Cat/Teal's trade secret, proprietary,

and confidential information to help design, build, and market Vector's own drone - the design, development, and manufacture of which were intentionally kept secret by Matus and Vector to prevent Red Cat from exercising its rights to enforce a valid non-compete clause in Matus's employment agreement with Red Cat. *Finally*, Matus's and Vector's conspiracy to cause significant harm to Red Cat/Teal became clear when, on July 11, 2025, during an interview on the Fox News Channel discussing Defense Secretary Pete Hegseth's announcement that President Donald Trump and the DoD are issuing a mandate to provide American warfighters with the most technologically advanced drone technology and systems in the world, a Vector advisor publicly revealed on national television that Vector had designed and built its own drone.[1] Red Cat/Teal were blindsided when they learned for the first time that Vector was a competitor in the drone industry, as they had relied in good faith on Matus's repeated representations that Vector would *not* be designing, manufacturing, and selling its own drones.

3.      Red Cat is a holding company that owns several drone technology subsidiaries, including Teal, all focused on developing, manufacturing, and deploying a variety of different drones for use by the U.S. military and its allies in training and on the battlefield.  Since its founding in 2016, Red Cat has invested over $22 million in researching and developing drone technologies, including proprietary developments in advanced software, hardware, aeronautics, optical/cameras, flight controls, and communication systems.[2]

---

[1] (*See Drone expert praises Sec. Hegseth's move to boost U.S. military: 'Finally,'* FOX NEWS (July 11, 2025), https://www.foxnews.com/video/6375545041112).

[2] (*See* Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended March 31, 2025 (2025), https://www.sec. gov/ix?doc=/Archives/edgar/data/0000748268/000164117225010350/form10-q.htm; Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended October 31, 2024 (2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000344/rcat1216form10q.htm; Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended July 31, 2024 (2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000238/rcat0923form10q.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2024 (2024),

4.      Matus founded Teal in 2014.  He remained Teal's CEO throughout the fall of 2021, when he sold his company to Red Cat for approximately $10 million.  As part of the acquisition, Matus remained Teal's CEO - though, now as an employee of Red Cat.  At the time of the acquisition, Matus described Teal's business and the synergies with Red Cat as follows: "Teal's prime directives since the beginning were simple: Rebuild the American drone industrial base and accelerate the global adoption of drones across Enterprise and Defense markets.  This acquisition represents the best way Teal will fulfill its mission, leveraging Red Cat's expertise and resources to deploy the best unmanned systems in the world, giving superhuman capabilities to commercial operators and military warfighters alike."[3]

5.      As Red Cat rapidly began expanding its investments, research, and development into other drone businesses, in late 2023, Red Cat elevated Matus to the role of CTO for the holding company.  As Red Cat's CTO, Matus was responsible for, *inter alia*, leading Red Cat's technical developments in the drone industry and helping Red Cat/Teal forge strategic partnerships with other military drone companies, including those based in allied countries, to drive Red Cat/Teal's market share, revenue, and profile as leading military drone contractors.

6.      Given his CEO/CTO roles and position as an officer of Red Cat, Matus had access to, and was actively involved in developing, Red Cat's and Red Cat's subsidiaries' most coveted trade secrets and proprietary and confidential information.  This information spanned Red Cat's and Red Cat's subsidiaries' (a) business information, along with confidential plans related to the

---

https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000195/rcat0808f orm10k.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2022 (2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479522000255/rcat0727f orm10k.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2020 (2020), https://www.sec.gov/Archives/edgar/data/748268/000155479520000206/rcat0 811form10k.htm).

[3] (Press Release, *Red Cat Holdings Closes Acquisition of Teal Drones* (Sept. 1, 2021), https://ir.redcatholdings.com/news-events/press-releases/detail/37/red-cat-holdings-closes-acquisition-of-teal-drones).

design, development, manufacturing, marketing, and sales of drones to the U.S. government and U.S. allies; (b) strategic initiatives, business opportunities, and relationships with important partners in the drone industry; and (c) confidential information related to Red Cat's employees.

7.      Armed with Red Cat/Teal's most sensitive and lucrative information, Matus co-founded and joined Vector as early as April 2024 (upon information and belief), while still serving as Red Cat's CTO and Teal's CEO.  Matus knew Red Cat/Teal would immediately move to enjoin him and Vector from illegally competing with Red Cat/Teal during his promised one-year non-compete period if he and his co-founders publicly announced that Vector would enter into the drone business.  To avoid this, Matus and Vector hatched a joint scheme to lull Red Cat/Teal into believing that Matus and Vector had no intention of designing, building, and selling their own drones, but would instead exclusively purchase drones, including drones specifically from Red Cat/Teal, and then use those third-party drones as part of Vector's service offerings to the U.S. military.

8.      For example, in May 2024 (around when, as Red Cat/Teal understand it, Matus joined Vector as a co-founder despite still working for Red Cat/Teal), Matus introduced Vector to other Red Cat employees when he invited three (3) of Vector's other co-founders to Red Cat/Teal's office and manufacturing facility in Salt Lake City, Utah.  In an apparent effort to keep his personal affiliation with Vector a secret, Matus framed Vector's visit as a potential business opportunity for Red Cat/Teal.  During the visit, the three (3) other Vector co-founders told Red Cat employees that Vector would not be competing in the drone space, as the new company would rather offer "warfare-as-a-service" and partner with Red Cat/Teal to purchase drones.  Red Cat/Teal now suspect that Matus invited his Vector co-founders to Red Cat/Teal's facilities to give them an opportunity to obtain first-hand business intelligence by observing Red Cat/Teal's processes, while

at the same time, laying the groundwork for Matus's and Vector's fabricated narrative that Vector would not be competing in the drone space.

9.  Based on Matus's conduct during the remainder of his Red Cat employment, among other things, Red Cat/Teal now believe that as the summer of 2024 approached, Matus and Vector conspired to cause significant damage to Red Cat/Teal's business.

10.  Red Cat/Teal tasked Matus to be the main point of contact and lead the negotiations on a significant and highly lucrative partnership with Orqa Ltd. ("Orqa") - a best-in-class Croatian-based drone company that was in the midst of negotiating with Red Cat/Teal to form a key strategic business partnership to collaborate on selling First-Person View ("FPV") drones to the DoD. Despite a majority of the terms of the ultimate deal having already been agreed upon, the deal suddenly collapsed.  Matus, upon whom Red Cat/Teal relied for communications from Orqa, was unable to articulate a reason why the deal died.  Nor did he provide a clear explanation as to what, if anything, he did to try and salvage the deal.  Unbeknownst to Red Cat/Teal at the time, Matus, without permission and in violation of his fiduciary duties, made representations to Orqa as Red Cat/Teal's representative that rendered Red Cat/Teal's primary leverage in the deal worthless.

11.  Based on this and information that has come to light since, Red Cat/Teal believe Matus sabotaged the Orqa deal because, *inter alia*, he did not want Orqa to enter into an exclusive long-term relationship with Red Cat/Teal nor for Red Cat/Teal to advance their design, development, manufacture, and sale of FPV drones.  Red Cat/Teal have come to learn that Vector, in fact, has attempted to engage in a relationship with Orqa, likely with Matus's help.

12.  At the time of his departure from Red Cat, Matus also misrepresented his and Vector's plans to directly compete in the drone space.  In December of 2024, as he was leaving Red Cat/Teal, Matus told several Red Cat/Teal employees and executives that Vector had no

intention to design, develop, market, and/or sell military drones, and that he (as Vector's CTO), looked forward to partnering with Red Cat/Teal in the future as a customer. Based on Matus's (false) representations, the esteem in which Red Cat/Teal's leaders had for Matus, and his obligations pursuant to an Executive Employment Agreement, *infra*, Red Cat/Teal had no cause for concern. However, as has now been made clear, Plaintiffs believe Matus and Vector knowingly lulled Red Cat/Teal into a false sense of security, which they exploited for their pecuniary benefit.

13.     To accelerate the process and unlawfully compete with Red Cat/Teal, Matus and Vector undoubtedly capitalized on Matus's intimate familiarity with Red Cat/Teal's business plans and operations along with the design, development, and the trial and error processes that Red Cat/Teal had no choice but to work through in order to bring military-grade drones to market. By unlawfully competing with Red Cat/Teal, Matus and Vector have improperly benefited from the millions of dollars in research and development that Red Cat/Teal have spent designing, developing, testing, marketing, and selling military-grade drones.

14.     On July 11, 2025, Vector publicly announced its drone, "Hammer," for the first time while discussing the U.S.'s push for military drone dominance on Fox News Channel.[4] In so doing, Vector revealed that Matus had lied to Red Cat/Teal all along and was, indeed, manufacturing drones and competing against Red Cat/Teal in violation of his contractual obligations. Vector followed-up the July 11, 2025 announcement with a press release dated July 29, 2025, introducing Hammer as a military drone that is "purpose-built for the warfighter and manufactured to strict quality and reliability standards," that was, "[e]ngineered and manufactured by Vector's world-class team, [and] will be produced at the company's cutting-edge manufacturing

---

[4] (*See Drone expert praises Sec. Hegseth's move to boost U.S. military: 'Finally,'* FOX NEWS (July 11, 2025), https://www.foxnews.com/video/6375545041112).

facility in Utah."[5]  The press release goes on to state that, "Hammer is designed for large-scale manufacturing and Vector is set to build tens of thousands to meet the demands of modern warfare" - yet further proof that Matus and Vector are direct competitors with Red Cat in the drone industry.[6]

15.    Despite requests that Matus and Vector immediately terminate their unlawful conduct, Defendants refuse to honor their legal obligations and Matus's contractual obligations, as they continue to pursue their illegal scheme.  Unless enjoined, Matus and Vector will continue to use and disclose Red Cat/Teal's trade secret, proprietary, and confidential information for their sole benefit and to Red Cat/Teal's detriment.  Matus's roles at Vector as a co-founder and CTO (the same position he held at Red Cat/Teal), make clear Matus cannot help but exploit Red Cat/Teal's protected information, customer, client, business, and employee relationships, goodwill, innovation, and investment.  Matus's and Vector's unlawful activities must be enjoined.

16.    Plaintiffs have suffered and continue to suffer significant damages and irreparable harm as a result of Defendants' actions.

## PARTIES

17.    Red Cat Holdings, Inc. is a Nevada corporation with its principal place of business in San Juan, Puerto Rico.

18.    Teal Drones, Inc. is a Delaware corporation with its principal place of business in Salt Lake City, Utah.

19.    George Matus is an individual who resides in Utah.  Matus is a citizen of Utah.

---

[5] (*Vector Launches The Hammer FPV – The First-To-Market FPV With Fiber Optic Integration*, BARCHART (July 29, 2025), https://www.barchart.com/story/news/33722910/vector-launches-the-hammer-fpv-the-first-to-market-fpv-with-fiber-optic-integration).
[6] (*Id.*).

20.     Vector Defense, Inc. is a Delaware corporation with its principal place of business in Draper, Utah.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this District pursuant to 28 U.S.C. § 1331.

22.     There is federal question jurisdiction under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836, *et seq.*, and the Computer Fraud and Abuse Act ("CFAA"), 18 U.S.C. § 1030, *et seq*.

23.     Venue is proper in this District under 28 U.S.C. § 1391, *et seq.,* because Matus entered into a contract directly connected to Utah, and because Matus's breach of his contractual duties, breach of his fiduciary duty of loyalty, and fraudulent misrepresentation as well as Matus's and Vector's misappropriation of Red Cat/Teal's trade secrets occurred primarily in Utah, and the resulting harm of which was principally felt by Red Cat/Teal in Utah.

## GENERAL ALLEGATIONS

### I.     Red Cat's Acquisition of Teal

24.     Founded in 2016, Red Cat is a drone technology holding company, that on its own and through its various subsidiaries including Teal, develops, designs, manufactures, markets, and sells drones for military, government, and commercial operations.  At all times relevant to this dispute, Red Cat/Teal have invested millions of dollars designing and developing a variety of drones under their ARACHNID™ family of drone systems, including FANG™ (an FPV drone), Teal 1, Teal 2, and Black Widow™ (Short-Range Reconnaissance ("SRR") drones), and TRICHON™ (Medium-Range Reconnaissance ("MRR") drones).  Additionally, as part of Red Cat's September 2024 acquisition of FlightWave Aerospace Systems Corporation ("FlightWave"), Red Cat also designs, markets, and sells vertical takeoff and landing ("VTOL") drones.

25. In 2014, Matus, a high school student at the time, founded and served as the CEO of Teal Drones. Initially, Teal focused on designing, manufacturing, and selling consumer drones.

26. Seeing the potential in Matus and Teal's drone offerings at the time, Red Cat worked to acquire Teal to operate under its umbrella.

27. In July 2021, Red Cat and Teal entered into an acquisition agreement. Red Cat acquired Teal, including, *inter alia*, its goodwill and intellectual property, from Matus in exchange for good and valuable consideration.

