Jess M. Krannich (14398)
Paul J. Sampson (13350)
Chris D. Mack (16094)
W. Bradford Barber (18601)
WILSON SONSINI GOORICH & ROSATI
95 S. State Street, Suite 1000
Salt Lake City, Utah 84111
Telephone:  (801) 401-8510
Facsimile:  (866) 974-7329
jkrannich@wsgr.com
psampson@wsgr.com
cmack@wsgr.com
bbarber@wsgr.com

Jason M. Storck (19084)
WILSON SONSINI GOODRICH & ROSATI
900 South Capital of Texas Highway
Las Cimas IV, Fifth Floor
Austin, TX 78746
Telephone:  (202) 973-8800
Facsimile:  (866) 974-7329
jstorck@wsgr.com

*Attorneys for Vector Defense, Inc.*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION**

| | |
|---|---|
| RED CAT HOLDINGS, INC., and TEAL DRONES, INC.,<br><br>Plaintiffs,<br><br>v.<br><br>GEORGE MATUS and VECTOR DEFENSE INC.,<br><br>Defendants. | **DEFENDANT VECTOR DEFENSE, INC.'S MOTION TO DISMISS COMPLAINT**<br><br>Case No. 2:25-cv-00646-TS-JCB<br><br>District Judge Ted Stewart<br><br>Magistrate Judge Jared C. Bennett |

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................................................1

FACTUAL BACKGROUND ........................................................................................................2

      A.      Vector Originated as a Service Business and Only Recently Began Developing Its Own Drones.......................................................................................2

      B.      Red Cat Initially Welcomed, Rather than Opposed, Matus' Transition to Vector..................................................................................................................3

      C.      Plaintiffs Have Never Fielded an FPV Drone Comparable to the Hammer. ............3

STANDARD OF REVIEW ...........................................................................................................4

ARGUMENT .................................................................................................................................4

I.      PLAINTIFFS FAIL TO STATE MISAPPROPRIATION CLAIMS AGAINST VECTOR (COUNTS I AND II). ........................................................................................5

      A.      Plaintiffs Fail to Identify Any Protectable Trade Secret.........................................6

      B.      Plaintiffs Fail to Allege Misappropriation. .............................................................9

            1.      No Actual Misappropriation. ...................................................................... 9

            2.      No Threatened Misappropriation ............................................................. 11

II.     PLAINTIFFS FAIL TO STATE A TORTIOUS INTERFERENCE CLAIM (COUNT VIII). ..............................................................................................................12

CONCLUSION............................................................................................................................14

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*,
    274 P.3d 317 (Utah Ct. App. 2012) ................................................................................14

*Complete Merchant Sol., LLLC v. Davis*,
    No. 2:24-cv-00789-RJS-DAO, 2024 WL 5057687 (D. Utah Dec. 10,
    2024) ..................................................................................................................................6

*Double Eagle Alloys, Inc. v. Hooper*,
    134 F.4th 1078 (10th Cir. 2025) ...................................................................................7, 9

*Geist v. Kansas State Univ. Found.*,
    2024 WL 3841828 (10th Cir. Aug. 16, 2024)...................................................................8

*Giles Const., LLC v. Tooele Inventory Sol., Inc.*,
    2015 WL 3755863 (D. Utah June 16, 2015)...................................................................14

*HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*,
    208 F. Supp.3d 1193 (D. Utah 2016)................................................................................8

*Hoyt v. Stahl*,
    1991 WL 174472 (10th Cir. 1991) ...................................................................................9

*In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*,
    No. 2:24-md-03102-RJS-DAO, 2025 WL 1135726 (D. Utah Apr. 17,
    2025) ................................................................................................................................13

*IOSTAR Corp. v. Stuart*,
    No. 1:07-CV-133, 2009 WL 270037 (D. Utah Feb. 3, 2009)..........................................12

*LifeLinc Anesthesia, PLLC v. Wolfe*,
    2012 WL 13026748 (W.D. Ten. Nov. 1, 2012)...............................................................10

*LS3 Inc. v. Cherokee Nation Strategic Programs, L.L.C.*,
    2022 WL 3440692 (10th Cir. Aug. 17, 2022)...................................................................7

