Darren G. Reid (11163)
April M. Medley (16102)
Zach Williams (16197)
HOLLAND & HART LLP
222 South Main Street, Ste 2200
Salt Lake City, UT 84101
Telephone: 801.799.5883
dgreid@hollandhart.com
ammedley@hollandhart.com
zdwilliams@hollandhart.com

*Attorneys for Defendant George Matus*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RED CAT HOLDINGS, INC. and TEAL DRONES, INC.;<br><br>    Plaintiffs,<br><br>v.<br><br>GEORGE MATUS and VECTOR DEFENSE INC.;<br><br>    Defendants. | **DEFENDANT GEORGE MATUS'S MOTION TO DISMISS**<br><br>Case No. 2:25-cv-00646-TS-JCB<br><br>Judge Ted Stewart |

Defendant George Matus ("Mr. Matus") by and through his counsel of record, hereby

moves to dismiss the claims brought by Plaintiffs Red Cat Holdings, Inc. ("Red Cat") and Teal

Drones, Inc. ("Teal").

# TABLE OF CONTENTS

Page No.

INTRODUCTION ..........................................................................................................1

PLAINTIFFS' ALLEGATIONS ...................................................................................2

    A.    The U.S. Army Announces Its SRR Program for Drones. .....................................3

    B.    Teal Submits a Drone to Compete for the U.S. Army's SRR1 Contract................3

    C.    Mr. Matus Joins Red Cat and Designs and Develops the Black Widow, a Highly Specialized ISR Drone; the Black Widow Wins the SRR2 Program.......................................................................................................................3

    D.    Red Cat Promotes Mr. Matus to Chief Technology Officer. ..................................4

    E.    Red Cat Explores a Partnership with Orqa to Build "FANG," an FPV Drone................................................................................................................................4

    F.    Mr. Matus Leaves Red Cat for Vector..................................................................5

    G.    Mr. Matus Returns His Company-Issued Laptop to Red Cat After Resetting It. ..........................................................................................................5

    H.    Other Red Cat/Teal Employees Join Vector..........................................................5

    I.    Vector Develops the Hammer, a Simple, Single-Use FPV drone. .........................5

LEGAL STANDARD.....................................................................................................6

ARGUMENT..................................................................................................................6

I.    PLAINTIFFS HAVE FAILED TO STATE A BREACH OF CONTRACT CLAIM.............................................................................................................................6

    A.    Plaintiffs Have Not Pleaded Sufficient Facts Showing That Mr. Matus Breached the Agreement's Non-Compete Clause. ..................................................7

        1.    Plaintiffs Have Failed to Plead Facts Showing That the Hammer Competes with the Black Widow Drone. .......................................................7

        2.    Plaintiffs Have Failed to Plead Facts Showing That the Hammer Competes with Their FANG Drone.............................................................8

i

B.    Plaintiffs Don't Plead Sufficient Facts Showing That Mr. Matus Breached the Agreement's Non-Solicitation Clause. ...........................................8

II.    PLAINTIFFS HAVE FAILED TO STATE A BREACH OF FIDUCIARY DUTY CLAIM..................................................................................................9

A.    Mr. Matus Didn't Breach His Duty of Loyalty by Joining Vector........................10

B.    Mr. Matus Didn't Breach His Duty of Loyalty by Failing to Implement "Business Initiatives."..........................................................................11

C.    Mr. Matus Didn't Breach His Duty of Loyalty by Giving Orqa "Information."..................................................................................12

D.    Mr. Matus Didn't Breach His Duty of Loyalty by Wiping His Computer...........13

III.    PLAINTIFFS HAVE FAILED TO STATE A TORTIOUS INTERFERENCE CLAIM................................................................................................14

A.    Plaintiffs Have Failed to Allege Mr. Matus Interfered with Orqa by Improper Means. .................................................................................14

1.    Plaintiffs' Breach of Contract Allegations Don't Amount to Improper Means. ..........................................................................15

2.    Plaintiffs' Breach of Fiduciary Duty Allegations Don't Amount to Improper Means. ..............................................................15

3.    Plaintiffs Fail to Allege Any Well-Pleaded Facts Showing That Mr. Matus Violated Any Industry Standards...............................16

B.    Plaintiffs Have Failed to Allege That Mr. Matus Interfered with Their Employees by Improper Means. ...........................................................16

C.    The Economic Loss Rule Bars Plaintiffs' Tortious Interference Claim as to Mr. Matus's Alleged Solicitation...................................................17

IV.    PLAINTIFFS HAVE FAILED TO STATE A FRAUDULENT MISREPRESENTATION CLAIM.....................................................................17

A.    Plaintiffs' Allegations Fall Well Short of Rule 9(B)'S Particularity Requirements. ....................................................................................18

B.    Plaintiffs Have Failed to Plead a Representation That Was False When It Was Made. .......................................................................................19

C.  Plaintiffs Fail to Allege Any Injury from Mr. Matus's Allegedly False Representation That Vector Had No Plans to Make Any Drones. ........................19

V.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE CFAA. ................20

A.  Plaintiffs Have Failed to Allege Sufficient Facts Under the CFAA's "Without Authorization" Prong. ............................................................20

B.  Plaintiffs Have Failed to Allege Sufficient Facts Under the CFAA's "Exceeds Authorized Access" Prong. ..................................................21

VI.  PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE UCADRA. ..........22

VII.  PLAINTIFFS HAVE FAILED TO STATE A TRADE SECRET MISAPPROPRIATION CLAIM. ......................................................................22

CONCLUSION ..............................................................................................23

## **INTRODUCTION**

On a motion to dismiss, the alleged facts take center stage. Courts assume the facts are true and then determine whether those facts state a plausible claim.