28. The acquisition agreement was finalized in August 2021, with a total purchase price of approximately $10,000,000. As a condition of the acquisition, Red Cat and Matus entered into a September 1, 2021 employment agreement, through which Red Cat employed Matus as Teal's CEO.

29. Pursuant to his September 1, 2021 employment agreement with Red Cat, Matus agreed to keep confidential certain Red Cat/Teal information not publicly known.

## II.    Matus's Role at Red Cat/Teal

30. Following Red Cat's acquisition of Teal, Red Cat employed Matus to continue to spearhead Teal's critical initiatives, drone design, and problem-solving efforts, now with the backing of Red Cat's resources, connections, and position within the market.

31. Teal acts in concert with Red Cat, and Red Cat represents and acts on behalf of Teal.

32. Matus's work for Red Cat/Teal was primarily grounded at Teal's Salt Lake City, Utah facilities, though he also traveled and conducted business across the U.S. and globally on behalf of Red Cat/Teal.

33. Even after the acquisition, Matus continued to be the "face" of Teal drones. Red

Cat deployed Matus to form and build strategic relationships on behalf of Red Cat/Teal within the industry, and in particular among their core customer base in the DoD and various branches of the military.  Using Red Cat's resources, Matus identified, met with, and fostered connections with individuals, entities, and organizations to help Red Cat/Teal (a) grow and expand Red Cat/Teal's business, (b) gain market intelligence on competing drone companies in the U.S. and across the globe, (c) obtain first-hand information directly from customers and potential customers on how to best position Red Cat/Teal to obtain lucrative military contracts, and (d) offer competitive products, solutions, and services, all in an effort to advance Red Cat/Teal's standing and gain a competitive edge in the market.

34.    Matus was also at the forefront of Red Cat/Teal's design, development, and production of advanced military-grade drones.  He worked directly with Red Cat/Teal engineers to understand and work through drone capabilities, necessities, and weaknesses, including as they relate to aeronautics, electrical systems, communications, and design features.  Matus was not just a figurehead with a rudimentary understanding of drones - he was intimately involved and familiar with how Red Cat/Teal's drones were designed and built.  Matus participated in and understood Red Cat/Teal's methods and choices made to optimize the performance of their drones and to reduce the costs of their drones' design and manufacture.  Matus directly engaged with Red Cat/Teal's engineers to work through deficiencies and quality control issues in Red Cat/Teal's drones, to identify areas of design improvement, and to formulate solutions for the same.

35.    As Red Cat rapidly began expanding its investments, research, and development into other drone businesses, in December 2023, Red Cat promoted Matus to the role of Chief Technology Officer ("CTO") of Red Cat.  In this role, Matus was responsible for overseeing all of the technological elements of Red Cat's entire drone operation expanding across Red Cat's

subsidiaries, including the design, development, manufacturing, marketing, and sales of said drones.

36.     Matus simultaneously served as the CTO of Red Cat and as the CEO of Teal.  At all relevant times, he was a fiduciary to Red Cat/Teal.

37.     In addition to his Teal CEO duties and other Red Cat CTO responsibilities, Matus's Red Cat CTO position also required him to strategically align Red Cat, its different business arms and subsidiaries, and all of Red Cat's offerings with key market initiatives.  For example, Matus worked on behalf of Red Cat to source, locate, and negotiate mergers and acquisitions benefitting Red Cat's goals, plans, and footing in the competitive drone marketplace.

38.     Red Cat trusted Matus as one of its key business strategists, both from a product perspective and a growth perspective.  Matus was one of the few individuals whom Red Cat provided with the autonomy to identify and map out advantageous objectives on behalf of Red Cat/Teal and, subsequently, take the steps necessary to achieve such objectives.

39.     Matus was responsible for helping Red Cat/Teal forge strategic partnerships with other drone companies, including those based in allied countries, to drive Red Cat/Teal's market share, revenue, and profile as leading military drone contractors.

40.     In order to perform his CTO role, Red Cat educated Matus on and exposed him to, among other things, its and its subsidiaries' business dealings, market plans, strategic initiatives, financials, weaknesses, growth blueprint, and future projects.  Matus understood the sensitive, granular details of Red Cat's business and plans in order to serve as one of its primary representatives in the market.

41.     Matus also maintained his deep understanding of Teal's business, offerings, and development plans.  This was necessary to fulfill his Teal CEO duties, promote Red Cat/Teal, form

relationships on Red Cat/Teal's behalf, and market Red Cat/Teal's offerings.

## III.   Matus's Employment Agreement

42.    Matus held a critical role in Red Cat's business.  Red Cat planned for Matus to help grow and build the business into the future.  Based on these considerations and in recognition of his December 2023 promotion to CTO of Red Cat, Red Cat presented Matus with, and Matus executed, an Executive Employment Agreement (the "Agreement").[7]

43.    Through the Agreement, Red Cat promised Matus, among other things, continued and at least two (2) years of guaranteed employment, a nearly $50,000 salary raise, annual bonus eligibility, an award of 600,000 time-based Red Cat stock units, and access to Red Cat/Teal's trade secret, proprietary, and confidential information.[8]

44.    Immediately following Matus's execution of the Agreement, Red Cat increased Matus's salary as promised from approximately $183,000 to $230,000, and granted him 150,000 of the 600,000 time-based Red Cat stock units.

45.    In exchange for the valuable consideration provided by Red Cat, Matus vowed to devote all of his "business time and best efforts" to perform his duties for Red Cat/Teal.[9]

46.    Matus also promised to comply with certain protective covenants, including non-compete, non-solicitation, and non-disclosure clauses.

47.    Matus's promises to comply with the protective covenants and his actual compliance with the protective covenants was and is necessary to protect Red Cat from harm, including harm to Red Cat's and Red Cat's subsidiaries' customer, client, business, and employee relationships, goodwill and investments, and competitive edge in the specialized military drone

---

[7] (*See* **Ex. A**, Executive Employment Agreement).

[8] (*See id.* at ¶¶ 2, 4-5).

[9] (*Id.* at ¶ 1).

space.

48.    In regard to his promises not to compete, Matus agreed to refrain from certain competitive activity during his Red Cat employment and for twelve (12) months following his separation of employment.  In particular, Matus agreed to the following:

> **Non-Compete Clause**: The Executive agrees that during the Employment Period and for a **period of twelve (12) months immediately following the Termination Date**, regardless of the cause of termination, the Executive **shall not directly or indirectly engage in any business activity which is similar to the business of the Company within the same city, county, state or other defined geographical area** recognized by the Company in which the Executive provided services for the Company, so long as the Company continues to carry on such business in the city, county, state or other defined geographical area.[10]

49.    Matus further promised not to solicit business or employees from Red Cat/Teal by agreeing to the following:

> Non-Solicitation Clause: For a period of twelve (12) months after the Termination Date, the Executive shall not directly or indirectly solicit business from, or attempt to sell, license, or provide the same or similar products or services as are now provided to, any customer or client of the Company who was a customer or client of the Company at any time during the Executive's employment with the Company. Further, the Executive shall not solicit, entice, or induce any employee of the Company to leave their employment during the same period.[11]

50.    Additionally, Matus agreed not to disclose and/or use any of Red Cat/Teal's confidential information.  In pertinent part, as it relates to Matus's non-disclosure obligations, the Agreement provides:

> Confidential Information and Company Property.
> (a) Executive recognizes, acknowledges and agrees that Executive has had and will continue to have access to secret and confidential information regarding the Company and Company, its subsidiaries and their respective businesses ("Confidential Information"), including but not limited to, its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans, provided such information is not in or does not hereafter become part of the public domain, or become known to others through

---

[10] (*Id.* at ¶ 14 (emphasis added)).

[11] (*Id.*).

no fault of the Executive. The Executive acknowledges that such information is of great value to the Company and Company, is the sole property of the Company, and has been and will be acquired by Executive in confidence. In consideration of the obligations undertaken by the Company herein, the Executive will not, at any time, during or after employment hereunder, reveal, divulge, or make known to any person, any information acquired by the Executive during the course of employment, which is treated as confidential by the Company, and not otherwise in the public domain. The provisions of this Section 12 shall survive the termination of the Executive's employment for any reason.

. . .

Non-Disclosure Agreement (NDA): The Executive shall not, during or at any time after the Termination Date, disclose any confidential information or proprietary data to any person or entity. This includes, but is not limited to, client lists, trade secrets, business operations, internal processes, and other Confidential Information as defined in 12(a) above. This does not include any information or data that has become part of the public domain and is neither confidential nor proprietary at the time of disclosure through no fault of the Executive. The obligations set forth in this clause shall survive the termination of employment and continue indefinitely.[12]

51.    Matus promised that upon the separation of his employment from Red Cat, he would provide Red Cat "any and all originals and copies, including those in electronic or digital formats, of Confidential Information."[13]

52.    Matus further represented:

(d) Executive is aware that all Company property, including physical property, documents, and Confidential Information that Executive receives or creates during employment with the Company, belongs to the Company. Executive understands and agrees that Executive has a duty and a responsibility to return all such property upon the Termination Date. Executive therefore agrees that, pursuant to that duty, upon the Termination Date, or at any other time upon the Company's request, Executive will promptly deliver to the Company all such property, documents, and Confidential Information.[14]

53.    Red Cat and Matus agreed the Agreement would be governed by Utah law, and

---

[12] (*Id.* at ¶¶ 12, 14).

[13] (*Id.* at ¶ 12).

[14] (*Id.*).

they consented to the exclusive jurisdiction of Utah's state and federal courts.[15]

54.    Red Cat and Matus also acknowledged the prevailing party in any dispute arising out of the Agreement would be entitled to its or his reasonable attorneys' fees and costs.[16]

## IV.    Red Cat/Teal's Confidential Information and Trade Secrets

55.    Red Cat's trade secret, proprietary, and confidential information covers different categories of its and its subsidiaries', including Teal's, data, information, and work product.  Red Cat owns and obtains significant value from its and its subsidiaries' trade secret, proprietary, and confidential information.

56.    Red Cat derives significant value from its and its subsidiaries' confidential and trade secret business information and plans, which include its, Teal's, and other Red Cat subsidiaries': budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans.  This information serves as the blueprint and guide for Red Cat's and Red Cat's subsidiaries' future initiatives, resource allocation, and contract application and/or bidding.

57.    Red Cat's and Red Cat's subsidiaries' business information and plans are not easily nor readily ascertainable.  Red Cat has acquired and developed this information through significant financial investment and hours of labor.  Only Red Cat's key employees, namely Red Cat's and Red Cat's subsidiaries' C-suite executives, including Matus, and those necessary to execute Red Cat's plans, have insight or exposure into these business plans.  No individual outside of Red Cat or its subsidiaries could easily acquire or duplicate this business information.

---

[15] (*Id.* at ¶ 16(g)).

[16] (*Id.*).

58.     Red Cat also dedicates serious capital and sweat equity into locating and developing strategic initiatives, business opportunities, and partners for it and its subsidiaries.  This includes identifying, researching into, and assessing potential business opportunities, acquisitions, and partnerships.  For example, Red Cat funds its and its subsidiaries' high-level executives and representatives to attend conferences and conventions to network and identify beneficial business partnerships with other entities based on Red Cat's and Red Cat's subsidiaries' business plans, capabilities, and offerings.  Once a potentially beneficial business partnership is identified, Red Cat deploys its and its subsidiaries' representatives to engage in a months-long process of performing due diligence into the entity, meeting and engaging with the entity to learn its needs, pain points, weaknesses, strengths, and capabilities, while at the same time assessing the benefits and drawbacks to Red Cat and its subsidiaries, and ultimately negotiating a business contract with the entity (as applicable).  These business partnerships shape Red Cat's and Red Cat's subsidiaries' plans, strategies, and leverage in the market.  This information is not available to the public and is only held by Red Cat's and Red Cat's subsidiaries' top executives and representatives.

59.     Red Cat's and Red Cat's subsidiaries' strategic initiatives, business opportunities, and partners are generally not public knowledge until final execution or agreement and public disclosure of the same.  Even then, Red Cat keeps secret its and its subsidiaries' assessment and the information developed and acquired throughout the course of it identifying and evaluating strategic initiatives, business opportunities, and partners.  Only Red Cat's and Red Cat's subsidiaries' high-level executives, including Matus, and representatives have insight or exposure to Red Cat's and Red Cat's subsidiaries' assessment and the information Red Cat and its subsidiaries develop and acquire regarding strategic initiatives, business opportunities, and partners.  It is near impossible for any individual outside of Red Cat or its subsidiaries to acquire

or duplicate their assessments and the information developed and acquired throughout the course of them identifying and evaluating strategic initiatives, business opportunities, and partners.