*Microbiological Res. Corp. v. Muna*,
    625 P.2d 690 (Utah 1981)...............................................................................................11

*Novus Franchising, Inc. v. Brockbank*,
    2016 WL 4734589 (D. Utah Sept. 9, 2016).....................................................................11

*Packaging Corp. of Am., Inc. v. Croner*,
    419 F. Supp. 3d 1059 (N.D. Ill. 2020) ............................................................................10

*Presidio Holdings Inc. v. People Driven Tech., Inc.*,
    2025 WL 947946 (N.D. Ill. Mar. 30, 2025) ..................................................................10

*Quest Sol., Inc. v. RedLPR, LLC*,
    2023 WL 11910450 (D. Utah Aug. 3, 2023) ............................................................6, 7, 8

*Seal v. Young*,
    2010 WL 4720738 (D. Utah Nov. 12, 2010) ...................................................................4

*Segment Consulting Mgmt., LTD. v. Streaming Mfg., LLC*,
    2020 WL 907154 (D. Utah Feb. 25, 2020) (Stewart, J.) ................................................13

*Smart Surgical Inc. v. Utah Cord Bank, Inc.*,
    2021 WL 734954 (D. Utah Feb. 25, 2021) ..............................................................12, 13

*Soccer Connection, Inc. v. Nike USA, Inc.*,
    2018 WL 3827371 (D. Utah Aug. 10, 2018) .................................................................14

*Total Quality Sys., Inc. v. Universal Synaptics Corp.*,
    679 F. Supp. 3d 1196 (D. Utah 2023) ..............................................................................6

*Utah Med. Prods. v. Clinical Innovations Assoc.*,
    79 F. Supp. 2d (D. Utah 1999) ................................................................................10, 11

## STATUTES

Utah Code § 13-24-8 ................................................................................................................14

UTSA ........................................................................................................................5, 6, 8, 14

## RULES

Fed. R. Civ. Pro. 12(b)(6) ................................................................................................1, 4, 14

Rule 8 ...........................................................................................................................................6

Defendant Vector Defense, Inc. ("Vector") respectfully moves under Federal Rule of Civil Procedure 12(b)(6) to dismiss the Complaint ("Complaint") filed by Plaintiffs Red Cat Holdings, Inc. ("Red Cat") and Teal Drones, Inc.'s ("Teal," and together, "Plaintiffs").

## **INTRODUCTION**

Plaintiffs' case rests on a false premise: that Vector competes in the same market with the same technology as Plaintiffs. The Complaint itself shows otherwise. Plaintiffs manufacture sophisticated intelligence, surveillance, and reconnaissance ("ISR") drones such as the Black Widow, built for the Army's Short-Range Reconnaissance ("SRR") program. Vector, by contrast, follows a different model—offering "warfare-as-a-service" and, more recently, developing the Hammer, a low-cost, expendable first-person view ("FPV") drone for precision strikes, as part of the services it offers. The Hammer bears no resemblance to Plaintiffs' ISR platform. Plaintiffs do not sell FPV strike drones, and Vector does not sell ISR drones. They operate in distinct markets and are not competitors.

That mismatch dooms Plaintiffs' claims against Vector. In 2024, Plaintiffs announced an FPV concept called "FANG," but never engineered or manufactured it. As discussed further below, their own allegations concede the project was shelved that same year, before reaching the design or specification stage, and even then, would have been a "white-label" product that was designed and built by a third-party, not Red Cat. By the time George Matus joined Vector, Plaintiffs had no FPV design, technology, or product to misappropriate (and, again, even if it had proceeded, Plaintiffs concede that it would have been a third-party product, further undercutting any potential misappropriation claims). Finally, the Hammer was developed independently by Vector personnel, and the Complaint pleads no facts otherwise.

-1-

Unable to identify any actual FPV product or technology of their own, Plaintiffs resort to vague labels such as "drone design," "component sourcing," and "cost and functionality analysis" to prop up their misappropriation claim. But such generic categories are not trade secrets, and the Complaint alleges no facts showing Vector ever acquired or used them. Plaintiffs' tortious interference claim fares no better: the Complaint identifies no disrupted contract, no improper means, and no lost business opportunity.