This well-trodden legal standard begs the question: what counts as a fact? The U.S. Supreme Court has repeatedly explained what doesn't count: labels, threadbare recitals, and conclusory statements. There's no room for these fact imposters even at the pleading stage.

Plaintiffs' complaint here includes *some* facts. Mr. Matus, while employed by Plaintiffs, developed a highly specialized surveillance drone called the Black Widow, which took years of work and millions of dollars. In November 2024, Plaintiffs won a coveted contract from the U.S. Army for the Black Widow. A few months later, Mr. Matus joined Vector, a new start-up company that offered "warfare-as-a-service" contracts to the U.S. Army. Vector planned to incorporate other companies' drones into these contracts but had no plans to make their own drones. In July 2025, Vector announced that it had developed a drone called the Hammer. The Hammer is a simple kamikaze drone that took months to develop. Unlike the Black Widow, which identifies targets, the Hammer's sole purpose is to destroy targets while equipped with explosives.

These are the pleaded facts. But when it comes time for Plaintiffs' punchline, *i.e.*, the necessary elements of their claims, Plaintiffs run out of facts and try to patch the necessary elements with fact imposters.

For example, Plaintiffs allege that (i) they created a drone, the Black Widow; (ii) Mr. Matus joined Vector; and then (iii) Vector created a drone, the Hammer. Plaintiffs' punchline? Vector is their "competitor." That's not a fact. It's a conclusory label. And even worse, it's a

conclusory label that Plaintiffs' own facts spoil: the Black Widow, a highly specialized surveillance drone that already won a government contract, doesn't compete with the Hammer, a simple kamikaze drone, because they are fundamentally different in purpose, build, and sophistication.

Here's another example: Plaintiffs allege that (i) they were negotiating with Orqa, a Croatian drone company, to "white label" Orqa's drone in the United States; but that (ii) the deal "fell flat" sometime after Mr. Matus gave Orqa "information." Plaintiffs' punchline? Mr. Matus purposefully tanked the Orqa deal. But that's not a fact. It's a conclusion that's not supported by any pleaded facts.

Last example. Plaintiffs allege that (i) Mr. Matus told them in late 2024 that Vector was not planning on creating a drone; and that (ii) Vector announced the Hammer in July 2025, roughly eight months later. Plaintiffs' punchline? Mr. Matus knew in late 2024 that Vector was going to make a drone, so his statements were false when made. Again, that's not a fact, much less a particularized fact required by Rule 9(b). It's a threadbare recital of an element of fraud.

These and other fact imposters make Plaintiffs' claims sound more like a conspiracy theory than plausible, well-pleaded causes of action. For the reasons below, and all the reasons in Vector's motion to dismiss, the Court should dismiss Plaintiffs' complaint with prejudice.

## **PLAINTIFFS' ALLEGATIONS**

Mr. Matus founded Teal in 2014 as a sophomore in high school. ¶ 25.[1] Teal specializes in designing, developing, manufacturing, and selling drones that can execute short-range intelligence, surveillance, and reconnaissance ("ISR") missions. ¶ 84.

---

[1] All "¶" references are to Plaintiffs' Complaint. ECF No. 1.

A.    **The U.S. Army Announces Its SRR Program for Drones.**

In November 2018, the U.S. Army announced its Short-Range Reconnaissance program of record ("SRR Program") to spur development of American Small Uncrewed Aircraft Systems ("sUAS"), *i.e.*, drones that can complete ISR missions. ¶ 69. The Army is executing the SRR Program in phased tranches to maintain flexibility to respond to advances in technology and user feedback. *Id*.

B.    **Teal Submits a Drone to Compete for the U.S. Army's SRR1 Contract.**

For Tranche 1 of the SRR Program ("SRR1"), Teal submitted its Golden Eagle drone. ¶¶ 70–71. While the Golden Eagle wasn't selected as the winner for Tranche 1, it was one of only five drones chosen to be on the Blue UAS list, *i.e.*, approved by the Department of Defense for reconnaissance applications. ¶¶ 73–74.

C.    **Mr. Matus Joins Red Cat and Designs and Develops the Black Widow, a Highly Specialized ISR Drone; the Black Widow Wins the SRR2 Program.**

Red Cat acquired Teal in August 2021. ¶ 28. After the acquisition, Mr. Matus continued to serve as Teal's CEO. ¶ 28.

In 2021, the Army began considering applicants for SRR Tranche 2. ¶ 75. SRR Tranche 2 sought ISR drones with "enhanced capabilities" that could give soldiers "situational awareness beyond the next terrain." ¶ 76.

To compete for the SRR Tranche 2 contract, Mr. Matus and others at Red Cat/Teal started developing the Black Widow drone. ¶ 78. The Black Widow, which cost millions of dollars to develop, is a "small, tactical quadrotor drone that is rucksack portable, field-repairable, and designed to provide critical ISR to the front-line warfighter" that "has an endurance of 45+ minutes and a link range of 5 mi[les]. The drone is also AI-enabled with capabilities such as

visual navigation, aided target recognition, and 3D mapping." ¶ 93 n.19; *see also* ¶¶ 78–80; 89–90.

On November 19, 2024, Red Cat announced that the Army had selected the Black Widow as the winner of the SRR Tranche 2 program and would move toward transitioning it into production. ¶ 93 n.19.