60.    Red Cat further relies on its and its subsidiaries' confidential and trade secret drone design and development to remain competitive within the industry.  Matus was involved with and had an intimate understanding of Red Cat's and Red Cat's subsidiaries' confidential and trade secret drone design and development.  Red Cat has invested significant labor, expense, and resources in its and its subsidiaries' design, planning, and development of drones.  As just one example, this is exhibited by its multi-million-dollar acquisition of Teal.  Red Cat has endured countless hours of trial and error to determine the designs, partnerships, product and component sourcing, manufacture, enhancements, and component combination to increase the competitive value of its and its subsidiaries' drones.

61.    In particular, Red Cat has poured significant research and development resources into identifying the ideal marriage of its and its subsidiaries' drone components.  To illustrate, as it relates to contracts for DoD-sponsored drones for which Red Cat and its subsidiaries compete, Red Cat has dedicated considerable time and financial capital into its and its subsidiaries' drones to locate and source DoD-approved drone components, build prototype drones with such components, test the prototype drones, identify deficiencies and areas of improvement with the prototype drones, identify different and/or additional DoD-approved drone components for testing, rebuild the prototype drones, retest the prototype drones, and again work to identify deficiencies and areas of improvement until the prototype drone is in its most ideal iteration.

62.    This not only includes a cost and functionality analysis, but it covers an extensive understanding of the pain points and factors that act as levers to form the optimal product.  Each component of a drone is not kept in a vacuum.  Instead, these components work together and are

impacted by one another when combined.  For example, a sensor from one vendor may provide unparalleled altitude measurement but increase the drone's load.  The increased load may decrease flight performance to such an unfavorable degree that it leads Red Cat or its subsidiary to opt to use a sensor from another vendor (despite not offering the same level of altitude measurement) to better serve the purpose of the drone.  Red Cat's and Red Cat's subsidiaries' testing, results, understanding of how different components combine, and knowledge of the shortcomings and advantages of different combinations of components have armored Red Cat and its subsidiaries with a competitive advantage new market entrants lack.

63.    Red Cat's and Red Cat's subsidiaries' drone design and development are the heart of Red Cat's business.  This information is not publicly available nor is it easily or readily ascertainable.  Red Cat's and Red Cat's subsidiaries' drone design and development are key to Red Cat's competitive vitality, particularly where this information drives Red Cat's ability for it and its subsidiaries to bid or apply for different drone contracts.  Such information would allow any competitor to skip the line by foregoing grueling hours and financial investment poured into trial and error.  It is near impossible for a competitor to obtain this information without first going through its own trial and error.  Even attempts to reverse engineer a drone cannot produce the information and understanding of why Red Cat and its subsidiaries designed it a certain way, the benefits and drawbacks of the specific components used to build a drone, and Red Cat's and Red Cat's subsidiaries' understanding of certain combinations, components, and methods they will not deploy in the future.

64.    To date, Red Cat has spent approximately $22 million on its and its subsidiaries' research and development, including researching and developing drone technologies such as proprietary developments in advanced software, hardware, aeronautics, optical technologies and

cameras, flight controls, and communication systems.[17]

65.     Red Cat protects its and its subsidiaries' trade secret, proprietary, and confidential information through numerous methods.  For example, Red Cat requires new employees who work for Red Cat directly or through one of its subsidiaries and who has access to its and/or its subsidiaries' confidential and trade secret information, to execute employment agreements through which they agree to protect and keep confidential Red Cat's and Red Cat's subsidiaries' confidential and trade secret information.  Red Cat also requires its and its subsidiaries' contractors, consultants, financial advisors, suppliers, and strategic partners to enter into confidentiality agreements, as appropriate.

66.     Additionally, Red Cat and its subsidiaries are required to follow the U.S. Government's and the DoD's protocols, policies, and procedures in storing and sharing sensitive information concerning matters related to such organizations.

67.     Red Cat also password-protects all of its and its subsidiaries' devices and systems, including servers, software platforms, and cloud storage systems.

68.     Red Cat limits dissemination of its and its subsidiaries' trade secret, proprietary, and confidential information as necessary or on a need-to-know basis.

## V.     Red Cat/Teal's Competition for SRR Tranche 1 and SRR Tranche 2

---

[17] (*See* Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended March 31, 2025 (2025), https://www.sec. gov/ix?doc=/Archives/edgar/data/0000748268/000164117225010350/form10-q.htm; Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended October 31, 2024 (2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000344/rcat1216form10q.htm; Red Cat Holdings, Inc. Form 10-Q for Fiscal Quarter Ended July 31, 2024 (2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000238/rcat0923form10q.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2024 (2024), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479524000195/rcat0808form10k.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2022 (2022), https://www.sec.gov/ix?doc=/Archives/edgar/data/0000748268/000155479522000255/rcat0727form10k.htm; Red Cat Holdings, Inc. Form 10-K for Fiscal Year Ended April 30, 2020 (2020), https://www.sec.gov/Archives/edgar/data/748268/000155479520000206/rcat0 811form10k.htm).

69.    In or around November 2018, the U.S. Army announced its SRR Program.  The Army sought an inexpensive drone with vertical take-off and landing features that could provide short-range reconnaissance capabilities.  The DoD's Defense Innovation Unit ("DIU") posted a Commercial Solutions Opening requesting interested entities to submit a solution brief detailing their product or product concept.  The DIU and the Army planned for the SRR Program to be carried out in phases, beginning with SRR Tranche 1.

70.    Teal applied for SRR Tranche 1.  In April 2019, the DIU and the Army awarded Teal a prototype contract.  Following the prototype contract, Teal had nine (9) months to design a military-grade drone to compete against five other companies' drones at a final test event.

71.    Teal developed and submitted a drone called the "Golden Eagle."

72.    In February 2022, the DIU and the Army announced it selected another drone company for the SRR Tranche 1's initial production award.

73.    Despite not being selected for SRR Tranche 1, the DIU added "Golden Eagle" to its then-current Blue Unmanned Aircraft Systems ("UAS") Cleared List.

74.    The Blue UAS Cleared List identifies drones compliant with current law and policy (including that all components are sourced from the United States and approved allied countries), validated as cyber-secure, and certified for DoD purchase and operation.

75.    In 2021, while the DIU's and the Army's decision on SRR Tranche 1 remained pending, the DIU and the Army began considering applicants for SRR Tranche 2.

76.    SRR Tranche 2 sought drones similar to SRR Tranche 1, but with certain enhanced capabilities.  Specifically, SRR Tranche 2 focused on a small, rucksack-portable UAS to provide Army infantry platoons (consisting of 20-50 soldiers) with situational awareness beyond the next terrain.

77.     Subsequent to the announcement of SRR Tranche 2's opening, Teal began planning and designing its submission for SRR Tranche 2.

78.     Following Red Cat's acquisition of Teal in 2021, Matus, Geoff Hitchcock (Senior Vice President of Sales for Red Cat at the time), and Red Cat/Teal engineers continued planning, designing, and manufacturing Red Cat/Teal's drone for SRR Tranche 2, which Red Cat/Teal called the "Black Widow"™.

79.     After a September 2021 demonstration of Black Widow™ to DoD decisionmakers, the DIU and the Army notified Red Cat/Teal that, out of the thirty-eight (38) entities to apply for SRR Tranche 2, Black Widow™ had been selected as one of the few drones to advance to the prototype phase of the SRR Tranche 2 program.  The prototype phase carried with it $1.5 million in research and development funding.

80.     The value of the research and development funding associated with SRR Tranche 2 increased over time, eventually reaching approximately $5-6 million.

81.     Throughout the course of competing for the SRR Tranche 2 contract, Matus, Hitchcock, and the Red Cat/Teal engineers went through numerous cycles of the DIU and the Army identifying specific technical requirements they desired the ideal drone to possess, Red Cat/Teal redesigning, strategizing, testing, and problem-solving around their drone in order to meet the DIU's and the Army's requirements, Red Cat/Teal presenting their drone to the DIU and the Army, and the DIU and the Army subsequently eliminating certain contenders from the running for the SRR Tranche 2 contract.

82.     Currently, Red Cat/Teal are preparing for the third phase of the Army's SRR Program, "Next Generation SRR."  Next Generation SRR is expected to open within the next approximately six (6) months.

83.    Red Cat/Teal also expect an uptick in requests for proposals to deliver U.S.-manufactured lethal FPV drones for military use.

## VI.    Red Cat/Teal's Other Drones and Business Ventures

84.    Teal specializes in intelligence, surveillance, and reconnaissance ("ISR") drones. In particular, its market-ready drones were developed for military and government purposes.

85.    From concept to manufacture, it generally takes several months (if not over a year) to develop a drone prototype intended for military and government purposes.  This does not account for the myriad additional months of research and development to test, redesign, and perfect the drone.

86.    "Teal 2" has been Red Cat/Teal's flagship drone.  Red Cat/Teal took Golden Eagle and began to enhance and build upon its capabilities in order to design, develop, and manufacture Teal 2 for more expansive use by the federal government.

87.    Teal 2 is used for SRR to serve as "eyes in the sky" for a warfighter or government agent.  It is small enough to be kept in a rucksack for quick deployment.  Red Cat/Teal specifically designed this drone for nighttime missions.  Teal 2's advanced imaging capabilities allow an individual on the ground, operating the drone, to view images that would be otherwise unavailable based on the exposure of the camera.  To do this, Teal 2 utilizes electro-optical systems to collect the light of an image and convert it into electrical signals for full visibility.  Teal 2 is also equipped with infrared thermal cameras to identify and track movement more easily.

88.    Teal 2 is American-Made and Blue UAS certified, meaning it is on the Blue UAS Cleared List of drones cleared for DoD purchase.  As of the date this Verified Complaint is filed,

Teal 2 is one of only twenty-seven (27) drones on the Blue UAS Cleared List.[18]

89.     Another one of Red Cat/Teal's drones is Black Widow™.  Red Cat/Teal designed, developed, and manufactured Black Widow™ specifically in response to SRR Tranche 2.

90.     Black Widow™ is a low-cost, SRR drone built for the frontline warfighter.  It is manufactured in the U.S. and features DoD-required specifications, including 3D mapping, electronic frequency stepping, and visual odometry.

91.     As of the date this Verified Complaint is filed, Red Cat/Teal are undergoing the Blue UAS clearance process for Black Widow™.

92.     In addition to Teal 2 and Black Widow™, Matus also helped Red Cat/Teal develop FPV drones.

93.     In or around March 2024, Red Cat/Teal, with the help of Matus, began developing an FPV, optionally-lethal drone that it called "FANG"™.  FANG™ is intended to be used in combination with ISR drones to deploy different capabilities, such as seek and destroy missions.  Through such missions, an ISR drone, like Teal 2, would be used to identify a target, and an FPV drone, such as FANG™, would be used to attack the target.  Around the time of its inception, Matus appeared in a Red Cat video discussing FANG's™ role for modern warfighting, explaining that it is "low-cost," "portable," and "intended for precision strike."[19]

94.     In or around the fall of 2024, FANG's™ development suspended when Red Cat/Teal's business deal with Orqa collapsed following certain representations Matus made to Orqa, as detailed *infra*.  As a result of the Red Cat/Teal and Orqa partnership not proceeding, Red

---

[18] (*See* Defense Innovation Unit, *Blue UAS Cleared List*, https://www.diu.mil/blue-uas-cleared-list (last visited August 4, 2025)).

[19] (Red Cat, *ARACHNID*, https://redcat.red/solutions/family-of-systems/ (last visited August 4, 2025)).

Cat/Teal could no longer develop FANG™ using Orqa's sophisticated, battlefield-tested hardware and software as planned.

95.    Despite this, in 2025, Red Cat/Teal began working, again, to develop an FPV drone that will be marketed and sold to the military as FANG™.

96.    Red Cat/Teal are handsomely positioned to develop a successful FPV drone for military use.  Red Cat/Teal have designed their SRR drones to operate in "Position" mode - one of the most sophisticated modes in which a drone can operate.  In Position mode, a drone uses a global positioning system ("GPS") and other sensors (such as vision sensors) to maintain the drone's position and altitude.

97.    Most FPV drones utilize "Acro" mode, a less complicated method to maneuver a drone's orientation and movement.

98.    As Acro mode is a "building block" to Position mode, Red Cat/Teal possess the foundation necessary to readily develop an FPV drone.  And, of course, Red Cat/Teal have already logged numerous hours developing FANG™.

99.    Given their market position, history working with the DoD, and established capabilities, Red Cat/Teal have a fast pass to FPV drone development where they have already undertaken the research, development, and trial-and-error processes with SRR drones and already understand the impacts of utilizing different combinations of components.  This is clear based on their current work on FANG™.

100.    Following the collapse of the Orqa deal, Red Cat/Teal were forced to retool their efforts to design and develop FANG™.  Currently, to finalize FANG™, Red Cat/Teal need only make final decisions on the drone's features and specifications.

101.    In the coming months, Red Cat/Teal intend to bid and submit applications for DoD

contracts, among other opportunities, in search of FPV drones.