Because Plaintiffs have not pled facts supporting the essential elements of their causes of action, their claims against Vector should be dismissed in full.

## FACTUAL BACKGROUND[1]

### A. Vector Originated as a Service Business and Only Recently Began Developing Its Own Drones.

Vector, led by CEO Andy Yakulis, was founded to provide "modern-warfare-as-a-service." Rather than manufacturing its own aircraft, Vector initially specialized in sourcing third-party unmanned aircraft systems ("UAS" or "drones"), integrating them into tactical packages, and training military personnel under government service contracts. Dkt. 1 ¶¶ 2, 8, 106, 112, 160, 340.

Unlike Plaintiffs, who devote years and millions into building their own drones, *id.* ¶¶ 3, 60–64, 85, Vector took a different approach: combining off-the-shelf equipment with training and support to deliver modern tools quickly and adapt them as technology evolves. *Id.* ¶¶ 106, 160. From the outset, Vector has purchased third-party gear—including drones from Red Cat itself— and pursued opportunities with other suppliers such as Orqa Ltd. ("Orqa"). *Id.* ¶¶ 106, 136, 160.

Only in July 2025 did Vector publicly announce it "had designed and built its own

---

[1] This section is based exclusively on the allegations in Plaintiffs' Complaint (Dkt. 1).

drone"—called the Hammer. *Id.* ¶¶ 2, 14. Vector's Hammer drone is an FPV drone. *Id.* ¶¶ 14, 166.

### B. Red Cat Initially Welcomed, Rather than Opposed, Matus' Transition to Vector.

George Matus founded Teal in 2014 as a company focused on ISR drone technology. *Id.* ¶¶ 4, 25, 84. Red Cat acquired Teal in September 2021, retaining Matus as Teal's CEO and later elevating him to Red Cat's CTO. *Id.* ¶¶ 5, 28, 32. In those roles, he led the development of the Black Widow, an advanced ISR platform that Plaintiffs prepared as part of their bid for the Army's SRR Tranche 2 contract in November 2024. *Id.* ¶¶ 78, 89, 116–17.

In 2024, Matus began discussions with Vector's CEO, Andy Yakulis, about Vector's service model and potential integration of Red Cat products. *Id.* ¶¶ 111–12. Matus later accepted an offer to become Vector's CTO, but deferred his start until after Red Cat's SRR Tranche 2 submission to avoid any disruption to Red Cat's efforts. *Id.* ¶ 105. He formally joined Vector in December 2024. *Id.*

Over Thanksgiving 2024, Matus and Yakulis informed Red Cat's CEO, Jeff Thompson, of Matus' transition and expressed interest in future collaboration. *Id.* ¶ 106. Neither Thompson nor anybody else at Red Cat "identified [any] serious cause for concern at the time." *Id.* ¶ 108. At Red Cat's holiday party the next month, Yakulis and Thompson even discussed potential synergies, including Vector sourcing drones from Plaintiffs. *Id.* ¶ 138.

Red Cat publicly announced Matus's resignation in December 2024. *Id.* ¶ 137. Upon separation, Matus reset his work laptop and returned it to Red Cat. *Id.* ¶ 139.

### C. Plaintiffs Have Never Fielded an FPV Drone Comparable to the Hammer.

Plaintiffs' principal product, the Black Widow, is an ISR drone designed for reconnaissance missions as part of the Army's SRR Tranche 2 program. *Id.* ¶¶ 78, 89–90. It is

undergoing the Blue UAS clearance process. *Id.* ¶ 91.

Vector's Hammer, by contrast, is an FPV drone built for precision strikes. *Id.* ¶¶ 14, 166. It is designed for "single use, explosive operations" and aimed at military FPV programs, not SRR contracts. *Id.* ¶¶ 14, 161. While ISR drones such as the Black Widow "identify a target," FPV drones like the Hammer are "used to attack the target." *Id.* ¶ 93.

Plaintiffs have never developed a deployable FPV drone. *Id.* ¶¶ 93–95, 100, 102. Their FANG project was "suspended" in fall 2024 after a failed partnership with Orqa (the proposed third-party developer of the FANG), and it remains a concept only—unavailable for purchase and still lacking "final" "features and specifications." *Id.* ¶¶ 93–95, 100, 102.