**D.    Red Cat Promotes Mr. Matus to Chief Technology Officer.**

In an employment agreement executed in May 2024 ("Agreement"), Red Cat promoted Mr. Matus to its Chief Technology Officer. ¶ 42 n.7. The Agreement prohibits Mr. Matus from (i) engaging in "certain competitive activity;" and (ii) soliciting Red Cat/Teal employees to leave their employment. ¶¶ 48–49.

**E.    Red Cat Explores a Partnership with Orqa to Build "FANG," an FPV Drone.**

In 2024, Red Cat/Teal started exploring a partnership with Orqa, a Croatian drone company specializing in first-person-view ("FPV") drones. ¶ 120.

In July 2024, Red Cat/Teal and Orqa executed a non-binding memorandum of understanding: Orqa would send Red Cat/Teal its components to build its drones in the U.S., Red Cat/Teal would assemble the drones, and Red Cat/Teal would then exclusively sell Orqa's FPV drones in the United States under their label as "FANG" drones. ¶ 124.

"At some point thereafter," the deal with Orqa "fell flat." ¶ 133. "[U]pon information and belief," Plaintiffs claim that Orqa backed out of the deal because Mr. Matus gave Orqa "information" about Blue UAS clearance. ¶ 135.

Red Cat/Teal stopped developing FANG in the fall of 2024. ¶¶ 94, 134. To date, Red Cat/Teal have not created FANG—it's still "under development." ¶ 88 n.19.

### F.    Mr. Matus Leaves Red Cat for Vector.

In November 2024, shortly after Red Cat/Teal won the SRR2 Tranche award, Mr. Matus announced that he was leaving to join Vector. ¶ 105. Vector describes its business model as "warfare-as-a-service." ¶ 106. Under that model, Vector wasn't planning to create any of its own equipment. ¶¶ 106, 112, 138. Instead, Vector planned to derive revenue from lucrative service contracts to train soldiers to tactically integrate technology into their operations and then sell technology and third-party equipment to them through those contract vehicles. ¶¶ 106, 112.

"Upon information and belief," Plaintiffs claim that Mr. Matus "covertly joined" Vector around April or May 2024. ¶¶ 8, 110. Plaintiffs also allege that, around that time, Mr. Matus "delay[ed] implementation" of "business directives" assigned by Mr. Hitchcock, who was Mr. Matus's subordinate. ¶¶ 113–19.

### G.    Mr. Matus Returns His Company-Issued Laptop to Red Cat After Resetting It.

Plaintiffs allege that, "[f]ollowing [Mr. Matus's] separation of his employment," Mr. Matus "wiped" and "returned" his Red Cat/Teal laptop. ¶ 139. Plaintiffs claim "documents, data, and files" were deleted from the laptop's local drive, but Plaintiffs don't allege which ones. *Id*.

### H.    Other Red Cat/Teal Employees Join Vector.

Plaintiffs allege that at least 9 Red Cat/Teal employees joined Vector between March and July 2025. ¶ 147. Plaintiffs claim that Mr. Matus "began to mine" Red Cat/Teal employees after he joined Vector. ¶ 145.

### I.    Vector Develops the Hammer, a Simple, Single-Use FPV drone.

In July 2025, Vector announced that it was releasing an FPV drone called "Hammer." ¶ 164. Hammer is "a first-of-its-kind" FPV quadcopter drone that "can fly in any jammed

environment completely radio silent with an explosive payload." ¶ 173 n.27. The Hammer is also "attritable," *i.e.*, it's used just one time and for one reason: to explode into its intended target like a kamikaze plane. ¶ 166 n.24. For that reason, the Hammer is "low cost, relevant, and scalable." *Id.* Unlike the Black Widow, the Hammer "is not an incremental tech spec." *Id.* Rather, the Hammer is a simple drone that can be "manufacture[d] . . . at orders of magnitude higher volume than America's existing output." *Id.*

## LEGAL STANDARD

To survive a motion to dismiss, Plaintiffs must allege "sufficient factual matter" to state a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009). While the Court must accept the complaint's well-pleaded facts as true, the Court cannot accept the complaint's labels, conclusory allegations, or legal conclusions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## ARGUMENT

## I.    PLAINTIFFS HAVE FAILED TO STATE A BREACH OF CONTRACT CLAIM.

"The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages." *Espenschied Transp. Corp. v. Fleetwood Servs.*, 2018 UT 32, ¶ 15.

Plaintiffs assert two breach of contract claims against Mr. Matus based on two alleged breaches of the Agreement. ¶¶ 225–71. Plaintiffs have failed to state a claim for either alleged breach.

### A.    Plaintiffs Have Not Pleaded Sufficient Facts Showing That Mr. Matus Breached the Agreement's Non-Compete Clause.

Plaintiffs claim that Mr. Matus violated the Agreement's non-compete clause by joining Vector because Vector "manufacture[s] competitive drones." ¶¶ 233–34.

This claim fails as a matter of law because Plaintiffs have not pleaded sufficient facts to show that Vector's only drone product, the Hammer, competes with either the Black Widow or the FANG.