102.    Red Cat/Teal's drones are not available for purchase on the general consumer market.

103.    Red Cat/Teal's customers and clients are located across the globe.  In addition to DoD contracts, Red Cat/Teal enter into and/or compete for contracts and programs funded and offered by U.S. federal, state, and local government agencies, private U.S. entities, U.S. allies, such as the Netherlands and United Kingdom, and the North Atlantic Treaty Organization ("NATO") Support and Procurement Agency.

104.    Whereas DoD contracts carry limitations related to Blue UAS clearance, such as prohibiting drone components from certain countries of origin, private U.S. entities, certain U.S. government agencies, and U.S. allies generally do not enforce the same restrictions when it comes to drone composition.

## VII.    Matus's Separation from Red Cat/Teal and Pre-Departure Conduct

105.    In or around November 2024, Matus notified Red Cat/Teal that he was resigning from his employment as Red Cat's CTO and Teal's CEO to join Vector as its CTO in December 2024.

106.    In describing his "future" work for Vector, Matus told Red Cat/Teal that Vector provides modern warfare-as-a-service.  He explained Vector offered contracted-for teaching and training on warfare technology offerings, including drones, to military units and sectors. Describing Vector as "Blackwater 2.0," Matus told Red Cat/Teal's executives that Vector would lease drones that it purchased from other entities, including Red Cat/Teal, to specific military units for use in training and deployment in warfare.  On numerous occasions in his conversations with Red Cat/Teal employees and executives, Matus made sure to mention the significant future

business opportunities between Vector and Red Cat/Teal.  He explained Vector would purchase drones from Red Cat/Teal to be used as part of Vector's service offerings, which would be a profitable business venture for Red Cat/Teal.

107.    Matus deceived Red Cat/Teal into believing a false narrative regarding Vector and his work there.

108.    Based on Matus's representations concerning Vector, the esteem in which Red Cat/Teal's leaders had in Matus, Matus's obligations pursuant to the Agreement, and numerous indications of a future business opportunity between Vector and Red Cat/Teal, Plaintiffs identified no serious cause for concern at the time Matus left to join Vector in December 2024.

109.    However, upon learning in or around July 2025 that Matus falsely represented Vector's business and offerings, Red Cat/Teal began to investigate Matus's conduct leading up to his separation of employment from Red Cat/Teal.

110.    Upon information and belief, while still employed by Red Cat and on its payroll, Matus covertly joined Vector in or around April 2024.  At this time, Vector knew or should have known Matus's obligations to Red Cat under the Agreement based on its due diligence and/or Matus's representations.

*i.    Matus Brings Vector's Founders to Teal's Office and Factory*

111.    In May 2024, Matus brought three (3) of Vector's other founders, including Andy Yakulis, to Teal's Salt Lake City, Utah office and factory.  Matus asked Hitchcock (then serving as the General Manager of Teal) to meet with the individuals from Vector and listen to their business concept, explaining Red Cat/Teal and Vector would likely be working together in the future.  At the time, Matus did not mention that he was personally affiliated with Vector.

112.    Hitchcock met with Matus and the other Vector co-founders for nearly three (3)

hours.  During their meeting, the Vector founders explained Vector's business concept as a private contractor providing "warfare-as-a-service."  They clarified they did not, and had no plans to, design, develop, and/or manufacture drones.  Vector also discussed partnering with Red Cat/Teal to include Red Cat/Teal's drones as part of a "high tech" package Vector would offer.  Therefore, Vector seemingly posed no threat to Red Cat/Teal.  Under the representation of potential partnership, as opposed to competition, Vector asked Hitchcock questions concerning Red Cat/Teal and their business.  However, no partnership between Red Cat/Teal and Vector came to fruition.

ii.  *Matus Begins Delaying Red Cat/Teal's Progress and Business Opportunities*

113.    Beginning in late April 2024 or early May 2024, Matus began to delay implementation of business actions as discussed and agreed upon with Hitchcock.

114.    Hitchcock traveled as part of his job and primarily worked away from Teal's office and factory.  He worked with Matus to identify business directives that Teal needed to undertake.  For illustrative purposes, Hitchcock and Matus may have determined Teal should test Black Widow™ with a different Systems-on-Module to assess performance capabilities.

115.    As the "boots on the ground" in the Teal office and factory, Matus was supposed to communicate and effectuate the business directives discussed and agreed upon with Hitchcock.  However, in the face of little to no progress on the agreed business directives, Hitchcock was forced to follow up with Matus numerous times.  When confronted, Matus had no excuse for the delays.  Such hinderances slowed the successful completion of important work and continued through the remainder of Matus's employment.

116.    Also around the May 2024 timeframe, Red Cat/Teal were preparing to build, pack, and ship approximately fifty (50) drones as part of their candidacy for SRR Tranche 2.  This

endeavor required as many hands on deck as possible.

117.    Matus understood Red Cat/Teal's continued candidacy for SRR Tranche 2
depended on the successful delivery of these drones.  Despite this, Matus and a few other Red Cat
employees decided to attend a seemingly inconsequential conference in Japan.

118.    While Red Cat/Teal were still able to send out their drones on time, the noticeable
absence of help from Matus and the other Red Cat employees placed significant and unnecessary
work and stress upon other employees.

119.    If the employees who stepped up and shouldered the burden of work caused by
Matus and the other Red Cat employees had not done so, Red Cat/Teal likely would not have been
able to deliver the drones and would have lost SRR Tranche 2.

iii.    *Matus Hinders Red Cat/Teal's Deal With Orqa*

120.    In early 2024, Teal began engaging in discussions with Orqa, a drone company
based out of Croatia.  Orqa specializes in FPV drones containing next-level radio technologies,
including radio detection and anti-jamming capabilities.  As one of the primary providers of
sophisticated FPV drones to the Armed Forces of Ukraine in its ongoing war with the Russian
Federation, Orqa has developed a reputation as one of the leading FPV drone companies outside
of China.

121.    In or around June 2024, Red Cat sent Matus and Red Cat's Director of Special
Programs at the time to Croatia to meet with Orqa on behalf of Red Cat/Teal, learn more about its
capabilities and offerings, assess its potential benefits to Red Cat/Teal, and negotiate a business
relationship.

122.    While in Croatia, Red Cat/Teal realized the significant benefits and competitive
advantages a business relationship with Orqa presented.

123.    The June 2024 trip proved fruitful because, in or around July 2024, Orqa representatives came to Teal's Salt Lake City, Utah facilities to further discuss a joint business venture.

124.    During Orqa's July 2024 trip to Utah, Matus, Hitchcock, and a few other Red Cat/Teal representatives met with Orqa's representatives to discuss forming a contractual business relationship.  By the end of Orqa's trip to Utah, Red Cat/Teal and Orqa entered into a non-binding memorandum of understanding.  Essentially, Red Cat/Teal and Orqa agreed Orqa would send Red Cat/Teal its components to build its drones in the U.S., Red Cat/Teal would assemble the drones, and Red Cat/Teal would then exclusively sell Orqa's FPV drones in the United States under their label as FANG™.

125.    As part of this deal, Red Cat/Teal discussed how they could help Orqa navigate the Blue UAS clearance process based on Red Cat/Teal's experience and familiarity with the process and status as only one of a small number of companies that has successfully obtained Blue UAS clearance.

126.    Blue UAS clearance was particularly difficult for Orqa to obtain as a foreign entity unfamiliar with the process.  However, Blue UAS clearance would open the doors for Orqa to sell its FPV drones to the U.S. military pursuant to multi-million-dollar contracts, which would be exceptionally advantageous to Orqa.  Matus knew this.

127.    Red Cat/Teal saw the unparalleled opportunities a partnership with Orqa presented. Orqa's drone was the only one of its kind.  It featured advanced, highly desirable, and unmatched technology, and was proving particularly effective on the battlefield in the ongoing Ukraine/Russia war - all of which Matus was aware, based on his role in the deal.

128.    As Orqa's exclusive U.S. seller of its cutting-edge FPV drone, Red Cat/Teal would

be able to expeditiously advance in the industry by acquiring substantial market share previously deemed unfathomable.  Red Cat/Teal reasonably believed that FANG™ (made in partnership with Orqa) would become one of the, if not *the*, go-to American-manufactured FPV drone(s).

129.    Orqa was one of the most important potential business relationships Red Cat/Teal had entertained.  Red Cat projects Red Cat/Teal's partnership with Orqa would have been worth well over a million dollars within the first year, and with the military's commitment to drones in general, and specifically lethal FPV drones (*i.e.*, drones with a lethal payload that can target an enemy's military installation), would put Red Cat/Teal in a position to earn tens of millions of dollars in future contracts.

130.    Following Orqa's July 2024 trip, only minor details needed to be hammered out, and Red Cat/Teal and Orqa worked to finalize their agreement.

131.    In his capacity as Red Cat's CTO and Teal's CEO, Matus served as Orqa's principal point of contact on behalf of Red Cat/Teal and the main individual with whom Orqa communicated regarding the partnership.  Matus was protective of this position.  While certain other Red Cat/Teal executives engaged in emails with Orqa, Red Cat/Teal relied on Matus to drive communication with Orqa, communicate with Orqa through all platforms, and to provide Red Cat/Teal with news about finalizing the deal.

132.    In or around August of 2024, Matus began to "slow walk" the deal by not providing updates on progress with the Orqa principals.  Red Cat/Teal grew concerned with the amount of time it was taking to finalize the agreement with Orqa.  Red Cat/Teal continued to ask Matus for updates, in response to which he stated he would message Orqa representatives.  However, Matus would then fail to follow up with Red Cat/Teal with any update.  Growing increasingly frustrated, Red Cat/Teal finally told Matus he needed to call Orqa representatives, rather than message them,

to better communicate and work towards a formal engagement.

133.    At some point thereafter, Matus told Red Cat/Teal that Orqa was no longer interested in a business partnership as negotiated, and the lucrative deal fell flat.  Matus provided no substantive detail or context for Orqa's surprising and sudden change.

134.    As a result of the Orqa deal roadblock, Red Cat/Teal were also forced to pause the development of FANG™.

135.    Red Cat/Teal recently learned, upon information and belief, in the midst of negotiations between Orqa and Red Cat/Teal, Matus, serving in his capacity as Red Cat/Teal's representative, provided Orqa information regarding Blue UAS clearance that rendered Red Cat/Teal's promise to help Orqa obtain Blue UAS clearance - Red Cat/Teal's primary leverage in closing the deal - to be of little to no value.  Matus knew, or should have known, that providing this information to Orqa would severely damage Red Cat/Teal's bargaining position.

136.    Upon information and belief, after Matus resigned from Red Cat/Teal, on behalf of Vector, he pursued Orqa to enter into a business relationship with Vector.

*iv.    Matus's Misconduct During His Final Days at Red Cat/Teal*

137.    In December 2024, Matus's resignation was publicly announced to Red Cat/Teal, and Matus left shortly thereafter to "join" Vector in the same or following month (despite Matus actually having joined and co-founded Vector in the spring of 2024, as based upon information and belief).

138.    Prior to leaving, but after Red Cat/Teal had announced Matus's resignation to join Vector, Matus attended Red Cat/Teal's December 2024 holiday party, bringing one of Vector's other founders, Yakulis, as his guest.  When discussing Vector at the holiday party, including with Hitchcock, both Matus and Yakulis represented Vector offered warfare-as-a-service and was *not*

a drone company.  Matus and Yakulis both stated Vector would source drones from Red Cat/Teal.

139.    In December 2024, following the separation of his employment with Red Cat, Matus returned his Red Cat-owned laptop to Red Cat/Teal.  Matus's Red Cat/Teal laptop was password-protected at all relevant times.  Subsequently, Red Cat/Teal learned Matus completely wiped the laptop, permanently deleting all work product, data, and files saved to Matus's local drive.  Matus's conduct prevented Red Cat/Teal from determining through forensic analysis if Matus transferred any information from his Red Cat/Teal laptop prior to the deletion.

140.    Matus used his Red Cat/Teal work computer to conduct Red Cat/Teal's interstate business and perform his job duties across multiple states.  As Matus led many of Red Cat/Teal's business ventures and was a key executive involved in nearly every part of the company's business operations, Red Cat/Teal understood Matus kept current and potential business partner contact information, research, contract drafts, business assessments, and other business documents, as well as Red Cat's and Red Cat's subsidiaries' patent applications and proposals, on the local drive of his laptop.  By their very nature, many of the documents, data, and files Matus kept on his local drive contained Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, all of which was owned and belonged to Red Cat.  Matus created and/or revised these documents, data, and files in the course of his Red Cat/Teal employment.

141.    Matus's action of wiping his laptop of all work product, data, and files robbed Red Cat/Teal of their benefit.  As a result, Red Cat/Teal have lost the value of the documents, data, and files Matus permanently deleted from his computer, worth in excess of $5,000.