## STANDARD OF REVIEW

On a Rule 12(b)(6) motion, the Court accepts as true "all well-pleaded factual allegations" and views them "in the light most favorable to Plaintiff as the nonmoving party." *Seal v. Young*, 2010 WL 4720738, at *1 (D. Utah Nov. 12, 2010). But the Court need not accept "conclusory allegations" unsupported by facts. *Id.* To survive dismissal, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Id.* (quotation omitted). Plausibility requires more than "the mere metaphysical possibility" that *some* set of facts could support the claims; the allegations must give the Court reason to believe the plaintiff can muster actual "factual support." *Id.* (quotation omitted).

## ARGUMENT[2]

Plaintiffs' trade secret claims (Counts I and II) should be dismissed under Rule 12(b)(6).

---

[2] Matus has concurrently filed a motion to dismiss claims asserted against him by Plaintiffs. Vector hereby incorporates the arguments from such motion in support of its grounds for dismissal.

-4-

Their own allegations *foreclose* those claims. One cannot misappropriate technology that *never existed*. Plaintiffs abandoned their only FPV drone concept, the "FANG," in fall 2024 and still concede they have not "finalized" its "features or specifications." Dkt.1 ¶ 100. A suspended concept—never reduced to practice and intended to be designed and built by a third party—cannot generate protectable trade secrets, much less support a misappropriation claim. Further, as they concede, FANG was to be designed and sourced by Orqa, a third-party drone developer. *Id.* ¶ 124. As such, even if Red Cat had advanced beyond the concept phase to an actual product, FANG was not a Red Cat product and thus could not support a claim for trade secret misappropriation. Unsurprisingly, Plaintiffs identify no specific trade secrets and no act of misappropriation by Vector.

Plaintiffs' tortious interference claim (Count VIII) is equally deficient. The Complaint alleges Vector interfered by employing Matus despite his non-compete and by encouraging him to solicit Red Cat employees. Dkt. 1 ¶¶ 312–20, 330–36. Neither theory is viable. *First*, because Vector and Plaintiffs are not competitors, Matus' non-compete could not have been triggered, and Vector could not have interfered with it. *Second*, Plaintiffs plead no "improper means" such as fraud, threats, or bribery. Their lone allegation—that Vector violated some undefined "industry standard"—is both conclusory and legally insufficient. *See id.* ¶¶ 319, 335. *Third*, to the extent the claim is premised on Vector's alleged use of "trade secret, proprietary, and confidential information," it is preempted by the UTSA. *See id.* ¶ 317.

On these pleadings, Plaintiffs fail to state any plausible claim against Vector.

## I. PLAINTIFFS FAIL TO STATE MISAPPROPRIATION CLAIMS AGAINST VECTOR (COUNTS I AND II).

To plead misappropriation under the UTSA, a party must allege: (1) the existence of a

protectable trade secret, (2) disclosure of that trade secret to the defendant under circumstances imposing a duty of confidentiality, and (3) the defendant's unauthorized use of the secret resulting in harm. *Complete Merchant Sol., LLLC v. Davis*, No. 2:24-cv-00789-RJS-DAO, 2024 WL 5057687, at *3 (D. Utah Dec. 10, 2024) (quotation omitted)).[3] Plaintiffs do not plausibly allege any of these elements.

Plaintiffs identify no trade secret with the particularity Rule 8 requires. Nor do they allege that Vector ever acquired, used, or even threatened to use any Red Cat information. At most, the Complaint asserts generalized access to "confidential" material, which is insufficient as a matter of law.[4]

### A.     Plaintiffs Fail to Identify Any Protectable Trade Secret.

Plaintiffs' trade secret allegations collapse at the starting line. To state a claim, they must identify a secret with "*sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Quest Sol., Inc. v. RedLPR, LLC*, 2023 WL 11910450, at *43 (D. Utah Aug. 3, 2023) (quotation omitted). It is not enough to rely on "catchall phrases or categories or lists of general areas of information." *Id.* (quotation

---

[3] The elements of misappropriation under the DTSA "closely resemble" those under the UTSA. *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023). The DTSA requires: "(1) the existence of a trade secret that relates to a product or service used in, or intended for use in, interstate or foreign commerce; (2) the acquisition of the trade secret, or the use or disclosure of the trade secret without consent; and (3) the person acquiring, using, or disclosing the trade secret knew or had reason to know that the trade secret was acquired by improper means." *Complete Merchant Sol.*, 2024 WL 5057687, at *2. Plaintiffs' DTSA claim fails for the same reasons their UTSA claim does.