### 1.    Plaintiffs Have Failed to Plead Facts Showing That the Hammer Competes with the Black Widow Drone.

The facts alleged in Plaintiffs complaint demonstrate how different the Hammer is from the Black Widow:

|  | **Red Cat's Black Widow** | **Vector's Hammer** |
|---|---|---|
| **Number of Uses** | Multi-use | One |
| **Purpose** | Intelligence, reconnaissance, surveillance (hunter drone) | Eliminating a target (killer drone), and "intended to be used . . . with ISR drones." |
| **R&D resources** | Millions of dollars, years of development, highly sophisticated and custom equipment. | "[N]ot an incremental tech spec" that, at most, took only a few months to develop. |
| **Scalability** | Took years to develop and requires "as many hands on deck as possible" to manufacture. | The Hammer is easy to manufacture at massive scale. |

¶¶ 93 n.19; 164 n.23; 166 n.24.

Because of these fundamental differences, the Hammer and Black Widow aren't competitors. They do different things: the Black Widow hunts and the Hammer kills. And their capabilities are tailored to those purposes. The Black Widow is chock-full of advanced technology that took years to develop, including 3D mapping, because it's designed to *find*

targets; the Hammer, developed in just months, is a simple drone that can be manufactured quickly because its only purpose is to *destroy* targets kamikaze style.

Also, the Black Widow and Hammer aren't competing for the same contracts. In fact, the Black Widow isn't competing for anything anymore—it *won* the SRR 2 Tranche contract award. ¶ 93 n.19. That was in November 2024, 8 months *before* Vector announced the Hammer. ¶¶ 93 n.19, 164.

### 2. Plaintiffs Have Failed to Plead Facts Showing That the Hammer Competes with Their FANG Drone.

The Hammer can't compete with the FANG because, as Plaintiffs allege, the FANG has never existed. Plaintiffs allege that they started "developing" the FANG in March 2024, and that they "intended" for the FANG to be an FPV drone. ¶ 93. But Plaintiffs also admit that they "suspended" FANG's development in the fall of 2024, and that sometime "in 2025" they started developing the FANG again. ¶ 95. And today, the FANG is still "under development." ¶ 93 n.19.

The Hammer couldn't compete with the FANG because there's nothing to compete with. The FANG has never existed.

### B. Plaintiffs Don't Plead Sufficient Facts Showing That Mr. Matus Breached the Agreement's Non-Solicitation Clause.

The Agreement prevents Mr. Matus from soliciting Red Cat employees to leave their employment. ¶ 49. Plaintiffs allege at least nine Red Cat employees left to join Vector within seven months of Mr. Matus's departure. ¶ 147. Plaintiffs speculate that this means Mr. Matus must have solicited them to join Vector.

This claim fails as a matter of law because Plaintiffs have not pleaded sufficient facts to show that Mr. Matus solicited any of Plaintiffs' employees to join Vector. Plaintiffs claim that

Mr. Matus "mined" Plaintiffs' employees, which is a threadbare legal conclusion not supported by any alleged facts. ¶ 145; *LS3 Inc. v. Cherokee Fed. Sols., L.L.C.*, 2021 U.S. Dist. LEXIS 186460, at *16 n.4 (D. Colo. Sep. 29, 2021) (dismissing claims when the plaintiff "offer[red] nothing more than the bare allegation that [the defendant] solicited employees"), *rev'd in part on other grounds by* 2022 U.S. App. LEXIS 22821, at *1 (10th Cir. Aug. 17, 2022); *Cunningham Lindsey U.S. Inc. v. Crawford & Co.*, 2018 U.S. Dist. LEXIS 204079, at *10 (D. Colo. Dec. 3, 2018) (dismissing claims based on allegations that the defendant "'solicited and induced' and 'encouraged or directed' [the defendant's] employees to take certain action'"); *see also Tenet Bus. Servs. Corp. v. Ascension Health All.*, 2024 U.S. Dist. LEXIS 231603, at *6 (N.D. Tex. Dec. 23, 2024) (dismissing complaint because the plaintiff merely alleged that the defendant "engaged in 'soliciting, recruiting, and poaching," and those "conclusory accusations [were] unsupported by any facts").

## II.    PLAINTIFFS HAVE FAILED TO STATE A BREACH OF FIDUCIARY DUTY CLAIM.

Under Utah law, officers have a duty of loyalty. In other words, officers must discharge their duties "in a manner [they] reasonably believe[] to be in the best interests of the corporation." Utah Code Ann. § 16-10a-840(1)(c).[2] To state a breach of loyalty claim, Plaintiffs must plead that Mr. Matus did something that he either knew was "not in the best interests of [Plaintiffs], or unreasonably or negligently believe[d] [was] in the best interests of the corporation." *Rawcliffe v. Anciaux*, 2017 UT 72, ¶ 19.

---

[2] "The legislature appears to have codified the common law duties of good faith, care, and loyalty. . . . Subsection (1)(c) appears to codify the duty of loyalty." *Rawcliffe v. Anciaux*, 2017 UT 72, ¶ 14 n.7.

Plaintiffs claim that Mr. Matus breached his duty of loyalty in four ways: by (i) joining Vector while he was still employed by Plaintiffs; (ii) failing to implement "business initiatives"; (iii) providing Orqa with "information" related to Blue UAS; and (iv) wiping his computer before joining Vector. ¶¶ 272–81.

For the reasons below, Plaintiffs have failed to state a claim as to any of them.