142.    Matus did not seek permission to completely wipe his Red Cat/Teal laptop.  Additionally, no one at Red Cat/Teal asked or approved Matus to wipe his Red Cat/Teal laptop.  Red Cat/Teal have no procedure or policy requesting employees wipe their devices prior to

separating from employment.  There was no business reason for Matus to wipe his Red Cat/Teal laptop.  In any case, Matus knew, pursuant to his Agreement, that all information and property created during his employment belonged to Red Cat/Teal, and he needed to return this information to Red Cat/Teal upon his departure.[20]  Yet, he deliberately violated this condition of his employment.  This is yet further evidence of Matus's plan to sabotage Red Cat/Teal for the benefit of his new company, Vector.

## VIII.   Matus and Vector Solicit Red Cat/Teal Employees

143.    Following Matus's departure from Red Cat/Teal and joining of Vector, Red Cat/Teal learned Matus not only joined Vector as its CTO but also as a co-founder.

144.    As Matus co-founded Vector, Vector has unquestionably been on notice of Matus's obligations pursuant to the Agreement.

145.    Soon after Matus publicly joined Vector, Matus and Vector began to mine Red Cat's employees.

146.    Red Cat's employee pool is relatively small, with approximately eighty-nine (89) employees serving in roles across Red Cat, including those benefitting Red Cat and its subsidiaries, as of June 30, 2024 (the last date on which Red Cat's official employee head count was taken).

147.    Three (3) Red Cat employees left Red Cat/Teal during each respective month of March, April, May, and July 2025.  Nine (9) of the twelve (12) employees eventually represented they were joining Vector either through their respective LinkedIn accounts or verbal confirmation to Red Cat/Teal personnel.

148.    Most of the twelve (12) employees who left Red Cat were subject to employment agreements featuring non-competition provisions.

---

[20] (*Id.*, ¶¶ 12(c)-(d)).

149.    The majority of these employees were Red Cat/Teal drone engineers.

150.    In July 2025, another employee provided notice of his resignation of employment and intention to join Vector.  However, Red Cat/Teal were able to convince the employee to remain there.

151.    Many of the employees solicited by Matus and Vector are legally bound by employment agreements with Red Cat providing them valuable consideration in exchange for their agreement not to compete against Red Cat/Teal for a reasonable amount of time.  Matus, as Red Cat's CTO and Teal's CEO, was aware of these employment agreements and the employees' obligations thereunder.  Matus was also aware of the terms and conditions of these employees' Red Cat employments, including salary and benefits information.

152.    Matus and Vector's solicitation of Red Cat's employees caused Red Cat/Teal irreparable harm.  Red Cat/Teal's time, finances, and efforts had to be redirected towards recruiting.

153.    Upon information and belief, Matus and Vector used Matus's knowledge of Red Cat's employees' terms and conditions of employment with Red Cat to make superior offers of employment and induce these employees to leave Red Cat and join Vector.

154.    While Red Cat has not replaced all of the employees Matus and Vector solicited away, it has been able to hire individuals to fill certain positions.  Still, these new hires are not capable of hitting the ground running on their first day.  They do not hold the same historic Red Cat/Teal knowledge, know-how, and understanding as the employees whom Matus and Vector solicited.

155.    Red Cat/Teal have been required to divert energy and efforts that would otherwise be used elsewhere to train and bring these new hires up to speed.

156.    Competition for highly-skilled and experienced technical personnel, particularly engineers, in the drone market is intense given the small pool of qualified and seasoned drone engineers in the market.

## IX.    Vector's Competitive Business

157.    Relying on Matus's representations, contractual obligations, and their trust in him, Red Cat/Teal initially believed the departing employees were leaving to work with Matus at a non-competitive company.  However, in or around early July 2025, Red Cat/Teal began to suspect Vector was positioning itself to compete directly with Red Cat/Teal based on Vector and Matus reigniting their solicitation efforts after pausing for a month.

158.    As a result, on July 2, 2025, Red Cat/Teal sent Matus a letter reminding him of his post-employment obligations he owed to Red Cat/Teal (the "Letter").  The Letter demanded Matus cease all activities in violation of his post-employment obligations and requested Matus provide certain information and assurances regarding his conduct.  Red Cat/Teal forwarded a copy of this letter to Vector.

159.    Despite Red Cat/Teal requesting Matus respond to their letter on or before July 11, 2025, counsel for Vector, on behalf of Vector and Matus, did not respond until July 18, 2025 (the "Response Letter").

160.    Shockingly, the Response Letter claimed Red Cat/Teal and Vector are not competitors.    It explained Vector "provides modern-war[]-fare-as-a-service" delivering "integrated technology capabilities, and then trains warfighters on how to tactically employ those capabilities on the modern battlefield, mainly under government service contracts."

161.    The Response Letter further asserted Vector "recently" decided to "develop UASs as a component of its service contract offerings."  It described Vector's drones as being entirely

different from Red Cat/Teal's drones because they are FPV UASs "designed for single use, explosive operations." The representations in the Response Letter from Vector's counsel are demonstratively false, as they completely ignore Red Cat/Teal's development of their own FPV drone, FANG™ - with which Matus, as Red Cat's former CTO and Teal's former CEO, was intimately familiar. The Response Letter also failed to provide any of the assurances or information requested to assuage Plaintiffs' concerns.

162. On July 10, 2025, U.S. Defense Secretary Pete Hegseth announced the U.S.'s initiative to ramp up drone production and procurement to maintain battlefield superiority.[21] Secretary Hegseth further represented the U.S. was removing restrictive policies hindering the production of drones, and the U.S. military planned to approve hundreds of American drones for purchase by the military from private entities.[22]

163. The war in Ukraine has highlighted the importance of sophisticated, specialized drones for the modern warfighter. The DoD and U.S. allies require drones that meet stringent requirements. In the coming years, competition for military drone contracts is expected to become even more aggressive.

164. On July 11, 2025, during an appearance on Fox News Channel, Vector publicly announced its drone offering, "Hammer," for the first time.[23]

165. Although this sudden revelation shocked Red Cat/Teal provided the short amount of time since Matus's departure and Matus's previous reassurances that Vector was *only* a warfare-

---

[21] *See* Memorandum For Senior Pentagon Leadership commanders of the Combatant Commands Directors of Defense Agencies from the U.S. Secretary of defense, Subject: *Unleashing U.S. Military Drone Dominance* (July 10, 2025), https://media.defense.gov/2025/Jul/10/2003752117/-1/-1/1/UNLEASHING-U.S.-MILITARY-DRONE-DOMINAN CE.PDF).

[22] (*See id.*).

[23] (*See Drone expert praises Sec. Hegseth's move to boost U.S. military: 'Finally,'* FOX NEWS (July 11, 2025), https://www.foxnews.com/video/6375545041112).

as-a-service provider, it confirmed Red Cat/Teal's suspicions and led to Red Cat/Teal engaging additional resources to conduct an investigation into Matus's actions pre- and post- his Red Cat/Teal departure.

166.    On July 28, 2025, Matus posted on his LinkedIn page a video with accompanying text describing Hammer as "an American made, attritable FPV that's purpose built for the warfighter."[24] Matus further explained Hammer is "a small but significant step forward in Vector's master plan" and is "scalable" and "low cost."[25]

167.    For over a year, Matus and Vector carried on a ruse to Red Cat/Teal that Vector's business did not design, develop, nor manufacture drones (nor plan to do so). Instead, Matus and Vector conveyed Vector would rely on Red Cat/Teal as a vendor of drones. This was a lie.

168.    Upon publicly announcing its entrance into the military drone marketplace, Vector joined the small Utah military drone arena featuring only two other military drone producers: Fortem Technologies and Red Cat/Teal.

169.    The military drone marketplace is a highly specialized and fiercely competitive industry. Military and government contracts are limited, requirements are stringent, and research and development to design and manufacture competitive drones is expensive and time consuming.

170.    Indeed, only nineteen (19) companies hold drones on the Blue UAS Cleared List, meaning only nineteen (19) companies can sell to the DoD.[26]

171.    Even outside of the DoD UAS contract space, Red Cat/Teal actively compete on a global scale with a relatively small number of global drone companies (particularly those

---

[24] (George Matus, LinkedIn, (July 28, 2025), https://www.linkedin.com/feed/update/urn:li:activity:7355643078398930945/).

[25] (*Id.*).

[26] (*See* Defense Innovation Unit, *Blue UAS Cleared List*, https://www.diu.mil/blue-uas-cleared-list (last visited August 4, 2025)).

companies, like Red Cat/Teal, that are not reliant on Chinese-covered telecommunications technology). Globally, over the past year, Red Cat/Teal's main competitors are the Chinese-based company DJI (which given their country of origin the DoD will not contract with) and California-based company Skydio, Inc. These entities are developing innovative technology and drones and securing their foothold in the drone marketplace at an aggressive pace.

172.    As part of their competitive advantage, Red Cat/Teal tout their unique product value propositions and features (*e.g.*, nighttime capability, modular platform), and scalable, low-cost, domestic manufacturing.

173.    In a July 29, 2025 press release, Vector represented it produces (or plans to produce) drones in the U.S. intended for military deployment at a low cost, just like Red Cat/Teal.[27] In particular, the press release discussed Hammer, describing it as a military drone that is "purpose-built for the warfighter and manufactured to strict quality and reliability standards" that was, "[e]ngineered and manufactured by Vector's world-class team, [and] will be produced at the company's cutting-edge manufacturing facility in Utah."[28] The press release goes on to state that, "Hammer is designed for large-scale manufacturing and Vector is set to build tens of thousands to meet the demands of modern warfare."[29]

174.    Vector's potential and actual customers are located across the U.S. and around the world.

175.    Matus serves as Vector's CTO and co-founder.

---

[27] (*See Vector Launches The Hammer FPV – The First-To-Market FPV With Fiber Optic Integration*, BARCHART (July 29, 2025), https://www.barchart.com/story/news/33722910 /vector-launches-the-hammer-fpv-the-first-to-market-fpv-with-fiber-optic-integration).

[28] (*Id.*).

[29] (*Id.*).

176.    Matus and Vector recruited and hired Red Cat/Teal's dedicated drone engineers and then produced their first drone offering, Hammer, in an implausibly short amount of time for a new company that (according to their attorney) just "recently" decided to develop UASs.

177.    Vector advertises itself to potential candidates as approaching its "hyper-growth stage" and claims to already be "on contract with government agencies, moving faster than legacy primes and making waves in programs traditionally locked to billion-dollar incumbents."[30]

178.    To design, develop, and manufacture Hammer at record speed and enter a "hyper-growth stage," Vector likely has relied, and will continue to rely, on Matus's knowledge of Red Cat/Teal's trade secret and confidential information.

179.    Matus and Vector have undoubtedly used Matus's intimate understanding of Red Cat/Teal's business information and plans, strategic initiatives, business opportunities, and partners, and drone design and development to develop Hammer and help Vector obtain a foothold in the drone marketplace.

180.    Through Matus's knowledge, Vector will not have to endure the same trial and error as Red Cat/Teal to build its drones.  Instead, Vector leapfrogged the investment of capital and man-hours, and now, through Matus, holds a built-in blueprint on ideal drone composition ready to adapt to new and different features.

181.    Vector and Red Cat/Teal will inevitably compete for the same U.S., private, and ally contracts and programs (to the extent they have not already).  For example, both companies will likely compete for Next Generation SRR.

182.    It will be impossible for Matus to perform his role at Vector without utilizing the trade secret, proprietary, and confidential information relating to Red Cat's and Red Cat's

---

[30] (**Ex. B**, Vector Recruiting Message).

subsidiaries' business information and plans, strategic initiatives, business opportunities, and partners, and drone design and development.  As Vector's co-founder and CTO, Matus has likely relied, and will continue to necessarily rely, upon his extensive knowledge of Red Cat/Teal's trade secret, proprietary, and confidential information.

183.    Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information are at risk of disclosure because, upon information and belief, Matus and Vector have used, and will continue to use, this information to create and promote competitive products and solutions.

184.    Matus's and Vector's actions have damaged and will continue to damage Red Cat/Teal, and they must be enjoined.

185.    Matus's and Vector's actions have diminished the value of Red Cat's, Teal's, and Red Cat's other subsidiaries' trade secret, proprietary, and confidential information.  This unfair competition has and will continue to damage Red Cat's and Red Cat's subsidiaries' goodwill, reputation, and competitive advantage.

## COUNT I
### Trade Secret Misappropriation Under the Defend Trade Secrets Act
### (Damages and Injunctive Relief)
### Against Matus and Vector

186.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 185 as though fully set forth herein.

187.    The Defend Trade Secrets Act ("DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1).

188.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if (A) the owner thereof has taken reasonable measures to keep such information secret; and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3).

189.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5).

190.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage

through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6).