[4] Because Plaintiffs have not identified a specific trade secret, by extension, they also cannot plausibly allege that any such secret was ever disclosed to Vector (second element).

-6-

omitted). "Merely referring to a trade secret by a phrase or category fails this standard" because it leaves the defendant facing "an unknown landscape against which to defend." *Id.*; *see also Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1089 (10th Cir. 2025) (plaintiff "must clearly refer to tangible trade secret material instead of referring to a system which *potentially* qualifies for trade secret protection. It is inadequate for plaintiffs to cite and incorporate by reference hundreds of documents that purportedly reference or reflect the trade secret information." (quotation omitted)).

That is precisely what Plaintiffs have done. They identify only broad categories—business plans, partnership opportunities, and drone design—without tying any allegation to a concrete, protectable trade secret.

***Business Plans***: Plaintiffs allege misappropriation of "business information and plans," including "budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans." Dkt. 1 ¶¶ 56–57. These generic labels describe routine business functions. Plaintiffs never specify which "budgets," "market strategies," or "growth methods and plans" Vector supposedly misappropriated, nor do they specify how any such items reflect actual trade secrets that were the subject of such misappropriation. Courts consistently reject such vague allegations. *See Quest Sol.*, 2023 WL 11910450, at \*18, \*43–\*44 (dismissing as "overbroad and vague" misappropriation claims of "numerous internal business plans, documents, and other materials"); *LS3 Inc. v. Cherokee Nation Strategic Programs, L.L.C.*, 2022 WL 3440692, at \*5 (10th Cir. Aug. 17, 2022) (allegations of stolen "proprietary information" and "plans, approaches, and proprietary methods" insufficient); *see also id.*, Am. Compl., Dkt. 21, 2021 WL 1748282 (D.

Colo. Jan. 4, 2021); *Geist v. Kansas State Univ. Found.*, 2024 WL 3841828, at *1 (10th Cir. Aug. 16, 2024) (plaintiff's "allegations concerning his business plan were not sufficiently specific to plead the existence of a trade secret." (citation omitted)).

*Partnership Opportunities*: Plaintiffs also invoke "strategic initiatives, business opportunities, and partners," including supposed insights into "needs, pain points, weaknesses, strengths, and capabilities" of unnamed partners. Dkt. 1 ¶¶ 58–59. Again, they identify no actual partners, deals, or proprietary analyses or how those constitute protectable trade secrets under the UTSA or DTSA. Courts dismiss such vague allegations. *See Quest Sol.*, 2023 WL 11910450, at *18, *43–*44 (rejecting reliance on unspecified "sales pipeline" document listing opportunities and pricing).

*Drone Design*: Plaintiffs allege misappropriation of "confidential and trade secret drone design," including "product and component sourcing, manufacture, enhancements, and component combination" and "the ideal marriage" of "drone components," along with unspecified "cost and functionality analysis." Dkt. 1 ¶¶ 60–62. Yet they cite no schematics, no unique configuration, and no concrete design detail. The deficiency is not surprising given that, by their own admission, Plaintiffs intended to have Orqa, a third-party Croatian company, design and develop the FANG, where Red Cat would merely "assemble" and resell these drones in the US with the Red Cat label. *See id.* ¶ 124. When that deal collapsed in fall 2024, Plaintiffs "suspended" the FANG project and still have not "finalized" its "features and specifications." *Id.* ¶¶ 94, 100. Trade secrets cannot be conjured from a PowerPoint concept that never reached development, particularly where the design was to come from someone else, and certainly not when they belonged to a third-party developer. *See HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp.3d 1193, 1201 (D.