### A.      Mr. Matus Didn't Breach His Duty of Loyalty by Joining Vector.

First, Plaintiffs claim that Mr. Matus breached his duty of loyalty because, "while employed by Red Cat/Teal, [he] co-founded, joined, and grew a competing business, Vector." ¶ 276. As a matter of law, Plaintiffs' allegations that Mr. Matus joined and founded Vector cannot state a claim because, at most, they were "mere preparation for competition." *See Premier Sleep Sols., LLC v. Sound Sleep Med., LLC*, 2021 U.S. Dist. LEXIS 63002, at *7 (D. Utah Mar. 30, 2021). Under Utah law, Mr. Matus "may properly plan to go into competition with his employer and may take active steps to do so while employed . . . without violating any duty to [Plaintiffs.]". *Spencer Law Office, LLC v. Dep't Workforce Servs.*, 2013 UT App 138, ¶ 17 (citation omitted); *see also Scenic Aviation, Inc. v. Blick*, 2003 U.S. Dist. LEXIS 28009, at *12 (D. Utah Aug. 4, 2003) ("In general, an employee may make arrangements to compete with [his] employer before termination of employment[.]").

Plaintiffs also allege that Mr. Matus "grew" Vector while he was still employed by Plaintiffs. ¶ 276. But Plaintiffs don't allege a single fact to support this bald assertion. For example, Plaintiffs don't allege that Mr. Matus (i) did any work for Vector; (ii) represented Vector in any capacity; (iii) was paid by Vector; (iv) or did anything on Vector's behalf while he was still employed by Plaintiffs.

10

**B.      Mr. Matus Didn't Breach His Duty of Loyalty by Failing to Implement "Business Initiatives."**

Plaintiffs claim that Mr. Matus breached his duty of loyalty by "failing to implement agreed-upon business initiatives at Teal and delaying Teal's progress." ¶ 277. When trying to describe these "business initiatives," Plaintiffs provide yet another helping of word salad, alleging that Mr. Matus failed "to communicate and effectuate the business directives discussed and agreed upon with Hitchcock;" that "Hitchcock was forced to follow up with Matus numerous times;" and that "[s]uch hinderances slowed the successful completion of important work." ¶ 115.

These allegations are far too vague to amount to a breach of fiduciary duty. As best as Mr. Matus can tell, Plaintiffs allege Mr. Matus didn't do the "important work" Mr. Hitchcock asked him to do as quickly as Mr. Hitchcock would have liked. *Id.* Plaintiffs don't allege that Mr. Matus—Red Cat's former CTO and Teal's founder and CEO—reported to Mr. Hitchcock—Red Cat's "Senior Vice President of Sales" and Teal's "General Manager" *See* ¶¶ 78, 111. But even setting that aside, Plaintiffs don't allege why Mr. Matus's alleged failure to listen to Mr. Hitchcock amounts to a breach of loyalty, *i.e.*, that Mr. Matus was not acting in Plaintiffs' best interest. At most, Plaintiffs allege that Mr. Matus wasn't working fast enough. But that's not a breach of the duty of loyalty. *See Rawcliffe*, 2017 UT 72, ¶ 19 (a director fulfills his duty of loyalty by subjectively believing that her "actions are in the best interest of the corporation[.]"); *see, e.g. Beltran v. Brentwood North Healthcare Ctr., LLC*, 426 F. Supp. 2d 827, 832 (N.D. Ill. 2006) ("[S]leeping on the job, like other forms of negligent or substandard job performance, is inherently dissimilar from the types of self-dealing scenarios that courts have recognized as forming the basis for viable breach-of-fiduciary claims.").

11

Plaintiffs also allege that Mr. Matus breached his duty of loyalty by attending a work conference in Japan shortly before a drone delivery deadline. ¶¶ 116–19. Plaintiffs admit that they "were still able to send out their drones on time," but claim Mr. Matus's absence caused their employees "stress." ¶ 118. This theory is silly—just because other employees felt stressed doesn't mean that Mr. Matus breached his duty of loyalty. Plus, Plaintiffs admit there was no injury; Plaintiffs met their delivery deadline without Mr. Matus. And on top of that, Plaintiffs haven't alleged that Mr. Matus knew that going to a work conference in Japan was not in the company's best interest. *See Rawcliffe*, 2017 UT 72, ¶ 19.

### C.    Mr. Matus Didn't Breach His Duty of Loyalty by Giving Orqa "Information."

Plaintiffs claim that Mr. Matus breached his duty of loyalty by "provid[ing] Orqa information regarding Blue UAS clearance" sometime "in the midst of negotiations." ¶ 135; *see also* ¶ 278. Plaintiffs say that this "information" spoiled their "primary leverage in closing the deal." ¶ 135.

There are far too many pleading gaps in this theory to state a breach of fiduciary duty claim. All Plaintiffs allege is that, at some point, Mr. Matus gave Orqa "information" and sometime later, their deal with Orqa fell apart. ¶ 135. Without basic facts to connect the dots—(i) what "information" Mr. Matus provided; (ii) when he provided it; (iii) or why that "information" tanked the deal—Plaintiffs can't even begin to allege facts showing that Mr. Matus was not acting in their best interest, much less knowingly so. *See Murphy v. Peak*, 2023 U.S. App. LEXIS 27635, at *3 (10th Cir. Oct. 18, 2023) (plaintiff's complaint did not satisfy Rule 8 because it failed to "include adequate allegations as to what each defendant did to him, when the

defendant did it, how the defendant's action harmed him, and what specific legal rights he believes each defendant violated." (cleaned up)).

### D.   Mr. Matus Didn't Breach His Duty of Loyalty by Wiping His Computer.

Plaintiffs claim that Mr. Matus breached his duty of loyalty by resetting "his Red Cat/Teal laptop without permission." ¶ 279.