191.    Red Cat dedicated substantial time and resources toward developing its and its subsidiaries' business information and plans.  Matus used Red Cat's and Red Cat's subsidiaries' business information and plans to perform his job duties as Red Cat's CTO and Teal's CEO.  He relied on and used Red Cat's and Red Cat's subsidiaries' sensitive information covering budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans to promote Red Cat and its subsidiaries in the industry and locate and source advantageous business opportunities and partnerships on behalf of Red Cat/Teal.  Only Red Cat's and Red Cat's subsidiaries' key representatives, namely C-suite employees and those necessary to execute Red Cat's and Red Cat's subsidiaries' plans, have insight or exposure to their business information and plans.  No individual outside of Red Cat or its subsidiaries could easily acquire or duplicate their business information and plans.

192.    Due to the nature of his positions with Red Cat/Teal, Matus is also intimately familiar with Red Cat's and Red Cat's subsidiaries' actual and contemplated strategic initiatives, business opportunities, and partners.  Matus engaged in identifying, researching into, and assessing potential business opportunities, acquisitions, and partnerships.  Matus was front and center in performing due diligence into an entity, meeting and engaging with the entity to learn its needs, pain points, weaknesses, strengths, and capabilities while at the same time assessing the benefits and drawbacks to Red Cat/Teal, and ultimately, as applicable, negotiating a business contract with the entity.  Red Cat's and Red Cat's subsidiaries' assessments and the information developed and acquired throughout the course of them identifying and evaluating strategic initiatives, business

opportunities, and partners are kept secret. Only Red Cat's and Red Cat's subsidiaries' high-level executives and representatives have insight or exposure into this information. It is practically impossible for any individual outside of Red Cat or its subsidiaries to obtain or duplicate Red Cat's and Red Cat's subsidiaries' assessments and the information they developed and acquired while locating and evaluating potential strategic initiatives, business opportunities, and partners.

193.    Matus also has a deep understanding of Red Cat's and Red Cat's subsidiaries' drone design and development. Matus knows the ideal designs, partnerships, product and component sourcing, manufacture, enhancements, and component combination to increase the competitive value of Red Cat's and Red Cat's subsidiaries' drones. This information required substantial resources and time to develop, and it is not publicly known.

194.    Red Cat's and Red Cat's subsidiaries' business information and plans; strategic initiatives, business opportunities, and partners; and drone design and development maintain their economic value due to this information being kept secret and not being readily ascertainable. If a competitor obtained this information, it could, *inter alia*, avoid investing countless hours and millions of dollars into research and development and, instead, devote resources to unexplored efforts, target Red Cat's and Red Cat's subsidiaries' business initiatives, and undercut Red Cat and its subsidiaries in the market.

195.    At all relevant times, Red Cat has made reasonable efforts to ensure that its and its subsidiaries' trade secret, proprietary, and confidential information remain confidential, proprietary, secret, and available for Red Cat's and Red Cat's subsidiaries' use only, unless otherwise necessary. Red Cat requires employees who work for Red Cat directly or through one of its subsidiaries and who have access to its and/or its subsidiaries' confidential and trade secret information to execute employment agreements containing confidentiality provisions, requires its

and its subsidiaries' contractors, consultants, financial advisors, suppliers, and strategic partners
to enter into confidentiality agreements (as appropriate), password-protects its and its subsidiaries'
devices, systems, and software, follows government-mandated secrecy and security protocols, and
only shares sensitive information on a need-to-know basis.

196.    Matus knew he had a duty to maintain Red Cat's and Red Cat's subsidiaries' trade
secret, proprietary, and confidential information due to his acknowledgement of such under the
Agreement, as well as under his September 1, 2021 employment agreement.  As Matus is co-
founder of Vector, Vector has been on notice of Matus's obligations pursuant to the Agreement.

197.    Prior to his departure from Red Cat/Teal and without permission, Matus wiped his
Red Cat/Teal laptop, permanently deleting all information, data, and files stored locally on the
device.  Matus's deliberate act of wiping his Red Cat/Teal laptop has permanently deprived Red
Cat/Teal of the work product stored on the laptop, including Red Cat's and Red Cat's subsidiaries'
trade secret, proprietary, and confidential information, which belonged to Red Cat and for which
Red Cat invested in developing and acquiring.  Matus also erased any trail of him taking Red Cat's
and Red Cat's subsidiaries' trade secret, proprietary, and confidential information.

198.    Upon information and belief, neither Matus nor Vector have taken actions to
prevent Matus from using or disclosing Red Cat's and Red Cat's subsidiaries' trade secret,
proprietary, and confidential information, and any such actions would be ineffectual.

199.    Matus has no doubt helped Vector skip the proverbial line at the expense of Red
Cat/Teal, design, develop, and create competitive drone products, and pursue advantageous
business initiatives and partnerships by leveraging his knowledge of Red Cat's and Red Cat's
subsidiaries' trade secret, proprietary, and confidential information.

200.     By virtue of the similarities between Matus's former Red Cat/Teal roles and his co-founder and CTO roles at Vector, which are near carbon copies, and Vector's competitive drone business, Matus and Vector threaten to misappropriate Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information to unfairly compete against Red Cat/Teal.

201.     Furthermore, in light of the similarities between Matus's Red Cat/Teal roles and his Vector roles and the fact Red Cat/Teal and Vector are competitors in a highly specialized and niche industry, Matus and Vector will continue to use Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information to their benefit.

202.     Red Cat/Teal have no adequate remedy at law for such present and future harm, and therefore, they are entitled to equitable relief in addition to compensatory relief.

203.     Red Cat/Teal have suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, threatened misappropriation, and inevitable misappropriation, including diminution of their trade secret, proprietary, and confidential information, harm to their reputation, goodwill, customer relationships, and their competitive advantage.

204.     Defendants' actions constitute willful and malicious violations of the DTSA.

205.     Because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Red Cat/Teal's rights, Red Cat/Teal are entitled to recover punitive damages from Defendants in an amount according to proof at trial.

### COUNT II
**Trade Secret Misappropriation Under the Utah Trade Secrets Act**
**(Damages and Injunctive Relief)**
**Against Matus and Vector**

206.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 205 as though fully set forth herein.

207.    The Utah Trade Secrets Act (the "UTSA"), Utah Code § 13-24-1, *et seq.*, prohibits the misappropriation and threatened misappropriation of trade secrets.  Under the Act, a trade secret means "information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."  Utah Code § 13-24-2(4).

208.    Under the UTSA, misappropriation means "(a) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (b) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was: (A) derived from or through a person who had utilized improper means to acquire it; (B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or (C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake." Utah Code § 13-24-2(2).

209.    Under the UTSA, "improper means" includes "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means."  Utah Code § 13-24-2(1).

210.    Red Cat dedicated substantial time and resources toward developing its and its subsidiaries' business information and plans.  Matus used Red Cat's and Red Cat's subsidiaries' business information and plans to perform his job duties as Red Cat's CTO and Teal's CEO.  He relied on and used Red Cat's and Red Cat's subsidiaries' sensitive information covering budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans to promote Red Cat and its subsidiaries in the industry and locate and source advantageous business opportunities and partnerships on behalf of Red Cat/Teal.  Only Red Cat's and Red Cat's subsidiaries' key representatives, namely C-suite employees and those necessary to execute Red Cat's and Red Cat's subsidiaries' plans, have insight or exposure to their business information and plans.  No individual outside of Red Cat or its subsidiaries could easily acquire or duplicate their business information and plans.

211.    Due to the nature of his positions with Red Cat/Teal, Matus is also intimately familiar with Red Cat's and Red Cat's subsidiaries' actual and contemplated strategic initiatives, business opportunities, and partners.  Matus engaged in identifying, researching into, and assessing potential business opportunities, acquisitions, and partnerships.  Matus was front and center in performing due diligence into an entity, meeting and engaging with the entity to learn its needs, pain points, weaknesses, strengths, and capabilities while at the same time assessing the benefits and drawbacks to Red Cat/Teal, and ultimately, as applicable, negotiating a business contract with the entity.  Red Cat's and Red Cat's subsidiaries' assessments and the information developed and acquired throughout the course of them identifying and evaluating strategic initiatives, business opportunities, and partners are kept secret.  Only Red Cat's and Red Cat's subsidiaries' high-level executives and representatives have insight or exposure into this information.  It is practically

impossible for any individual outside of Red Cat or its subsidiaries to obtain or duplicate Red Cat's and Red Cat's subsidiaries' assessments and the information they developed and acquired while locating and evaluating potential strategic initiatives, business opportunities, and partners.

212.    Matus also has a deep understanding of Red Cat's and Red Cat's subsidiaries' drone design and development.  Matus knows the ideal designs, partnerships, product and component sourcing, manufacture, enhancements, and component combination to increase the competitive value of Red Cat's and Red Cat's subsidiaries' drones.  This information required substantial resources and time to develop, and it is not publicly known.

213.    Red Cat's and Red Cat's subsidiaries' business information and plans; strategic initiatives, business opportunities, and partners; and drone design and development maintain their economic value due to this information being kept secret and not being readily ascertainable.  If a competitor obtained this information, it could, *inter alia*, avoid investing countless hours and millions of dollars into research and development and, instead, devote resources to unexplored efforts, target Red Cat's and Red Cat's subsidiaries' business initiatives, and undercut Red Cat and its subsidiaries in the market.

214.    At all relevant times, Red Cat has made reasonable efforts to ensure that its and its subsidiaries' trade secret, proprietary, and confidential information remain confidential, proprietary, secret, and available for Red Cat's and Red Cat's subsidiaries' use only, unless otherwise necessary.  Red Cat requires employees who work for Red Cat directly or through one of its subsidiaries and who have access to its and/or its subsidiaries' confidential and trade secret information to execute employment agreements containing confidentiality provisions, requires its and its subsidiaries' contractors, consultants, financial advisors, suppliers, and strategic partners to enter into confidentiality agreements (as appropriate), password-protects its and its subsidiaries'

devices, systems, and software, follows government-mandated secrecy and security protocols, and only shares sensitive information on a need-to-know basis.

215.    Matus knew he had a duty to maintain Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information due to his acknowledgement of such under the Agreement, as well as under his September 1, 2021 employment agreement.  As Matus is co-founder of Vector, Vector has been on notice of Matus's obligations pursuant to the Agreement.

216.    Prior to his departure from Red Cat/Teal and without permission, Matus wiped his Red Cat/Teal laptop, permanently deleting all information, data, and files stored locally on the device.  Matus's deliberate act of wiping his Red Cat/Teal laptop has permanently deprived Red Cat/Teal of the work product stored on the laptop, including Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, which belonged to Red Cat and for which Red Cat invested in developing and acquiring.  Matus also erased any trail of him taking Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information.

217.    Upon information and belief, neither Matus nor Vector have taken actions to prevent Matus from using or disclosing Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, and any such actions would be ineffectual.

218.    Matus has no doubt helped Vector skip the proverbial line at the expense of Red Cat/Teal, design, develop, and create competitive drone products, and pursue advantageous business initiatives and partnerships by leveraging his knowledge of Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information.

219.    By virtue of the similarities between Matus's former Red Cat/Teal roles and his co-founder and CTO roles at Vector, which are near carbon copies, and Vector's competitive drone

business, Matus and Vector threaten to misappropriate Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information to unfairly compete against Red Cat/Teal.

220.    Furthermore, in light of the similarities between Matus's Red Cat/Teal roles and his Vector roles and the fact Red Cat/Teal and Vector are competitors in a highly specialized and niche industry, Matus and Vector will continue to use Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information to their benefit.

221.    Red Cat/Teal have no adequate remedy at law for such present and future harm, and therefore, they are entitled to equitable relief in addition to compensatory relief.

222.    Red Cat/Teal have suffered and will continue to suffer damages and irreparable harm as a result of this misappropriation, threatened misappropriation, and inevitable misappropriation, including diminution of their trade secret, proprietary, and confidential information, harm to their reputation, goodwill, customer relationships, and their competitive advantage.

223.    Defendants' actions constitute willful and malicious violations of the UTSA.

224.    Because Defendants have committed the acts alleged herein willfully, in bad faith, from an improper motive amounting to malice, and in conscious disregard of Red Cat/Teal's rights, Red Cat/Teal are entitled to recover punitive damages from Defendants in an amount according to proof at trial.

## COUNT III
### Breach of Contract – Non-Competition
### (Damages and Injunctive Relief)
### Against Matus

225.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 224 as though fully set forth herein.

226.    The Agreement is a valid and enforceable contract.

227.    Red Cat and Matus did not engage in bad faith during negotiations regarding the terms of the Agreement.

228.    In consideration for entering into the Agreement, Red Cat provided Matus continued employment and at least two (2) years of guaranteed employment, a nearly $50,000 salary raise, annual bonus eligibility, an award of 600,000 time-based Red Cat stock units, and access to Red Cat/Teal's trade secret, proprietary, and confidential information.

229.    Among other obligations under the Agreement, Matus agreed and was obligated during his employment and for a period of twelve (12) months following the separation of his employment, not to directly or indirectly engage in business activity that is similar to Red Cat's business.