Utah 2016) (dismissing trade secret claims because plaintiffs "did not own the alleged trade secrets"); *Hoyt v. Stahl*, 1991 WL 174472, at *2 (10th Cir. 1991) (dismissing trade secret claim when plaintiff failed to identify "precisely what is peculiarly advantageous and secret about its [product's] synthesis of *conceededly available components* and how this confidential information was used in the design of plaintiff's competing product" (emphasis added)).[5]

### B. Plaintiffs Fail to Allege Misappropriation.

Even assuming Plaintiffs had identified a protectable trade secret, which they have not, their claims still collapse for lack of misappropriation. Plaintiffs advance two theories—actual misappropriation and threatened (or "inevitable") misappropriation—but the Complaint pleads no facts to make either theory plausible.

#### 1. *No Actual Misappropriation.*

The Complaint pleads no facts showing that Vector ever possessed or used any Red Cat trade secret. Plaintiffs do not allege that Vector, Matus, or anyone else ever downloaded, transferred, or otherwise accessed Red Cat's systems to misappropriate any alleged trade secrets. To the contrary, their own allegations confirm there was nothing to misappropriate: Plaintiffs' own FPV concept—the FANG—even if it had proceeded to an actual product, would have been developed by a third party, not Red Cat. Dkt. 1 ¶ 124. Regardless, as they admit, FANG never progressed beyond marketing slides, and remains unfinished today. *See id.* ¶¶ 94, 100, 124.

---

[5] Because Plaintiffs have not identified any protectable trade secret, they necessarily cannot establish the required interstate nexus—and indeed have not even attempted to do so. That omission independently defeats their DTSA claim. *See Double Eagle Alloys*, 134 F.4th at 1087 (plaintiff must allege the trade secret "implicates interstate or foreign commerce" to state a DTSA claim (quotation omitted)).

Therefore, based on their own Complaint, there would be nothing to misappropriate.

Unable to identify any trade secret material Vector actually obtained, Plaintiffs invite the Court to *infer* theft from Matus' routine reset of his Red Cat laptop upon departure. *See* Dkt. 1 ¶¶ 139–42, 197–99, 216–18. Courts in this District do not indulge such speculation: "The burden is upon the plaintiff to establish the existence of a trade secret, and plaintiff must substantiate more than vague and unsupported allegations as to unknown trade secrets." *Utah Med. Prods. v. Clinical Innovations Assoc.*, 79 F. Supp. 2d at 1312 (D. Utah 1999). Courts elsewhere likewise reject the notion that a departing employee's reset of a device proves misappropriation. *See, e.g.*, *Presidio Holdings Inc. v. People Driven Tech., Inc.*, 2025 WL 947946, at *6 (N.D. Ill. Mar. 30, 2025) (deletion of 7,000 files not misappropriation); *LifeLinc Anesthesia, PLLC v. Wolfe*, 2012 WL 13026748, at *2 (W.D. Ten. Nov. 1, 2012) (deletion is not "acquisition, disclosure, or use").

The far more reasonable inference is that Matus reset his work laptop as a standard precaution to avoid retaining confidential materials after leaving Red Cat, especially when those materials relate to confidential government contracts. Absent any allegation of data exfiltration or unusual access—which Plaintiffs do not plead—the reset indicates an effort to *prevent* misappropriation, not facilitate it. *See Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059, 1067 (N.D. Ill. 2020) ("If anything, [defendant's] deletions support his claim that he did not use or disclose any trade secrets—he took active steps to ensure that he was no longer in possession of confidential materials from his previous job.").[6]

---

[6] Although not dispositive here, Matus voluntarily searched his cloud storage at Plaintiffs' request after joining Vector. *See* Dkt. 29-1 ¶ 43. He located a handful of Red Cat documents that had passively carried over, promptly sequestered them, and asked Plaintiffs how they wished him

### *2. No Threatened Misappropriation.*

Plaintiffs' "inevitable disclosure" theory fares no better. They speculate that because Matus once held a senior role at Red Cat, there is "no doubt" he "helped Vector skip the proverbial line at the expense of" Plaintiffs' trade secrets. Dkt. 1 ¶¶ 199–201. Utah law squarely rejects that reasoning and conclusory logic.