The Utah Trade Secrets Act ("UTSA") preempts Plaintiffs' breach of fiduciary claim as to these allegations because they also "support[] [Plaintiffs'] misappropriation of trade secrets" claim. *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 48; *see also* Utah Code Ann. § 13-24-8. Here, Plaintiffs' UTSA claim is based on the allegation that "Matus wiped his Red Cat/Teal laptop." ¶ 216. Identical allegations form this strand of Plaintiffs' breach of fiduciary duty claim. ¶ 279 ("Matus wiped his Red Cat/Teal laptop"). For that reason, the UTSA preempts Plaintiffs' breach of fiduciary duty claim. *See, e.g.*, *Graystone Funding Co., LLC v. Network Funding, L.P.*, 2021 U.S. Dist. LEXIS 187818 at *29–30 (D. Utah Sep. 29, 2021) (applying *CDC Restoration*); *Premier Sleep Sols.*, 2021 U.S. Dist. LEXIS 63002 at *16–17 (applying *CDC Restoration* and dismissing breach of fiduciary duty claim as preempted under the UTSA because "the facts that PSS alleges as part of [that] claim relate to Angus and Kilpack allegedly misappropriating PSS's confidential information").

But even setting that aside, Mr. Matus didn't have a duty of loyalty when he allegedly wiped his computer because Plaintiffs allege that happened "*[a]fter* his separation of employment from Red Cat." ¶¶ 288, 304. And as a matter of law, Mr. Matus's duty of loyalty ended when his employment did. *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 695

13

(Utah 1981) ("When a corporate officer ceases to act as such, because of his resignation or removal, the fiduciary relationship ceases.").

## III.    PLAINTIFFS HAVE FAILED TO STATE A TORTIOUS INTERFERENCE CLAIM.

To state a claim for tortious interference with contractual relations, a plaintiff must allege "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) by improper means, (3) causing injury to the plaintiff." *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70.

Plaintiffs allege Mr. Matus tortiously interfered (i) with their prospective economic relationship with Orqa by providing Orqa "information regarding Blue UAS clearance" (¶¶ 326–29); and (ii) with Plaintiffs' existing economic relations with their employees by soliciting them to join Vector (¶¶ 330–35).

Both theories fail as a matter of law.

### A.    Plaintiffs Have Failed to Allege Mr. Matus Interfered with Orqa by Improper Means.

To state a claim for tortious interference, Plaintiffs must show that Mr. Matus tortiously interfered "by improper means." *Eldridge*, 2015 UT 21, ¶ 70. The Utah Supreme Court has "narrowly" defined improper means "to include only those actions that are contrary to law, such as violations of statutes, regulations, or recognized common-law rules or actions that violate an established standard of a trade or profession." *C.R. England v. Swift Transp. Co.*, 2019 UT 8, ¶ 42 (cleaned up). Those actions include "violence, threats or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehood[s]." *Id.*

14

Plaintiffs claim that Mr. Matus shared "information regarding Blue UAS clearance" with Orqa, and that he did so by improper means because he violated (i) his "contractual obligations;" (ii) "fiduciary duties;" and (iii) the "military defense contractor industry standard." ¶¶ 326, 328–29.

None of these allegations count as improper means as a matter of law.

### 1. Plaintiffs' Breach of Contract Allegations Don't Amount to Improper Means.

As a matter of law, "breaching or inducing breach of a contract … cannot be considered a possible improper means." *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, 2016 U.S. Dist. LEXIS 163187, at *6–7 (D. Utah Nov. 27, 2016).

But even if it did, Plaintiffs don't plead this claim with sufficient factual support. They fail to identify any specific contract or contractual obligation that Mr. Matus breached by purportedly sharing "information regarding Blue UAS clearance." ¶ 326. Such conclusory allegations of breach need not be considered. *Twombly*, 550 U.S. at 555.

And as explained above, Plaintiffs have failed to state a breach of contract claim.

### 2. Plaintiffs' Breach of Fiduciary Duty Allegations Don't Amount to Improper Means.

Because Plaintiffs have failed to state a breach of fiduciary duty claim, their improper means claim fails. Specifically, the Complaint contains no well-pleaded allegations that Matus shared information with Orqa knowing it was not in Plaintiffs' best interest, or unreasonably or negligently believing it was in Plaintiffs' best interests. *See Rawcliffe*, 2017 UT 72, ¶ 19.

15

### 3. Plaintiffs Fail to Allege Any Well-Pleaded Facts Showing That Mr. Matus Violated Any Industry Standards.

Plaintiffs fail to identify the applicable "military defense contractor industry standard" that Matus allegedly violated. ¶ 329. Instead, Plaintiffs vaguely allege that the interference "contradicted military defense contractor industry standard where he did not truthfully act on behalf of or represent the interests of Red Cat/Teal." *Id.* "But merely rephasing a party's [alleged interference] as a violation of industry standards will not suffice to satisfy the improper means requirement." *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, 2021 U.S. Dist. LEXIS 36563, at *8 n.3 (D. Utah Feb. 25, 2021) (granting motion to dismiss tortious interference claim where party did not adequately identify the "applicable industry standard").

### B. Plaintiffs Have Failed to Allege That Mr. Matus Interfered with Their Employees by Improper Means.

Plaintiffs claim that Mr. Matus's solicited their employees by improper means because his solicitation violated his "contractual obligations." ¶ 334. But, again, breaching a contract as a matter of law does not count as improper means. *First Am. Title Ins. Co.*, 2016 U.S. Dist. LEXIS 163187, at *6–7. Instead, "[t]he improper means must be independently actionable conduct." *Id.* at *4; *see also C.R. Eng.*, 2019 UT 8, ¶ 45 ("[W]e have been careful to limit the scope of actionable conduct within the tortious interference context to those situations where a defendant employs a means that is independently tortious or wrongful.").