230.    The activity restriction and geographical area are narrowly tailored and only apply to business activity similar to Red Cat's business within the same city, county, state, or other defined geographical area in which Matus provided services for Red Cat and only so long as Red Cat continues to carry on business in such locations.

231.    The temporal scope of during his employment and for twelve (12) months following Matus's separation of employment is reasonable and limited to the extent necessary to protect Red Cat.

232.    The terms of the Agreement are not greater than required for the protection of Red Cat's legitimate business interests, including Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, business relationships, employee relationships, goodwill, innovation, and investments.

233.    Matus breached the Agreement by secretly co-founding and/or joining Vector during his Red Cat employment and then publicly co-founding and joining Vector immediately

following his separation from Red Cat/Teal.

234.    Vector is positioned to directly compete with Red Cat/Teal (if it has not already) by offering drone solutions for the same partnerships, contracts, and programs and designing, developing, and manufacturing competitive drones.

235.    Matus performed his Red Cat/Teal work in Utah, the same state in which Vector operates.  Red Cat continues to carry out its and its subsidiaries' business in Utah.

236.    Red Cat carries out its and its subsidiaries' business nationwide, and its customers are located across the globe.  Similarly, Vector's potential and actual customers are located across the U.S. and around the world.

237.    Matus's positions at Vector mirror his roles at Red Cat/Teal.  Matus's roles as Vector's co-founder and CTO involve the use or disclosure, or the likelihood of the use or disclosure, of Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information and serve to erode Red Cat's goodwill, innovation, and investments.

238.    Matus knew he had a duty not to compete against Red Cat, and Red Cat reminded Matus of his post-employment obligations following his separation.

239.    Matus's promise not to compete against Red Cat is and was necessary to protect Red Cat from harm, including harm to Red Cat's and Red Cat's subsidiaries' customer, client, business, and employee relationships, goodwill and investments, and competitive edge in the specialized military drone space.

240.    Red Cat has fully performed its contractual obligations owed to Matus under the Agreement.

241.    Red Cat has suffered and will continue to suffer damages as a result of Matus's breach of contract, including without limitation, diminishing the value of Red Cat's and Red Cat's

subsidiaries' trade secret, proprietary, and confidential information, harming Red Cat's and Red Cat's subsidiaries' business relationships, eroding Red Cat's and Red Cat's subsidiaries' goodwill, innovation, and investments, and undermining Red Cat's and Red Cat's subsidiaries' competitive edge in the specialized military drone space.

242.    Red Cat's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

243.    Matus's actions will continue to cause harm to Red Cat if not restrained.

244.    Red Cat has demonstrated that Matus, unless restrained, has already and will continue to engage in conduct that breaches the Agreement.

245.    The terms of the Agreement do not pose an undue hardship on Matus.

246.    The Agreement is not injurious to the public.

247.    Should this Court grant injunctive relief to Red Cat, the burden on Matus would be slight compared to the injury to Red Cat if it is not granted.  No injury to Matus would result from an order requiring him to comport his actions under the Agreement.

248.    The grant of an injunction will not disserve the public interest.

**COUNT IV**
**Breach of Contract – Non-Solicitation**
**(Damages and Injunctive Relief)**
**Against Matus**

249.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 248 as though fully set forth herein.

250.    The Agreement is a valid and enforceable contract.

251.    Red Cat and Matus did not engage in bad faith during negotiations regarding the terms of the Agreement.

252.    In consideration for entering into the Agreement, Red Cat provided Matus

continued employment and at least two (2) years of guaranteed employment, a nearly $50,000 salary raise, annual bonus eligibility, an award of 600,000 time-based Red Cat stock units, and access to Red Cat/Teal's trade secret, proprietary, and confidential information.

253.    Among other obligations under the Agreement, Matus agreed and was obligated for a period of twelve (12) months following the separation of his Red Cat employment, not to directly or indirectly solicit business from or attempt to provide the same or similar products or services to any of Red Cat's customers or clients.

254.    This restriction is narrowly tailored to Red Cat customers and clients who were Red Cat's customers or clients at any time during Matus's Red Cat employment.  Red Cat's customers are located globally.

255.    For the same twelve (12) month post-employment period, Matus also promised not to solicit, entice, or induce any Red Cat employee to leave his or her employment.

256.    This restriction is reasonably limited to Red Cat's small employee pool.

257.    The temporal scope of twelve (12) months following Matus's separation of employment is reasonable and limited to the extent necessary to protect Red Cat.

258.    The terms of the Agreement are not greater than required for the protection of Red Cat's legitimate business interests, including Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, business relationships, employee relationships, goodwill, innovation, and investments.

259.    Matus, as Vector's co-founder and CTO, breached the Agreement by, upon information and belief,  Vector entering into government contracts focused on Vector's warfighter-centered offerings.  Numerous U.S. government agencies as well as the DoD are Red Cat's customers.

260.    Matus also breached the Agreement by soliciting and causing approximately nine (9), and potentially up to twelve (12), employees to leave their employ with Red Cat to join Vector.

261.    Matus knew he had a duty not to solicit Red Cat's customers, clients, and/or employees, and Red Cat reminded Matus of his post-employment obligations following his separation.

262.    Matus's promise not to solicit Red Cat's customers, clients, and/or employees is and was necessary to protect Red Cat from harm, including harm to Red Cat's and Red Cat's subsidiaries' customer, client, business, and employee relationships, goodwill and investments, and competitive edge in the specialized military drone space.

263.    Red Cat has fully performed its contractual obligations owed to Matus under the Agreement.

264.    Red Cat has suffered and will continue to suffer damages as a result of Matus's breach of contract, including without limitation, diminishing the value of Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, harming Red Cat's and Red Cat's subsidiaries' business relationships, eroding Red Cat's and Red Cat's subsidiaries' goodwill, innovation, and investments, and undermining Red Cat's and Red Cat's subsidiaries' competitive edge in the specialized military drone space.

265.    Red Cat's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

266.    Matus's actions will continue to cause harm to Red Cat if not restrained.

267.    Red Cat has demonstrated that Matus, unless restrained, has already and will continue to engage in conduct that breaches the Agreement.

268.    The terms of the Agreement do not pose an undue hardship on Matus.

269.     The Agreement is not injurious to the public.

270.     Should this Court grant injunctive relief to Red Cat, the burden on Matus would be slight compared to the injury to Red Cat if it is not granted.  No injury to Matus would result from an order requiring him to comport his actions under the Agreement.

271.     The grant of an injunction will not disserve the public interest.

**COUNT V**
**Breach of Fiduciary Duty**
**(Damages)**
**Against Matus**

272.     Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 271 as though fully set forth herein.

273.     Matus served in positions of authority at Red Cat/Teal as Red Cat's CTO and Teal's CEO.  Red Cat/Teal granted Matus access to their trade secret, proprietary, and confidential information.  Red Cat/Teal also entrusted Matus to act primarily for their benefit to grow, develop, and build the businesses.

274.     At all relevant times, Matus was a fiduciary of Red Cat/Teal.

275.     Matus owed Red Cat/Teal a fiduciary duty of loyalty.

276.     In breach of his fiduciary duty of loyalty, while employed by Red Cat/Teal, Matus co-founded, joined, and grew a competing business, Vector.

277.     Matus additionally breached his fiduciary duty of loyalty by failing to implement agreed-upon business initiatives at Teal and delaying Teal's progress while serving as Red Cat's CTO and Teal's CEO.

278.     Also in breach of his fiduciary duty of loyalty, during his Red Cat/Teal employment and in the midst of deal negotiations with Orqa, a potential business partner of Red Cat/Teal, upon

information and belief, Matus shared information with Orqa that vitiated Red Cat/Teal's bargaining position and caused Orqa to walk away from the deal as negotiated.

279.    Prior to his separation of employment from Red Cat, Matus wiped his Red Cat/Teal laptop without permission, permanently deleting and depriving Red Cat/Teal of all of the data, documents, folders, settings, work product, and applications stored on the device.  This also was in breach of his fiduciary duty of loyalty and violated his obligations pursuant to the Agreement.

280.    Matus's breaches of his fiduciary duty of loyalty harmed Red Cat/Teal.  However, Matus and/or his new company and employer, Vector, benefitted from these actions.

281.    As a direct and proximate result of Matus's numerous breaches of his fiduciary duty of loyalty, Red Cat/Teal have been damaged in an amount to be determined at trial.

### COUNT VI
### Violation of the Computer Fraud and Abuse Act
### (Damages)
### Against Matus

282.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 281 as though fully set forth herein.

283.    The Computer Fraud and Abuse Act of 1986 ("CFAA") prohibits the knowing "transmission of a program, information, code, or command," that "as a result of such conduct, intentionally causes damage without authorization, to a protected computer."  18 U.S.C. § 1030(a)(5)(A).

284.    Under the CFAA, "damage" means "any impairment to the integrity or availability of data, a program, a system, or information."  18 U.S.C. § 1030(e)(8).

285.    Under the CFAA, a "protected computer" includes a computer "which is used in or affecting interstate or foreign commerce or communication."  18 U.S.C. § 1030(e)(2)(B).

286.    Red Cat issued Matus a work computer for his Red Cat/Teal work.  Matus used his Red Cat/Teal work computer to conduct Red Cat/Teal's interstate business and perform his job duties across multiple states.

287.    At all relevant times, Matus's Red Cat/Teal work computer was password-protected.

288.    After his separation of employment from Red Cat, Matus returned his Red Cat/Teal work computer to Red Cat after he knowingly and intentionally caused a transmission of a program, information, code, or command upon the device by executing a wipe of his Red Cat/Teal work computer, which erased all of the data, documents, folders, settings, and applications that were previously stored on the device.

289.    Matus's conduct caused the impairment of the integrity of the data, programming, and information stored on his Red Cat/Teal work computer.  Matus's work computer housed confidential and trade secret information, including current and potential business partner contact information, research, contract drafts, business assessments, patent applications, and other business documents.  Matus caused the permanent deletion of this information, data, and files kept on his work computer's local drive.

290.    Matus's conduct was unauthorized and in direct violation of Matus's obligation pursuant to the Agreement.

291.    Matus did not seek permission to execute a wipe of his Red Cat/Teal work computer.  And, Red Cat/Teal did not authorize, permit, nor allow Matus to execute a wipe of his Red Cat/Teal work computer.  There was no legitimate business purpose for Matus's conduct, and it interfered with Red Cat/Teal's use of their systems.

292.    Through his deliberate acts of wiping his Red Cat/Teal work computer, Matus intended to cause damage to his Red Cat/Teal work computer and the data and information housed therein.  And, Matus did cause damage to his Red Cat/Teal work computer and the data and information housed therein.

293.    Matus's actions have permanently deprived Red Cat/Teal of a majority of the work product stored on Matus's Red Cat/Teal work computer.  Red Cat/Teal invested resources to develop and/or acquire the work product Matus destroyed, and such work product belonged to Red Cat/Teal.

294.    As a direct and proximate result of Matus's conduct, Red Cat/Teal have incurred loss in value of and harm and damages to the data and information Matus destroyed in excess of $5,000.

**COUNT VII**
**Violation of the Utah Computer Abuse and Data Recovery Act**
**(Damages)**
**Against Matus**

295.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 294 as though fully set forth herein.

296.    The Utah Computer Abuse and Data Recovery Act ("UCADRA") prohibits an "[u]nauthorized user" from knowingly, with the intent to cause harm or damage, causing "the transmission of a program, code, or command to the protected computer" that causes "harm or loss."  Utah Code § 63D-3-104(1)(b).

297.    Under the UCADRA, an "unauthorized user" includes an individual who "is not an authorized user of the protected computer" and who accesses the protected computer by "obtaining, without an authorized user's permission, the authorized user's technological access barrier."  Utah Code § 63D-3-102(9).

298.    Under the UCADRA, an "authorized user" includes an individual who "has permission to access the protected computer," but the permission is valid "only to the extent or for the specific purpose the protected computer's owner authorizes," and an "authorized user" does not include an individual who "ceases to be a director, officer, employee, agent, or contractor of the protected computer's owner."  Utah Code §§ 63D-3-102(1), 63D-3-103(2)-(3).

299.    Under the UCADRA, "damage" includes "(i) the cost of repairing or restoring a protected computer; (ii) economic damages; (iii) consequential damages, including interruption of service; and (iv) profit by the individual from the unauthorized access to the protected computer."  Utah Code § 63D-3-102(3)(b).

300.    Under the UCADRA, "harm" means "any impairment to the integrity, access, or availability of: (a) data; (b) a program; (c) a system; or (d) information."  Utah Code § 63D-3-102(4).

301.    Under the UCADRA, a "protected computer" includes a computer "used in connection with the operation of a business" that requires a digital security measure to access it (*i.e.*, a "technological access barrier"), such as a password.  Utah Code § 63D-3-102(6)-(7).