The Utah Supreme Court has long held that "an employee has the prerogative to use his general knowledge, experience, memory and skill" in subsequent employment. *Microbiological Res. Corp. v. Muna*, 625 P.2d 690, 697 (Utah 1981). On that basis, the Court overturned an injunction against a former president who left to develop competing medical kits because the plaintiff had not shown any *actual* proprietary secrets at risk. *See id.* at 700. Likewise, this Court has emphasized that "[m]ere knowledge of a trade secret is not enough" to enjoin future employment, and that injunctions cannot issue "to eliminate a possibility of a remote future injury." *Novus Franchising, Inc. v. Brockbank*, 2016 WL 4734589, at *14 n.16 (D. Utah Sept. 9, 2016); *see also Utah Medical Products, Inc..*, 79 F. Supp. 2d 1290, 1313–14 (D. Utah 1999) (rejecting as "too tenuous" theory that defendants must have used trade secrets because they performed similar work elsewhere).

Here, Plaintiffs identify no specific trade secret Matus must "inevitably" use at Vector— no designs, algorithms, or proprietary systems. They rely only on the same generalized suspicion rejected in *Microbiological* and *Utah Medical*: that because Matus once held a senior role, he

---

to proceed. *See id.* ¶¶ 43–44. To date, Plaintiffs have never responded. *See id.* ¶ 44. In any event, those materials are absent from the Complaint and do not (and ultimately could not) form the basis of their misappropriation claim.

cannot help but rely on Red Cat's secrets while working at Vector. Dkt. 1 ¶¶ 199–201. But the law is clear: former employees may draw on general experience and skills, and speculative fears of future misuse cannot sustain a claim. *IOSTAR Corp. v. Stuart*, No. 1:07-CV-133, 2009 WL 270037, at *5 (D. Utah Feb. 3, 2009) ("A risk of misappropriation … is far too tenuous upon which to justify a remedy as extraordinary as an injunction, or to support a violation of the Act.").

Even if the mere "risk" of misappropriation could suffice, the products Red Cat and Vector have developed do not overlap. Plaintiffs' Black Widow is an ISR drone designed for reconnaissance missions in the Army's SRR Tranche 2 program. Dkt. 1 ¶¶ 78, 89–91. Vector's Hammer, by contrast, is an FPV drone for single-use explosive operations, built for different DoD FPV programs, not SRR contracts. *Id.* ¶¶ 14, 173. As Plaintiffs themselves allege, the Black Widow identifies targets, while the Hammer attacks them. *Id.* ¶ 93. Plaintiffs have no competing FPV product, as their FANG project was "suspended" in fall 2024, never proceeded beyond the concept phase, and remains unavailable. *Id.* ¶¶ 93–95, 102. Moreover, as discussed above, FANG was not a Red Cat product, but a white-label designed by a third-party developer. With no overlap in purpose, design, or procurement channel, Red Cat's ISR-focused know-how has no bearing on Vector's FPV-focused Hammer, nor its third-party FANG concept drone.

## II. PLAINTIFFS FAIL TO STATE A TORTIOUS INTERFERENCE CLAIM (COUNT VIII).

To state a tortious interference claim, Plaintiffs must allege that Vector (1) "intentionally interfered" with "existing or potential economic relations," (2) did so "for an improper purpose or by improper means," and (3) caused actual injury. *Smart Surgical Inc. v. Utah Cord Bank, Inc.*, 2021 WL 734954, at *2 (D. Utah Feb. 25, 2021) (quotation omitted). Plaintiffs plead none of these elements.

*No Interference with a Contract:* Plaintiffs allege Vector interfered by employing Matus despite his restrictive covenants and by allowing him to "solicit" Red Cat employees. Dkt.1 ¶¶ 312–20, 330–36. But a tortious interference claim cannot survive absent a breach—and Plaintiffs' contract claims against Matus fail for the reasons discussed above and those discussed in Matus' Motion to Dismiss. If Matus did not breach, Vector cannot have induced breach.[7]