Also, as explained above, Plaintiffs' breach of contract claim fails.

Plaintiffs also claim that Mr. Matus's solicitation violates a "military defense contractor industry standard." ¶ 335. But once again, "merely rephasing a party's [alleged interference] as a violation of industry standards will not suffice to satisfy the improper means requirement." *Smart*

*Surgical, Inc.*, 2021 U.S. Dist. LEXIS 36563, at *8 (rejecting alleged industry standard of "respecting non-competes and confidentiality agreements" and granting motion to dismiss for failure to plead improper means).

### C. The Economic Loss Rule Bars Plaintiffs' Tortious Interference Claim as to Mr. Matus's Alleged Solicitation.

The economic loss rule bars Plaintiffs' tortious interference claim as it relates to Mr. Matus's solicitation of Plaintiffs' employees because that claim is based on Mr. Matus's alleged breach of his "contractual obligations." ¶ 334. "'All contract duties, and all breaches of those duties . . . must be enforced pursuant to contract law.'" *Zurich Am. Ins. Co. v. Ascent Constr., Inc.*, 2022 U.S. Dist. LEXIS 1321, at *14–15 (D. Utah Jan. 3, 2022) (quoting *Reighard v. Yates*, 2012 UT 45, ¶ 21). Utah law does not impose a general duty on former employees not to solicit former employer's employees. Without a duty independent of the contract, the economic loss rule precludes Plaintiffs' claim for tortious interference with their employees. *Healthbanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1199 (D. Utah 2016) (collecting Utah cases holding that application of economic loss rule depends on whether a duty exists independent of any contractual obligations).

### IV. PLAINTIFFS HAVE FAILED TO STATE A FRAUDULENT MISREPRESENTATION CLAIM.

To state a claim for fraudulent misrepresentation, Plaintiffs must plead facts showing "(1) that a representation was made (2) concerning a presently existing material fact (3) which was false and (4) which the representor either (a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation, (5) for the purpose of inducing the other party to act upon it and (6) that the other party, acting reasonably

and in ignorance of its falsity, (7) did in fact rely upon it (8) and was thereby induced to act (9) to that party's injury and damage." *11500 Space Ctr. LLC v. Private Capital Grp. Inc.*, 2022 UT App 92, ¶ 55.

Plaintiffs' fraud claim fails for three reasons.

A.      **Plaintiffs' Allegations Fall Well Short of Rule 9(B)'S Particularity Requirements.**

Plaintiffs must allege "the time, place and contents of the false representations, the identity of the party making the false statements, and the consequences" of the false representations. *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000). Put differently, Plaintiffs must plead "the who, what, where, when, and how of the alleged fraud." *Clinton v. Sec. Ben. Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).

Plaintiffs allege in a May 2024 meeting—seven months before Mr. Matus joined Vector—"the Vector founders" told Hitchcock that "they did not, and had no plans to, design, develop, and/or manufacture drones." ¶ 112. While Plaintiffs allege that Mr. Matus was at that meeting, they don't allege that he made that statement or any other allegedly false statement. *Id.*; *Coroles v. Sabey*, 2003 UT App 339, ¶ 28 (affirming dismissal of a fraud claim when the plaintiff "fail[ed] to identify exactly who made the alleged misrepresentations"). "Certainly one requirement for pleading fraud with particularity is to identify the offender," and Plaintiffs have failed to do so here. *Coroles*, 2003 UT App 339 at ¶ 28.

Plaintiffs allege that, when Mr. Matus announced his departure to Vector in November 2024, Mr. Matus told "Red Cat/Teal" that Vector "provides modern warfare-as-a-service," and that Vector would "lease drones that it purchased from other entities." ¶ 112. This allegation is far too vague—to whom at "Red Cat/Teal" did Mr. Matus allegedly make this statement? *See*

*11500 Space Ctr.*, 2022 UT App 92 at ¶ 60 (affirming dismissal of fraud-based claims when the plaintiff "failed to identify with any particularity who the recipients of the alleged misstatements were").

### B.  Plaintiffs Have Failed to Plead a Representation That Was False When It Was Made.

Plaintiffs allege that Mr. Matus represented to Mr. Hitchcock in December 2024 that Vector "offered warfare-as-a-service and was not a drone company." ¶138. The only reason Plaintiffs say this statement was false when made is because, in July 2025—eight months later—Vector announced the Hammer. ¶ 164. But the fact that Vector made drones in July 2025 doesn't make Mr. Matus's statement in December 2024 false. In other words, Plaintiffs have failed to plead a "*presently existing* material fact" that was false in December 2024. *11500 Space Ctr.*, 2022 UT App 92 at ¶ 55. That pleading deficiency is fatal.

Neither have Plaintiffs alleged any facts showing that Mr. Matus, "*at the time of the representation*, did not intend to perform the promise and made the representation for the purpose of deceiving the promise." *Firehole River Capital, LLC v. Supurva Healthcare Grp., Inc.*, 2021 U.S. Dist. LEXIS 181338, at *19 (Sep. 21, 2021) (emphasis added).

### C.  Plaintiffs Fail to Allege Any Injury from Mr. Matus's Allegedly False Representation That Vector Had No Plans to Make Any Drones.