302.    Red Cat/Teal issued Matus a work computer, owned by Red Cat.  Matus used his Red Cat/Teal work computer to conduct Red Cat/Teal's interstate business and perform his job duties across multiple states.

303.    At all relevant times, Matus's Red Cat/Teal work computer was password-protected.

304.    After his separation of employment from Red Cat, Matus returned his Red Cat/Teal work computer after he knowingly and intentionally caused a transmission of a program, information, code, or command upon the device by executing a wipe of his Red Cat/Teal work

computer, which erased all of the data, documents, folders, settings, and applications that were previously stored on the device.

305.   Matus's conduct caused the impairment of the integrity of the data, programming, and information stored on his Red Cat/Teal work computer.  Matus's work computer housed confidential and trade secret information, including current and potential business partner contact information, research, contract drafts, business assessments, patent applications, and other business documents.  Matus caused the permanent deletion of this information, data, and files kept on his work computer's local drive.

306.   Matus was not an "authorized user," and his conduct was in direct violation of his obligation pursuant to the Agreement.

307.   Matus did not seek permission to execute a wipe of his Red Cat/Teal work computer.  And, Red Cat/Teal did not authorize, permit, nor allow Matus to execute a wipe of his Red Cat/Teal work computer.  There was no legitimate business purpose for Matus's conduct, and it interfered with Red Cat/Teal's use of their systems.

308.   Through his deliberate acts of wiping his Red Cat/Teal work computer, Matus intended to cause damage to his Red Cat/Teal work computer and the data and information housed therein.  And, Matus did cause damage and harm to his Red Cat/Teal work computer and the data and information housed therein.

309.   Matus's actions have permanently deprived Red Cat/Teal of a majority of the work product stored on Matus's Red Cat/Teal work computer.  Red Cat/Teal invested resources to develop and/or acquire the work product Matus destroyed, and such work product belonged to Red Cat/Teal.

310.    As a direct and proximate result of Matus's conduct, Red Cat/Teal have incurred loss in value of and harm and damages to the data and information Matus destroyed in excess of $5,000.

## COUNT VIII
**Tortious Interference With Actual and Prospective Economic Relations**
**(Damages and Injunctive Relief)**
**Against Matus and Vector**

311.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 310 as though fully set forth herein.

312.    At the time Vector engaged Matus as a co-founder and its CTO, Vector likely knew or should have known that Matus promised Red Cat he would not compete pursuant to the Agreement.

313.    Once Matus became Vector's CTO and co-founder, Vector was made aware (to the extent Vector was not already aware) that Matus owed Red Cat a duty not to compete pursuant to the Agreement.

314.    And, Red Cat/Teal reminded Vector of Matus's contractual non-compete obligations pursuant to the Agreement in July 2025.

315.    Despite knowing Matus was bound not to compete against Red Cat for one year post-employment, Vector hired and engaged Matus and continues to do so.

316.    Matus's non-competition obligation owed to Red Cat was intended to protect Red Cat from the harm to its and its subsidiaries' business.

317.    Matus, as a former Red Cat/Teal executive with troves of Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, posed a threat to Red Cat if he were to join or find a competitive business.

318.    Vector knew employing Matus would be to Red Cat/Teal's detriment.

319.    In enticing Matus to join Vector and continuing to employ and engage him, Vector has violated and continues to violate the standards of business ethics and community customs within the military defense contractor industry.

320.    As Vector has made representations to Red Cat/Teal that it will not stop employing and engaging Matus, Vector continues to threaten to interfere with Red Cat's economic relationship with Matus.

321.    Matus, after joining Vector (upon information and belief) but while still working as Red Cat's CTO and Teal's CEO, represented Red Cat/Teal in communications and negotiations concerning a business deal with Orqa. Matus served as the main Red Cat/Teal representative with whom Orqa communicated throughout the deal.

322.    Matus understood the points of leverage Red Cat/Teal held in deal negotiations with Orqa as well as areas of importance to Orqa. In particular, Matus knew one of the largest benefits Red Cat/Teal offered Orqa to enter into a deal was their assistance in applying for and obtaining Blue UAS clearance for Orqa's drone(s). Red Cat/Teal, having already went through the Blue UAS clearance process and as only one of few entities with a Blue UAS cleared drone on the Blue UAS Clearance List, were in an attractive position to help Croatian-based Orqa obtain Blue UAS clearance and, thus, be able to sell Orqa drones to the DoD.

323.    Matus also understood the importance and strategic advantages the Orqa deal presented Red Cat/Teal. As Orqa's exclusive U.S. seller of its cutting-edge FPV drone, Red Cat/Teal would be able to expeditiously advance in the industry by acquiring substantial market share previously deemed unfathomable. Red Cat/Teal reasonably believed that FANG™ (made in partnership with Orqa) would become a go-to U.S.-manufactured FPV drone.

324.    In or around July 2024, Red Cat/Teal and Orqa entered into a non-binding business agreement covering the terms of their partnership with the intent to finalize their deal.  In order to finalize the deal, Red Cat/Teal and Orqa needed to resolve minor outstanding details.

325.    At some point thereafter, Matus informed Red Cat/Teal that the Orqa deal as negotiated collapsed without further substantive explanation.

326.    Upon information and belief, in the midst of negotiations between Orqa and Red Cat/Teal, Matus, serving in his capacity as Red Cat/Teal's representative, provided Orqa information regarding Blue UAS clearance that rendered Red Cat/Teal's primary leverage in closing the deal valueless.  This interfered with the deal between Red Cat/Teal and Orqa as it caused the deal as negotiated to collapse.

327.    In his communication with Orqa, Matus misrepresented himself to Orqa as providing communications on behalf of Red Cat/Teal, despite deliberately acting contrary to Red Cat/Teal's interests.  Upon information and belief, Matus did so in an attempt to usurp the Orqa opportunity in Vector's favor.

328.    Matus's interference with Red Cat/Teal's prospective economic relationship with Orqa was in violation of the law and of his fiduciary duties and contractual obligations owed to Red Cat/Teal.

329.    Matus's interference with Red Cat/Teal's prospective economic relationship with Orqa also contradicted military defense contractor industry standard where he did not truthfully act on behalf of or represent the interests of Red Cat/Teal.

330.    Beginning in March 2025, Matus and Vector began to solicit Red Cat's employees to end their employment with Red Cat and join Vector.

331.    Many, if not all, of the employees Matus and Vector solicited had employment contracts with Red Cat through which they promised to keep certain of Red Cat/Teal's information confidential and not to compete with Red Cat/Teal for a period following separation of their employment.  Matus was aware of these obligations as well as of the terms and conditions of these individuals' employments with Red Cat.

332.    Upon information and belief, Matus and Vector leveraged Matus's knowledge of the terms and conditions of employment of these Red Cat employees to make superior offers of employment and entice these employees to leave their Red Cat employments.

333.    Matus and Vector knew Red Cat/Teal obtain considerable benefits and economic value from Red Cat's employees provided the small candidate pool of qualified drone workers in the industry.

334.    Matus's and Vector's interference with Red Cat's economic relationships with its employees is in violation of the law and of Matus's contractual obligations.

335.    Matus's and Vector's interference with Red Cat's economic relationships with its employees also cuts against military defense contractor industry standard and understanding that companies within the industry take steps to protect their investment into employees and confidential information.

336.    As Matus and Vector solicited a Red Cat employee as recently as July 2025 and have made representations to Red Cat/Teal that they will not stop nor remedy their conduct, they continue to threaten to interfere with Red Cat's economic relationships with its employees.

337.    Red Cat/Teal's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

338.    As a direct and proximate result of Matus's and Vector's separate and collaborative conduct, Red Cat/Teal have been damaged, in part, in an amount to be determined at trial.

## COUNT IX
### Fraudulent Misrepresentation
### (Damages)
### Against Matus

339.    Red Cat/Teal reallege and incorporate by reference Paragraphs 17 through 338 as though fully set forth herein.

340.    Prior to his separation of employment, Matus represented to Red Cat/Teal that Vector did not and had no plans to design, development, or manufacture drones.  He further explained Vector's business focuses on warfare-as-a-service.  Matus also stated Vector would partner with Red Cat/Teal in the future to acquire drones.

341.    While Matus made these statements to Red Cat/Teal numerous times, he specifically made such statements to Hitchcock while casually discussing his future work at Vector and during Red Cat/Teal's December 2024 holiday party.

342.    Matus's statements were false, and Matus either knew such statements were false or knew he made such statements recklessly, knowing he had insufficient knowledge on which to base his representations.

343.    At the time he made his statements to Red Cat/Teal, Matus either knew Vector either planned to or had already begun designing, developing, and/or manufacturing drones or knew he did not have sufficient information to conclusively make representations that Vector did not and had no plan to design, develop, or manufacture drones.

344.    Matus's statements regarded presently existing material facts.  Namely, Vector's business purpose, capabilities, and intentions.  These facts are material because based on such

facts, Red Cat determined whether or not to pursue a breach of contract claim against Matus for breach of his non-compete obligations under the Agreement.

345.    Red Cat/Teal acted reasonably in relying on Matus's statements, and they were unavoidably ignorant to the falsity of Matus's statements.

346.    In reliance on Matus's representations, at the time Matus separated his employment, Red Cat/Teal did not enforce Matus's non-compete obligations pursuant to the Agreement nor pursue relief through litigation based on a claim for breach of Matus's non-compete obligations under the Agreement.

347.    Matus's intention and purpose in making such representations was to prevent Red Cat/Teal from enforcing his non-compete obligations pursuant to the Agreement and/or pursuing relief through litigation based on a claim for breach of his non-compete obligations under the Agreement.

348.    Red Cat/Teal were injured and damaged based on Matus's statements because Matus competed against Red Cat/Teal for nearly seven months post-employment with minimal detection, delay, or hinderance.

349.    If Matus had been honest with Red Cat/Teal, Red Cat/Teal would have been able to immediately take action to enforce Matus's non-compete obligations pursuant to the Agreement and/or pursue relief through litigation based on a claim for breach of his non-compete obligations under the Agreement in order to avoid the exploitation and erosion of Red Cat's and Red Cat's subsidiaries' trade secret, proprietary, and confidential information, business relationships, employee relationships, goodwill, innovation, and investments.

350.    As a direct and proximate result of Matus's fraudulent misrepresentation, Red Cat/Teal have been damaged in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

With respect to this Verified Complaint, and based on the foregoing, Plaintiffs Red Cat Holdings, Inc. and Teal Drones, Inc. pray for the following relief:

1. Entry of a Preliminary Injunction, and, upon final disposition, entry of a Permanent Injunction against Defendants, enjoining Defendants as follows:

    a. For one (1) year from the date the Court enters a Preliminary Injunction Order, Matus may not work for, and collaborate with, Vector on the design, development, production, marketing, and sales of any drone technology;

    b. For one (1) year from the date the Court enters a Preliminary Injunction Order, Vector is prohibited from *(i)* manufacturing, marketing, distributing, entering or competing for contracts, and/or selling any Vector designed, developed, and/or marketed drones; *(ii)* working to identify and/or building business relationships with any external entities or individuals in support of its drone design, development, marketing, and/or manufacture efforts;

    c. For one (1) year from the date the Court enters a Preliminary Injunction Order, Matus and Vector are prohibited from soliciting any of Red Cat's employees.

    d. Defendants are prohibited from using, referencing, and/or disclosing Plaintiffs' confidential information and trade secrets under the Defend Trade Secrets Act and Utah Trade Secrets Act;

and other applicable relief as set forth in Plaintiffs' Motion for a Preliminary Injunction and Memorandum in Support;

2. For actual, compensatory, punitive, and exemplary damages to be determined at trial;

3. For reasonable attorneys' fees, costs, and expenses;

4. For Matus's obligations pursuant to the Agreement's Non-Compete and Non-Solicitation obligation to be tolled for a period of one (1) year from the date the Court enters an Order enjoining Matus's conduct in breach of the Agreement; and

5. Such other and further relief the Court deems just, including all fees and costs associated with this action.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Red Cat Holdings, Inc. and Teal Drones, Inc. hereby assert their right to a trial by jury on all counts so triable.

Dated: August 4, 2025        Respectfully submitted,

*/s/ Christina M. Jepson*

Christina M. Jepson (Utah Bar No. 7301)
Corey J. Hunter (Utah Bar No. 18964)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
CJepson@parsonsbehle.com
CHunter@parsonsbehle.com

Adam R. Rosenthal (*Pro Hac Vice* pending)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
12275 El Camino Real
Suite 100
San Diego, CA 92130
Tel: (858) 720-8900
Fax: (858) 509-3691
arosenthal@sheppardmullin.com

Victoria W. Hubona (*Pro Hac Vice* pending)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654

Tel: (312) 499-6300
Fax: (313) 499-6301
vhubona@sheppardmullin.com

*Attorneys for Plaintiffs*