*No "Improper Means":* Even if a breach were assumed, Plaintiffs still fail to plead improper means. The Utah Supreme Court has "narrowly" defined improper means to include only conduct "contrary to law"—such as fraud, threats, bribery, or defamation—or conduct violating "an established standard of a trade or profession." *Smart Surgical*, 2021 WL 734954, at *3 (quotation omitted). Plaintiffs cite only a vague "industry standard" requiring defense contractors to "take steps to protect their investment into employees and confidential information." Dkt. 1 ¶ 335. Courts have consistently rejected such bootstrapping. *See Smart Surgical*, 2021 WL 734954, at *3 ("[M]erely rephrasing a party's inducement to breach a contract as a violation of industry standards," along with "vague assertion" that industry standard "includes non-competition and confidentiality" not enough); *Segment Consulting Mgmt., LTD. v. Streaming Mfg., LLC*, 2020 WL 907154, at *6 (D. Utah Feb. 25, 2020) (Stewart, J.) (no improper means when premised "on the

---

[7] Plaintiffs allege that Vector "made representations to Red Cat/Teal that [they] will not stop" soliciting Red Cat employees, referencing Vector's July 18, 2025 letter. Dkt. 1 ¶ 336. Because the Complaint references that letter and relies on it, the Court may consider it on this Motion. *See In re Church of Jesus Christ of Latter-Day Saints Tithing Litig.*, No. 2:24-md-03102-RJS-DAO, 2025 WL 1135726, at *2 n.5 (D. Utah Apr. 17, 2025). The letter, attached as Exhibit A, says nothing of the sort. It states Matus "has not reached out to any Red Cat employee for the purpose of recruiting them to work at Vector." Ex. A at 3. It further explains that when Red Cat employees "voluntarily reached out to Vector about potential employment opportunities," they were "redirected to Vector's Human Resource team," and that Matus had "no involvement" in their evaluation or hiring. *Id.* Accordingly, their argument fails based upon the very letter upon which they rely.

same allegations as" the other claims); *Soccer Connection, Inc. v. Nike USA, Inc.*, 2018 WL 3827371, at \*6 (D. Utah Aug. 10, 2018) (no bootstrapping an industry standard because otherwise "virtually any breach of contract could give rise to liability under a theory of tortious interference.").

*UTSA Preemption Bars the Remainder:* To the extent Plaintiffs' theory rests on Vector's alleged misuse of confidential information, *see* Dkt. 1 ¶¶ 317–18, 332, it is preempted by the Utah Uniform Trade Secrets Act. The UTSA "displaces conflicting tort, restitutionary, and other [Utah law] providing civil remedies for misappropriation of a trade secret." Utah Code § 13-24-8. Utah courts hold that the UTSA preempts any tort claim "to the extent that [it is] based on factual allegations supporting a misappropriation of trade secrets or otherwise confidential information." *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 274 P.3d 317, 331 (Utah Ct. App. 2012). Thus, "if the [non–UTSA] claim fails without the allegations regarding misuse of information, the UTSA preempts it." *Giles Const., LLC v. Tooele Inventory Sol., Inc.*, 2015 WL 3755863, at \*6 (D. Utah June 16, 2015). Plaintiffs' interference claim cannot stand without the very allegations of misuse they invoke elsewhere; it is therefore displaced.

In short, Plaintiffs cannot plausibly allege breach, improper means, or a non-preempted theory of liability. Their tortious interference claim should be dismissed.

## CONCLUSION

For the reasons set forth herein, Vector respectfully requests that this Court dismiss all claims brought against it by Plaintiffs under Rule 12(b)(6) for failure to state a claim.

Dated: September 11, 2025

Respectfully submitted,

*/s/ Jess M. Krannich*

Jess M. Krannich, State Bar No. 14398
Jason Storck, State Bar No. 19084
Paul J. Sampson, State Bar No. 13350
Chris D. Mack, State Bar No. 16094
W. Bradford Barber, State Bar No. 18601
WILSON SONSINI GOODRICH & ROSATI
A Professional Corporation
Jkrannich@wsgr.com
Psampson@wsgr.com
Cmack@wsgr.com
Bbarber@wsgr.com

*Attorneys for Defendant Vector Defense, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on this September 11, 2025, I caused a true and correct copy of the foregoing document to be electronically filed in the CM/ECF system, which will effectuate service on all counsel of record deemed to have consented to electronic service.

      /s/ *Jess M. Krannich*
      Jess M. Krannich