Plaintiffs allege that they were injured because Mr. Matus "competed against Red Cat/Teal for nearly seven months post-employment with minimal detection, delay, or hinderance." ¶ 348. But as Plaintiffs admit, Red Cat's FANG drone—the only drone that could conceivably compete with Vector's Hammer drone—has never hit the market, and its

development was "suspended" in the "fall of 2024." ¶ 94. Because there was nothing for Hammer to compete against, Plaintiffs didn't suffer an injury.

## V.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE CFAA.

The federal Computer Fraud and Abuse Act ("CFAA") "subjects to criminal liability anyone who 'intentionally accesses a computer without authorization or exceeds authorized access,' and thereby obtains computer information." *Van Buren v. United States*, 593 U.S. 374, 379 (2021) (quoting 18 U.S.C. § 1030(a)(2)). The CFAA also provides a civil cause of action: "Any person who suffers damage or loss by reason of a violation of this section may maintain a civil action against the violator to obtain compensatory damages and injunctive relief or other equitable relief." 18 U.S.C. § 1030(g). Thus, the CFAA creates two avenues to civil liability: one for accessing protected information "without authorization" and one for "exceeding authorized access." *Id.* § 1030(a)(1).

The Supreme Court's decision in *Van Buren* forecloses both avenues here.

### A.    Plaintiffs Have Failed to Allege Sufficient Facts Under the CFAA's "Without Authorization" Prong.

The "without authorization" prong applies to "so-called outside hackers—those who 'acces[s] a computer without any permission at all.'" *Van Buren*, 593 U.S. at 389 (quoting *LVRC Holdings LLC* v. *Brekka*, 581 F. 3d 1127, 1133 (9th Cir. 2009)).

None of the pleaded facts here even remotely suggest that Mr. Matus was an outside hacker that accessed Plaintiffs' files without permission. For example, Plaintiffs don't allege that Mr. Matus (i) wasn't authorized to access his computer at any point; or (ii) that he accessed Plaintiffs' computer after he joined Vector.

### B.    Plaintiffs Have Failed to Allege Sufficient Facts Under the CFAA's "Exceeds Authorized Access" Prong.

"[A]n individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him." *Van Buren*, 593 U.S. at 396.

Here, Plaintiffs do not plead that Mr. Matus accessed any files that were off limits to him. Instead, Plaintiffs allege that Mr. Matus deleted files when he reset his laptop. But that has nothing to do with his access. At most, these allegations amount to improper use of information. But that theory of liability is precisely what Supreme Court said does not count under the exceeds-authorized-access prong: "if a person has access to information stored in a computer— *e.g.*, in 'Folder Y,' from which the person could permissibly pull information—then he does not violate the CFAA by obtaining such information, *regardless of whether he pulled the information for a prohibited purpose*. But if the information is instead located in prohibited 'Folder X,' to which the person lacks access, he violates the CFAA by obtaining such information." 593 U.S. at 382–83 (emphasis added).

Because Plaintiffs have only alleged that Mr. Matus accessed his computer with an improper purpose—deleting files—their claim fails as a matter of law. *See, e.g.*, *Speed of Light Ops, Ltd. Liab. Co. v. Elliot*, 2023 U.S. Dist. LEXIS 61876, at *6 (D. Utah Mar. 20, 2023) ("[T]he CFAA does not cover those who have improper motives for obtaining information that is otherwise available to them."); *ACI Payments, Inc. v. Conservice, LLC*, 2022 U.S. Dist. LEXIS 38222, at *23 (D. Utah Mar. 3, 2022) ("*Van Buren* precludes liability under the exceeds authorized access prong for those who use authorized access to a computer for an unauthorized purpose.").

## VI.     PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER THE UCADRA.

Utah's Computer Abuse and Data Recovery Act ("UCADRA") "overlap[s]" with the "federal Computer Fraud and Abuse Act." *Vendr, Inc. v. Tropic Techs., Inc.*, 2023 U.S. Dist. LEXIS 226181, at *23 (D. Utah Dec. 19, 2023). It creates a civil cause of action for various acts by "unauthorized users" of computers. Utah Code Ann. § 63D-3-104.

Plaintiffs' UCADRA claim fails because they have not alleged facts showing that Mr. Matus was an unauthorized user. An "unauthorized user" is someone who, without permission, "accesses the protected computer by: obtaining . . . the authorized user's [password]; or circumventing . . . [the password]." *Id.* § 63D-3-102(9).

Here, Plaintiffs have not alleged any facts showing that Mr. Matus accessed their computer by either obtaining or circumventing a password without their permission.

In addition, Plaintiffs have not alleged that Mr. Matus engaged in any of the UCADRA's "prohibited acts:" (i) "obtain[ing] information from the protected computer;" (ii) "caus[ing] the transmission of a program, code, or command to the protected computer;" or (iii) providing a password to unauthorized user. *Id.* § 63D-3-104. Instead, Plaintiffs allege that Mr. Matus deleted files by resetting his computer, which doesn't fall under any of these prohibited acts.

## VII.    PLAINTIFFS HAVE FAILED TO STATE A TRADE SECRET MISAPPROPRIATION CLAIM.

For the reasons stated in Vector's brief, which Mr. Matus fully incorporates herein, Plaintiffs fail to state a trade secret misappropriation claim.

**<u>CONCLUSION</u>**

For these reasons, and all the reasons in Vector's motion to dismiss, Mr. Matus asks the

Court to dismiss Plaintiffs' complaint with prejudice.

DATED this 11th day of September, 2025.

HOLLAND & HART LLP


*/s/ Darren G. Reid*
Darren G. Reid
April M. Medley
Zach D. Williams

*Attorneys for Defendant George Matus*