# Exhibit 2

Christina M. Jepson (Utah Bar No. 7301)
Corey J. Hunter (Utah Bar No. 18964)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
CJepson@parsonsbehle.com
CHunter@parsonsbehle.com

Adam R. Rosenthal (*Pro Hac Vice*)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
12275 El Camino Real, Suite 100
San Diego, CA 92130
Tel: (858) 720-8900
Fax: (858) 509-3691
arosenthal@sheppardmullin.com

Victoria W. Hubona (*Pro Hac Vice*)
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
321 N. Clark Street, 32nd Floor
Chicago, Illinois 60654
Tel: (312) 499-6300
Fax: (313) 499-6301
vhubona@sheppardmullin.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| RED CAT HOLDINGS, INC. and TEAL DRONES, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> GEORGE MATUS and VECTOR DEFENSE INC., <br><br> Defendants. | **SUPPLEMENTAL DECLARATION OF GEOFF HITCHCOCK IN ADVANCE OF PRELIMINARY INJUNCTION HEARING** <br><br> Case No. 2:25-cv-00646-TS-JCB <br><br> District Judge Ted Stewart <br><br> Magistrate Judge Jared C. Bennett |

I, Geoff Hitchcock, hereby declare under penalty of perjury, under the laws of the United States of America, pursuant to 28 U.S.C. §1746, that the following is true and correct to the best of my knowledge and belief:

1. I am a resident of Oregon. I am over the age of twenty-one (21) years. I have personal knowledge of all facts set forth in this declaration and would and could testify thereto if called upon.

2. Since September 2021, I have performed work for Red Cat Holdings, Inc. ("Red Cat") and Teal Drones, Inc. ("Teal") (together, "Red Cat/Teal"). I currently serve as Red Cat's Chief Revenue Officer ("CRO").

### HAMMER'S MARKET ADVANTAGE

3. Since 2023, the Red Cat/Teal leadership team, including George Matus (during the time he was employed by Red Cat/Teal) engaged in discussions regarding plans to design, develop, and manufacture a first-person view ("FPV") drone. Approximately two years later, in October 2025, Red Cat/Teal publicly released their FPV drone, FANG™, to the market.

4. I understand that Vector Defense, Inc. ("Vector") publicly released its FPV drone, Hammer, to the market in July 2025, approximately three months before Red Cat/Teal debuted FANG™ for sale.

5. Vector unquestionably benefits from entering the FPV market early and approximately three months prior to Red Cat/Teal.

6. Upon formalizing a drone contract, early market entrants enjoy valuable drone feedback and insight from the drone's end-users. This intel drives refinement of the drone and places the drone manufacturer on the cutting-edge of drone advancement for that class of drones.

Such a manufacturer is able to offer iterations of its drone technology based on end-user feedback meeting customer needs and preferences long before the manufacturer's competitors become aware of these insights. This is a significant advantage to a manufacturer over its competitors. Drone manufacturers earn revenue through these contracts while simultaneously acquiring the substantial research and development that help edge out competitors.

7.	Beginning in 1999, I led teams of airmen innovating with unmanned aerial systems ("UAS") for military usage as a special forces operator in the U.S. Air Force. After my service in the military, and through present day, I have spent twenty-three (23) years working for different military contractors in the drone industry. Throughout my decades of experience in the defense technology industry, I have personally observed numerous drone manufacturers gain a significant advantage by bringing their drones to market before their competitors.

**MR. MATUS'S SOLICITATION OF RED CAT/TEAL EMPLOYEES**

8.	In the months following Mr. Matus's December 2024 formal departure from Red Cat/Teal to join Vector, which Mr. Matus described as a "warfare-as-a-service" provider (and *not* a drone company), as its co-founder and CTO, I understand that Mr. Matus solicited numerous Red Cat/Teal employees to join Vector. These employees included drone experts who held superior qualifications beneficial to Red Cat/Teal's development of an FPV drone.

9.	It is my understanding that several former Red Cat/Teal employees whom Mr. Matus solicited intentionally did not share with Red Cat/Teal that they were joining Vector. Red Cat/Teal were only able to confirm these employees had in fact joined Vector after reviewing Vector's Opposition to Red Cat/Teal's Motion for Preliminary Injunction.

10. The following list identifies the Red Cat/Teal employees who left Red Cat/Teal to join Vector as a result of, as I believe, Mr. Matus's improper solicitation and his and Vector's intentional interference. The list also includes these employees' formal positions at Red Cat/Teal and their final dates of employment at Red Cat/Teal:

**March 20, 2025:** Bradley Weeber (Senior Drone Controls Engineer)

**March 28, 2025:** David Wishart (Drone Design Engineer)

**March 31, 2025:** Rebecca Ferguson (Senior Business Analyst)

**April 14, 2025:** Kenneth Carignan (Electrical Drone Engineer)

**April 23, 2025:** Jay Weight (Vice President of Drone Manufacturing)

**May 2, 2025:** Alexander Wishart (Senior Drone Technician)

**May 9, 2025:** Trevor Johnson (Mechanical Drone Engineer 2)

**May 16, 2025:** Colby Whitney (Director of Drone Software Engineering)

**July 3, 2025:** Dennis Millard (Senior Drone Software Engineer)

**July 4, 2025:** Austin Zobell (Senior Mechanical Drone Engineer Manager)

**July 18, 2025:** Whitney Smith (Drone Software Manager, FW & Services)

11. While at Red Cat/Teal, Mr. Matus oversaw the above-listed employees, was part of the decisions (if not serving as the definitive decision maker) regarding these employees' salaries and benefits, and understood these employees' capabilities, specialties, and expertise.

12. Several of these former Red Cat/Teal employees have significant experience and expertise that would be (and likely have been) especially beneficial to support Vector in its design, development, and manufacture of the Hammer FPV drone. These employees include, but are not limited to, David Wishart (Drone Design Engineer), Jay Weight (Vice President of Drone

Manufacturing), Alex Wishart (Senior Drone Technician), Ken Carignan (Electrical Drone Engineer), and Colby Whitney (Director of Drone Software Engineering). These employees executed Red Cat/Teal employment agreements containing non-competition provisions.

13. For many of these employees, Mr. Matus was one of the final decision makers approving the terms of their Red Cat/Teal employment offers and executing their offer letters and employment agreements on behalf of Red Cat/Teal. (*See, e.g.,* **Exhibit A**, attached hereto).

14. Upon Red Cat/Teal's further investigation into the departures of certain former employees, we have learned that some of these employees stole Red Cat/Teal property prior to and/or following their separation from Red Cat/Teal. For example, after Red Cat/Teal's normal working hours when employees had already gone home for the day, brothers David Wishart and Alex Wishart brought a U-Haul to Teal's Salt Lake City office and loaded it with materials. Red Cat/Teal continue their investigation into departing employees' conduct. This includes our current work to locate and review CCTV footage to better understand what David and Alex Wishart took and whether their conduct merits further criminal investigation.

15. Notably, Rebecca Ferguson worked day-in-and-day-out with Red Cat/Teal's drone pricing and market analysis team. She understands what Red Cat/Teal charge for their drones, how they adjust prices based on different considerations, what market characteristics impact Red Cat/Teal's pricing and how, and the levers that trigger Red Cat/Teal's changes in price. She also knows what Red Cat/Teal's customers pay for different products, when and why Red Cat/Teal provide discounts, and the costs Red Cat/Teal pay for their materials.

<u>**UPCOMING DRONE PROCUREMENTS**</u>

16. As further detailed in Jason Gunter's Declaration in Advance of the Preliminary Injunction Hearing, in April of 2025, the U.S. Army publicly issued a Sources Sought Notice to the drone industry for Purpose Built Attritable Systems covering FPV drones ("PBAS"). While active competition for PBAS has not begun, PBAS appears to represent the U.S. Army's FPV Program of Record. Based on my experience working on numerous Programs of Record, I expect competition for PBAS to begin in early 2026, including competitive FPV drone flyoffs. Red Cat/Teal intend to compete for PBAS, and I understand Vector is also planning to compete for PBAS.

17. In addition to PBAS, Vector and Red Cat/Teal will continue to compete against each other for other FPV opportunities.

18. Currently, we are actively pursuing and competing for, or preparing to pursue and compete for[1], at least thirty-five (35) specific opportunities seeking FPV drones. Collectively, these thirty-five (35) opportunities seek 14,760 units of FPV drones and equate to approximately $19,400,000 in revenue. Beyond these identified opportunities, new requests and sales prospects for FPV drones arise frequently. We anticipate that such forthcoming opportunities will increase the number of active pursuits well beyond thirty-five (35) in the coming months.

19. Based on my understanding of the timeline of events, Mr. Matus's knowledge and understanding of Red Cat/Teal's trade secrets and confidential information, the roles of the Red Cat/Teal employees whom Mr. Matus and Vector successfully poached, and the less than two-

---

[1] For those specific FPV drone opportunities that we are preparing to pursue and compete for, those customers await final budget confirmation before they formally open their requisitions. Such requisitions are expected to open in early Q1 of 2026, at which time we will actively compete to be selected to fulfill those requests seeking FPV drones.

week sprint Vector represents it designed, developed, and manufactured Hammer, I believe the only way Vector was able to design, build, and manufacture to scale the Hammer drone (among other drones) is by improperly taking advantage of Red Cat/Teal's trade secrets and confidential information.

20. Moreover, I understand Mr. Matus and Vector are utilizing Red Cat/Teal's goodwill and relationships to advance Vector's interests. For example, on one website used to promote Vector, Vector represents:

> "Our competitive advantage involves our team of uniquely trained and experience[d] operations, our deep manufacturing leadership experience (**former SRR program winner**), and relationship with active DoD units."

(*See* **Exhibit B**, attached hereto (emphasis added)). Vector is not the former SRR Program of Record winner. Right before Mr. Matus left Red Cat/Teal, Red Cat/Teal were awarded the SRR Program of Record. As Vector's description demonstrates, Vector promotes Red Cat/Teal's SRR Program accomplishment as its own to serve as the basis of Vector's "deep manufacturing leadership experience." Importantly, Mr. Matus was also not an "SRR program winner," as, again, that accomplishment belongs squarely to Red Cat/Teal. It is also concerning that Red Cat/Teal's SRR Program award and Mr. Matus's connection to the same are used to tout Vector's drone manufacturing leadership, especially where, as I understand, Mr. Matus claims to not work directly in Vector's drone manufacturing and Vector has made the outlandish argument in this lawsuit that FPV drones and SRR drones are so fundamentally different that a manufacturer of FPV drones does not compete in the same industry as a manufacturer of an SRR drone.

21. Even where Vector may not ultimately be selected for a contract for which it and Red Cat/Teal are considered, Mr. Matus's and Vector's unfair competition and misconduct can

serve to boost Hammer as well as prematurely remove FANG™ from consideration for that contract where Red Cat/Teal may have been successful otherwise.

22. Red Cat/Teal actively and imminently face harm caused by Mr. Matus and Vector's misconduct, including breach of Mr. Matus's employment agreement, solicitation and interference with Red Cat/Teal's employment relationships, exploitation of Red Cat/Teal's confidential information and trade secrets, and use of Red Cat/Teal's reputation, goodwill, and business relationships. Until this lawsuit goes to trial, the only remedy that can provide Red Cat/Teal relief in the form of stability is a preliminary injunction order preventing, among other things, Mr. Matus and Vector from marketing and selling their drones.

DocuSigned by:

*Geoff Hitchcock*

1C649CE1C55D485...

10/23/2025

_____
**Geoff Hitchcock**

_____
**Date**

# Exhibit A

To Declaration of Geoff Hitchcock

## TEAL DRONES, INC.
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,
## INVENTION ASSIGNMENT AND NON-COMPETITION AGREEMENT

As a condition of my employment with Teal Drones, Inc., its subsidiaries, affiliates, successors or assigns (together, the "*Company*"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Teal Drones, Inc. At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement (this "*Agreement*"):

### 1.  AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF THE COMPANY ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

### 2.  APPLICABILITY TO PAST ACTIVITIES

The Company and I acknowledge that I have been engaged in discussions with the Company for a period of time prior to the date of this Agreement starting on April 10, 2020 (the "*Prior Engagement Period*"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

### 3.  CONFIDENTIALITY

A.  *Definition of Confidential Information*. I understand that "*Company Confidential Information*" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with the Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company to me; (ii) becomes publicly known or made generally available after disclosure by the Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confiden-

tiality obligations, at the time of disclosure by the Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of the Company (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between the Company and myself, the Company retains all Confidential Information as the sole property of the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("*Associated Third Parties*"), their confidential or proprietary information ("*Associated Third Party Confidential Information*") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

4. **OWNERSHIP**

A. *Assignment of Inventions.* As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of the Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 4.G** below (collectively, "*Inventions*"), are the sole property of the Company. I also agree to promptly make full written disclosure to the Company of any Inventions, and to deliver and assign and hereby irrevocably assign fully to the Company all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to the Company of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during

2

the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B. *Pre-Existing Materials*. I will inform the Company in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including, without limitation, any such inventions that are subject to Utah Code Title 34, Chapter 39, Section 3 (attached hereto as Exhibit B) ("*Prior Inventions*") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without the Company's prior written permission. I have attached hereto as Exhibit A, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement.

C. *Moral Rights*. Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "*Moral Rights*"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between the Company and myself, the records are and will be available to and remain the sole property of the Company at all times.

E. *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

F. *Attorney-in-Fact*. I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in **Section 4.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREE-MENT REQUIRING ASSIGNMENT OF INVENTIONS (AS DEFINED UNDER **SECTION 4.A** ABOVE) TO THE COMPANY DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PRO-VISIONS OF UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 (ATTACHED HERETO AS EXHIBIT B). I WILL ADVISE THE COMPANY PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 AND ARE NOT OTHER-WISE DISCLOSED ON EXHIBIT A TO PERMIT A DETERMINATION OF OWNERSHIP BY THE COM-PANY. ANY SUCH DISCLOSURE WILL BE RECEIVED IN CONFIDENCE.

H. *No Self-Help or Unauthorized Code.* I represent and warrant to the Company, that I will not knowingly infect, incorporate into or combine with any computer system, computer program, software product, database or computer storage media of the Company, except as known to and intended by the Company's senior management, any Self-Help Code or Unauthorized Code (as defined below).

"*Self-Help Code*" means any back door, time bomb, drop dead device, or other illegitimate or harmful routing, code, algorithm or hardware component designed or used: (i) to disable, erase, alter or harm any computer system, computer program, database, data hardware or communications system, automatically with the passage of time, or under the control of, or through some affirmative action by, any person, or (ii) to access any computer system, computer program, database, data, hardware or communications system. "Self-Help Code" does not include any routine, code, algorithm or hardware component which is known to Company management and which is intended by Company management to be incorporated into or combined with any computer system, computer program, software product, database or computer storage media of the Company. For example, computer programs used for legitimate and authorized access to computer systems (e.g., remote access via modem) are not Self-Help Code.

"*Unauthorized Code*" means any virus, Trojan horse, worm, or other illegitimate or harmful routine, code, algo-rithm or hard component designed or used to disable, erase, alter, or otherwise harm any computer system, pro-gram, database, data, hardware or communications system, or to consume, use, allocate or disrupt any computer resources.

## 5. CONFLICTING OBLIGATIONS

A.*Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company without prior written authorization from the Company.

B.*Prior Relationships.* Without limiting **Section 5.A**, I represent and warrant that I have no other agree-ments, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corpora-tions, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

4

6. **RETURN OF COMPANY MATERIALS**

A. *Definition of Electronic Media Equipment and Electronic Media Systems.* I understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for my use directly by the Company or by third-party providers on behalf of the Company.

B. *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**.

C. *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

D. *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

E. *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an audit to confirm my compliance with this **Section 6**, and I will certify in writing that I have complied with the requirements of this **Section 6**.

7. **TERMINATION CERTIFICATION**

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

5

**8. NOTIFICATION OF NEW EMPLOYER**

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

**9. SOLICITATION OF EMPLOYEES**

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment at the Company or take away such employees, either for myself or for any other person or entity. I agree that nothing in this **Section 9** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 3**.

**10. NON-INTERFERENCE WITH BUSINESS.** I agree that during the course of my employment and for twelve (12) months following the termination of my relationship with the Company for any reason (the "*Noncompetition Period*"), I will not, either directly or indirectly, whether for my account or for the account of any other person, firm, corporation or other business organization, intentionally interfere with any person who is or during the course of my employment with the Company was a partner, supplier, customer or client of the Company or its affiliates, or solicit, induce or encourage any such person to terminate or change its relationship with the Company or its affiliates, or otherwise interfere with the Company's relationships with its partners, suppliers, customers and clients.

**11. COVENANT NOT TO COMPETE.**

A.*Covenant.* I agree that during the Noncompetition Period, I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any business, (a) in competition with or otherwise similar to the Company's business at the time my relationship with the Company terminated or (b) competing in any other line of business that I knew or had reason to know the Company had formed an intention to enter. This covenant shall not prohibit me from owning less than one percent of the securities of any company that is publicly traded on a nationally recognized stock exchange. The foregoing covenant shall cover my activities in every part of the Territory in which I may conduct business during the term of such covenant as set forth above. "*Territory*" shall mean (i) all counties in the State of Utah, (ii) all other states of the United States of America and (iii) all other countries of the world; *provided that*, with respect to clauses (ii) and (iii), the Company derives at least one percent (1%) of its gross revenues from such geographic area.

B.*Acknowledgement.* I acknowledge that my fulfillment of the obligations contained in this Agreement is necessary to protect the Company's Confidential Information and to preserve the trade secrets, value and goodwill of the Company. I further acknowledge the time, geographic and scope limitations of my obligations under subsection (a) above are reasonable, especially in light of the Company's desire to protect its Confidential Information and trade secrets, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and within the Territory as described above.

C.*Severability.* The covenants contained in subsection (a) above shall be construed as a series of separate covenants, one for each county, state and country of any geographic area in the Territory. Except for geographic coverage, each such separate covenants shall be deemed identical in terms to the covenant contained in subsection (a) above. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of subsection (a) are deemed to exceed the time, geographic or scope limitations permitted by law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by law.

**12. CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

**13. REPRESENTATIONS**

Without limiting my obligations under **Section 4.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**14. AUDIT**

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**15.    MISCELLANEOUS**

A.    *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of Utah without regard to Utah's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Utah. I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Salt Lake County, Utah for any lawsuit filed against me by the Company.

B.    *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

C.    *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

D.    *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

E.    *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

F.    *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of the Company and myself. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

G.    *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: 04/17/2020

Signature

Colby Whitney
Name of Employee (typed or printed)

George Matus, Jr. - Chief Executive Officer:

George Matus

Signature



9 Nov 2021

Rebecca Ferguson

Dear Becca:

I am pleased to offer you a position with **TEAL DRONES, INC.**, a Delaware corporation (the "*Company*"). This letter serves to confirm to you our offer of employment pursuant to the following terms and conditions:

~Thursday, December 2nd~

1.     ***Position.*** If you decide to join us, you will start in a full-time position as Purchasing & ERP Manager beginning on **~Monday, Nov 22nd~, 2021, or sooner if possible.** ████ ████ and have the duties and responsibilities customarily associated with such position and such other duties as may be assigned by him. By signing this letter, you confirm to the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties for the Company.

2.     ***Compensation and Employee Benefits.*** You will be paid a starting salary at the rate of ████ per year, which will be paid semi-monthly in accordance with the Company's standard payroll procedures. You will also ████████████████████ ████████████████████ This position is considered an exempt position for purposes of federal wage-hour law, which means that you will not be eligible for overtime pay for hours actually worked in excess of 40 in a given workweek. As a Company employee, you will also be eligible to participate in Company-sponsored benefits as offered to other similarly situated employees and other benefits as they are adopted and introduced subject to the terms of such benefit plans and policies. You will also be entitled to certain vacation benefits, in accordance with the Company's vacation policy for employees, with the timing and duration of specific vacations to be mutually and reasonably agreeable to you and your manager. You should note that the Company may modify salaries and benefits from time to time as it deems necessary.

3.     ***Withholding Taxes.*** All forms of compensation referred to in this letter are subject to reduction to reflect applicable withholding and payroll taxes.

4.     ***At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement.*** As a condition to your employment with the Company, you will be required to sign the Company's standard At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement, a copy of which is enclosed with this letter.

5.     ***Employment Relationship.*** Your employment with the Company is for no specific period of time and constitutes "*at will*" employment. As a result, you are free to resign at any time, for any reason or no reason at all; we request, however, that in the event of resignation, you give the Company at least two weeks prior notice. Similarly, the Company is free to conclude its employment relationship with you at any time and for any reason, with or without cause and with or without notice. As a Company employee, you will be expected to abide by all Company rules and regulations. Any contrary or different representations that may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation and benefits, as well as the Company's

personnel policies and procedures, may change from time to time, the "at will" nature of your employment may only be changed in an express written agreement signed by you and by the President of the Company.

**6.**      ***Outside Activities.***   During the term of your employment, you agree that you will not engage in any other employment, consulting or other business activity without the prior written consent of the Company. While you render services to the Company, you also will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

**7.**      ***Federal Immigration Law.***   As required by federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States.  Such documentation must be provided to us within three business days of your date of hire, or our employment relationship with you may be terminated.

**8.**      ***Entire Agreement.***   This offer letter and the At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement set forth the terms of your employment with the Company and supersede and replace any prior understandings or agreements, whether oral or written.  This offer letter may not be modified or amended except by express written agreement that is signed by you and by the President of the Company. **This offer, if not accepted, will expire at the close of business on Monday, Nov 9th, 2021.**

We are very excited about your decision to join our team, and hope that you find the foregoing terms acceptable. *To indicate your agreement with these terms and acceptance of our offer, please sign and date this letter and the attached At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement in the spaces provided and return them to me.* A duplicate original of this offer letter is enclosed for your records.

Sincerely,

*George Matus*_____

George Matus, Jr.
President and Chief Executive Officer

**I HAVE READ AND ACCEPT
THIS OFFER OF EMPLOYMENT:**

Signature: *Ferguson*

Name: Rebecca Ferguson

Dated: 15 November 2021

Enclosures:   — Duplicate Original Letter; and
       — At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement

# TEAL DRONES, INC.
## AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION, INVENTION ASSIGNMENT AND NON-COMPETITION AGREEMENT

As a condition of my employment with Teal Drones, Inc., its subsidiaries, affiliates, successors or assigns (together, the "***Company***"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Teal Drones, Inc. At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement (this "***Agreement***"):

### 1. AT-WILL EMPLOYMENT

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF THE COMPANY ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

### 2. APPLICABILITY TO PAST ACTIVITIES

The Company and I acknowledge that I have been engaged in discussions with the Company for a period of time prior to the date of this Agreement starting on August 3, 2020 (the "***Prior Engagement Period***"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

### 3. CONFIDENTIALITY

A. *Definition of Confidential Information.* I understand that "***Company Confidential Information***" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with the Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company to me; (ii) becomes publicly known or made generally available after disclosure by the Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confiden-

tiality obligations, at the time of disclosure by the Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B.  *Nonuse and Nondisclosure*. I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of the Company (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between the Company and myself, the Company retains all Confidential Information as the sole property of the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

C.  *Former Employer Confidential Information*. I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D.  *Third Party Information*. I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators (“***Associated Third Parties***”), their confidential or proprietary information (“***Associated Third Party Confidential Information***”) subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

4.  <u>OWNERSHIP</u>

A.  *Assignment of Inventions*. As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of the Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 4.G** below (collectively, “***Inventions***”), are the sole property of the Company. I also agree to promptly make full written disclosure to the Company of any Inventions, and to deliver and assign and hereby irrevocably assign fully to the Company all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to the Company of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during

2

the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B. *Pre-Existing Materials*. I will inform the Company in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including, without limitation, any such inventions that are subject to Utah Code Title 34, Chapter 39, Section 3 (attached hereto as Exhibit B) ("***Prior Inventions***") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without the Company's prior written permission. I have attached hereto as Exhibit A, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on Exhibit A, they will not materially affect my ability to perform all obligations under this Agreement.

C. *Moral Rights*. Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D. *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between the Company and myself, the records are and will be available to and remain the sole property of the Company at all times.

E. *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

F. *Attorney-in-Fact*. I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in **Section 4.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREE-MENT REQUIRING ASSIGNMENT OF INVENTIONS (AS DEFINED UNDER **SECTION 4.A** ABOVE) TO THE COMPANY DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PRO-VISIONS OF UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 (ATTACHED HERETO AS <u>EXHIBIT B</u>). I WILL ADVISE THE COMPANY PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 AND ARE NOT OTHER-WISE DISCLOSED ON <u>EXHIBIT A</u> TO PERMIT A DETERMINATION OF OWNERSHIP BY THE COM-PANY. ANY SUCH DISCLOSURE WILL BE RECEIVED IN CONFIDENCE.

H. *No Self-Help or Unauthorized Code.* I represent and warrant to the Company, that I will not knowingly infect, incorporate into or combine with any computer system, computer program, software product, database or computer storage media of the Company, except as known to and intended by the Company's senior management, any Self-Help Code or Unauthorized Code (as defined below).

"*Self-Help Code*" means any back door, time bomb, drop dead device, or other illegitimate or harmful routing, code, algorithm or hardware component designed or used: (i) to disable, erase, alter or harm any computer system, computer program, database, data hardware or communications system, automatically with the passage of time, or under the control of, or through some affirmative action by, any person, or (ii) to access any computer system, computer program, database, data, hardware or communications system. "Self-Help Code" does not include any routine, code, algorithm or hardware component which is known to Company management and which is intended by Company management to be incorporated into or combined with any computer system, computer program, software product, database or computer storage media of the Company. For example, computer programs used for legitimate and authorized access to computer systems (e.g., remote access via modem) are not Self-Help Code.

"*Unauthorized Code*" means any virus, Trojan horse, worm, or other illegitimate or harmful routine, code, algo-rithm or hard component designed or used to disable, erase, alter, or otherwise harm any computer system, pro-gram, database, data, hardware or communications system, or to consume, use, allocate or disrupt any computer resources.

5. <u>C</u>ONFLICTING <u>O</u>BLIGATIONS

A.*Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company without prior written authorization from the Company.

B.*Prior Relationships.* Without limiting **Section 5.A**, I represent and warrant that I have no other agree-ments, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corpora-tions, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

4

## 6. RETURN OF COMPANY MATERIALS

A. *Definition of Electronic Media Equipment and Electronic Media Systems.* I understand that **"Electronic Media Equipment"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"Electronic Media Systems"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for my use directly by the Company or by third-party providers on behalf of the Company.

B. *Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**.

C. *Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

D. *Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

E. *No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an audit to confirm my compliance with this **Section 6**, and I will certify in writing that I have complied with the requirements of this **Section 6**.

## 7. TERMINATION CERTIFICATION

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as <u>Exhibit C</u>. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

**8.**      <u>NOTIFICATION OF NEW EMPLOYER</u>

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

**9.**      <u>SOLICITATION OF EMPLOYEES</u>

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment at the Company or take away such employees, either for myself or for any other person or entity. I agree that nothing in this **Section 9** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 3**.

**10.**      <u>NON-INTERFERENCE WITH BUSINESS</u>. I agree that during the course of my employment and for twelve (12) months following the termination of my relationship with the Company for any reason (the "***Noncompetition Period***"), I will not, either directly or indirectly, whether for my account or for the account of any other person, firm, corporation or other business organization, intentionally interfere with any person who is or during the course of my employment with the Company was a partner, supplier, customer or client of the Company or its affiliates, or solicit, induce or encourage any such person to terminate or change its relationship with the Company or its affiliates, or otherwise interfere with the Company's relationships with its partners, suppliers, customers and clients.

**11.**      <u>COVENANT NOT TO COMPETE</u>.

A.*Covenant*. I agree that during the Noncompetition Period, I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any business, (a) in competition with or otherwise similar to the Company's business at the time my relationship with the Company terminated or (b) competing in any other line of business that I knew or had reason to know the Company had formed an intention to enter. This covenant shall not prohibit me from owning less than one percent of the securities of any company that is publicly traded on a nationally recognized stock exchange. The foregoing covenant shall cover my activities in every part of the Territory in which I may conduct business during the term of such covenant as set forth above. "***Territory***" shall mean (i) all counties in the State of Utah, (ii) all other states of the United States of America and (iii) all other countries of the world; *provided that*, with respect to clauses (ii) and (iii), the Company derives at least one percent (1%) of its gross revenues from such geographic area.

B.*Acknowledgement*. I acknowledge that my fulfillment of the obligations contained in this Agreement is necessary to protect the Company's Confidential Information and to preserve the trade secrets, value and goodwill of the Company. I further acknowledge the time, geographic and scope limitations of my obligations under subsection (a) above are reasonable, especially in light of the Company's desire to protect its Confidential Information and trade secrets, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and within the Territory as described above.

C.*Severability*. The covenants contained in subsection (a) above shall be construed as a series of separate covenants, one for each county, state and country of any geographic area in the Territory. Except for geographic coverage, each such separate covenants shall be deemed identical in terms to the covenant contained in subsection (a) above. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of subsection (a) are deemed to exceed the time, geographic or scope limitations permitted by law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by law.

**12. CONFLICT OF INTEREST GUIDELINES**

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as Exhibit D hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

**13. REPRESENTATIONS**

Without limiting my obligations under **Section 4.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**14. AUDIT**

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**15.**     <u>MISCELLANEOUS</u>

        A.       *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of Utah without regard to Utah's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Utah. I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Salt Lake County, Utah for any lawsuit filed against me by the Company.

        B.       *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

        C.       *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

        D.       *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

        E.       *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

        F.       *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of the Company and myself. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

        G.       *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: _August 2, 2021_____

_(signature)_____
Signature

_David S. Wishart, Jr._____
Name of Employee (typed or printed)

George Matus, Jr. - Chief Executive Officer:

_George Matus_____
Signature



January 28th, 2022

Brad Weber

Dear Brad:

I am pleased to offer you a position with **TEAL DRONES, INC.**, a Delaware corporation (the "***Company***,,). This letter serves to confirm to you our offer of employment pursuant to the following terms and conditions:

1. ***Position.*** If you decide to join us, you will start in a full-time position as Senior Controls Engineer beginning on February 14th, 2022. ███████████████████ and have the duties and responsibilities customarily associated with such position and such other duties as may be assigned by him. By signing this letter, you confirm to the Company that you are under no contractual or other legal obligations that would prohibit you from performing your duties for the Company.

2. ***Compensation and Employee Benefits.*** You will be paid a starting salary at the rate ████████ per year, which will be paid semi-monthly in accordance with the Company's standard payroll procedures. This position is considered an exempt position for purposes of federal wage-hour law, which means that you will not be eligible for overtime pay for hours worked in excess of 40 in a given workweek. As a Company employee, you will also be eligible to participate in Company-sponsored benefits as offered to other similarly situated employees and other benefits as they are adopted and introduced subject to the terms of such benefit plans and policies. You will also be entitled to certain vacation benefits, in accordance with the Company's vacation policy for employees, with the timing and duration of specific vacations to be mutually and reasonably agreeable to you and your manager. You should note that the Company may modify salaries and benefits from time to time as it deems necessary.

3. ***Employment Relationship.*** Your employment with the Company is for no specific period of time and constitutes "*at will*,, employment. As a result, you are free to resign at any time, for any reason or no reason at all; we request, however, that in the event of resignation, you give the Company at least two weeks prior notice. Similarly, the Company is free to conclude its employment relationship with you at any time and for any reason, with or without cause and with or without notice. As a Company employee, you will be expected to abide by all Company rules and regulations. Any contrary or different representations that may have been made to you are superseded by this offer. This is the full and complete agreement between you and the Company on this term. Although your job duties, title, compensation, and benefits, as well as the Company's personnel policies and procedures, may change from time to time, the "at will,, nature of your employment may only be changed in an express written agreement signed by you and by the President of the Company.

4. ***Outside Activities.*** During the term of your employment, you agree that you will not engage in any other employment, consulting, or other business activity without the prior written consent of the Company. While you render services to the Company, you also will not assist any person or entity in competing with the Company, in preparing to compete with the Company or in hiring any employees or consultants of the Company.

5. **Federal Immigration Law.** As required by federal immigration law, you will be required to provide to the Company documentary evidence of your identity and eligibility for employment in the United States. Such documentation must be provided to us within three business days of your date of hire, or our employment relationship with you may be terminated.

6. **Entire Agreement.** This offer letter and the At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement set forth the terms of your employment with the Company and supersede and replace any prior understandings or agreements, whether oral or written. This offer letter may not be modified or amended except by express written agreement that is signed by you and by the President of the Company. **This offer, if not accepted, will expire at the close of business on February 1ˢᵗ, 2022.**

We are very excited about your decision to join our team, and hope that you find the foregoing terms acceptable. *To indicate your agreement with these terms and acceptance of our offer, please sign and date this letter and the attached At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement in the spaces provided and return them to me.* A duplicate original of this offer letter is enclosed for your records.

Sincerely,

*George Matus*

George Matus, Jr.
President and Chief Executive Officer

**I HAVE READ AND ACCEPT**
**THIS OFFER OF EMPLOYMENT:**

Signature: *Bradley R. Weeber*

Name: *Bradley R. Weeber*

Dated: 1/31/2022

Enclosures:  At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement

**TEAL DRONES, INC.**
**AT-WILL EMPLOYMENT, CONFIDENTIAL INFORMATION,**
**INVENTION ASSIGNMENT AND NON-COMPETITION AGREEMENT**

As a condition of my employment with Teal Drones, Inc., its subsidiaries, affiliates, successors or assigns (together, the "*Company*"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following provisions of this Teal Drones, Inc. At-Will Employment, Confidential Information, Invention Assignment and Non-Competition Agreement (this "*Agreement*"):

1. **AT-WILL EMPLOYMENT**

I UNDERSTAND AND ACKNOWLEDGE THAT MY EMPLOYMENT WITH THE COMPANY IS FOR NO SPECIFIED TERM AND CONSTITUTES "AT-WILL" EMPLOYMENT. I ALSO UNDERSTAND THAT ANY REPRESENTATION TO THE CONTRARY IS UNAUTHORIZED AND NOT VALID UNLESS IN WRITING AND SIGNED BY THE PRESIDENT OR CEO OF THE COMPANY ACCORDINGLY, I ACKNOWLEDGE THAT MY EMPLOYMENT RELATIONSHIP MAY BE TERMINATED AT ANY TIME, WITH OR WITHOUT GOOD CAUSE OR FOR ANY OR NO CAUSE, AT MY OPTION OR AT THE OPTION OF THE COMPANY, WITH OR WITHOUT NOTICE. I FURTHER ACKNOWLEDGE THAT THE COMPANY MAY MODIFY JOB TITLES, SALARIES, AND BENEFITS FROM TIME TO TIME AS IT DEEMS NECESSARY.

2. **APPLICABILITY TO PAST ACTIVITIES**

The Company and I acknowledge that I have been engaged in discussions with the Company for a period of time prior to the date of this Agreement starting on January 17th, 2022 (the "*Prior Engagement Period*"). Accordingly, I agree that if and to the extent that, during the Prior Engagement Period: (i) I received access to any information from or on behalf of Company that would have been "Company Confidential Information" (as defined below) if I received access to such information during the period of my employment with Company under this Agreement; or (ii) I conceived, created, authored, invented, developed or reduced to practice any item, including any intellectual property rights with respect thereto, that would have been an "Invention" (as defined below) if conceived, created, authored, invented, developed or reduced to practice during the period of my employment with Company under this Agreement; then any such information shall be deemed "Company Confidential Information" hereunder and any such item shall be deemed an "Invention" hereunder, and this Agreement shall apply to such information or item as if conceived, created, authored, invented, developed or reduced to practice under this Agreement.

3. **CONFIDENTIALITY**

A. *Definition of Confidential Information.* I understand that "*Company Confidential Information*" means information (including any and all combinations of individual items of information) that the Company has or will develop, acquire, create, compile, discover or own, that has value in or to the Company's business which is not generally known and which the Company wishes to maintain as confidential. Company Confidential Information includes both information disclosed by the Company to me, and information developed or learned by me during the course of my employment with the Company. Company Confidential Information also includes all information of which the unauthorized disclosure could be detrimental to the interests of the Company, whether or not such information is identified as Company Confidential Information. By example, and without limitation, Company Confidential Information includes any and all non-public information that relates to the actual or anticipated business and/or products, research or development of the Company, or to the Company's technical data, trade secrets, or know-how, including, but not limited to, research, product plans, or other information regarding the Company's products or services and markets therefor, customer lists and customers (including, but not limited to, customers of the Company on which I called or with which I may become acquainted during the term of my employment), software, developments, inventions, discoveries, ideas, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances, and other business information disclosed by the Company either directly or indirectly in writing, orally or by drawings or inspection of premises, parts, equipment, or other Company property. Notwithstanding the foregoing, Company Confidential Information shall not include any such information which I can establish (i) was publicly known or made generally available prior to the time of disclosure by the Company to me; (ii) becomes publicly known or made generally available after disclosure by the Company to me through no wrongful action or omission by me; or (iii) is in my rightful possession, without confiden-

tiality obligations, at the time of disclosure by the Company as shown by my then-contemporaneous written records; provided that any combination of individual items of information shall not be deemed to be within any of the foregoing exceptions merely because one or more of the individual items are within such exception, unless the combination as a whole is within such exception. I understand that nothing in this Agreement is intended to limit employees' rights to discuss the terms, wages, and working conditions of their employment, as protected by applicable law.

B. *Nonuse and Nondisclosure.* I agree that during and after my employment with the Company, I will hold in the strictest confidence, and take all reasonable precautions to prevent any unauthorized use or disclosure of Company Confidential Information, and I will not (i) use the Company Confidential Information for any purpose whatsoever other than for the benefit of the Company in the course of my employment, or (ii) disclose the Company Confidential Information to any third party without the prior written authorization of the President, CEO, or the Board of Directors of the Company. Prior to disclosure when compelled by applicable law; I shall provide prior written notice to the President, CEO, and General Counsel of the Company (as applicable). I agree that I obtain no title to any Company Confidential Information, and that as between the Company and myself, the Company retains all Confidential Information as the sole property of the Company. I understand that my unauthorized use or disclosure of Company Confidential Information during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company. I understand that my obligations under this **Section 3.B** shall continue after termination of my employment.

C. *Former Employer Confidential Information.* I agree that during my employment with the Company, I will not improperly use, disclose, or induce the Company to use any proprietary information or trade secrets of any former employer or other person or entity with which I have an obligation to keep in confidence. I further agree that I will not bring onto the Company's premises or transfer onto the Company's technology systems any unpublished document, proprietary information, or trade secrets belonging to any such third party unless disclosure to, and use by, the Company has been consented to in writing by such third party.

D. *Third Party Information.* I recognize that the Company has received and in the future will receive from third parties associated with the Company, e.g., the Company's customers, suppliers, licensors, licensees, partners, or collaborators ("*Associated Third Parties*"), their confidential or proprietary information ("*Associated Third Party Confidential Information*") subject to a duty on the Company's part to maintain the confidentiality of such Associated Third Party Confidential Information and to use it only for certain limited purposes. By way of example, Associated Third Party Confidential Information may include the habits or practices of Associated Third Parties, the technology of Associated Third Parties, requirements of Associated Third Parties, and information related to the business conducted between the Company and such Associated Third Parties. I agree at all times during my employment with the Company and thereafter, that I owe the Company and its Associated Third Parties a duty to hold all such Associated Third Party Confidential Information in the strictest confidence, and not to use it or to disclose it to any person, firm, corporation, or other third party except as necessary in carrying out my work for the Company consistent with the Company's agreement with such Associated Third Parties. I further agree to comply with any and all Company policies and guidelines that may be adopted from time to time regarding Associated Third Parties and Associated Third Party Confidential Information. I understand that my unauthorized use or disclosure of Associated Third Party Confidential Information or violation of any Company policies during my employment may lead to disciplinary action, up to and including immediate termination and legal action by the Company.

4. **OWNERSHIP**

A. *Assignment of Inventions.* As between the Company and myself, I agree that all right, title, and interest in and to any and all copyrightable material, notes, records, drawings, designs, logos, inventions, improvements, developments, discoveries, ideas and trade secrets conceived, discovered, authored, invented, developed or reduced to practice by me, solely or in collaboration with others, during the period of time I am in the employ of the Company (including during my off-duty hours), or with the use of the Company's equipment, supplies, facilities, or Company Confidential Information, and any copyrights, patents, trade secrets, mask work rights or other intellectual property rights relating to the foregoing, except as provided in **Section 4.G** below (collectively, "*Inventions*"), are the sole property of the Company. I also agree to promptly make full written disclosure to the Company of any Inventions, and to deliver and assign and hereby irrevocably assign fully to the Company all of my right, title and interest in and to Inventions. I agree that this assignment includes a present conveyance to the Company of ownership of Inventions that are not yet in existence. I further acknowledge that all original works of authorship that are made by me (solely or jointly with others) within the scope of and during

the period of my employment with the Company and that are protectable by copyright are "works made for hire," as that term is defined in the United States Copyright Act. I understand and agree that the decision whether or not to commercialize or market any Inventions is within the Company's sole discretion and for the Company's sole benefit, and that no royalty or other consideration will be due to me as a result of the Company's efforts to commercialize or market any such Inventions.

B.     *Pre-Existing Materials*. I will inform the Company in writing before incorporating any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by me or in which I have an interest prior to, or separate from, my employment with the Company, including, without limitation, any such inventions that are subject to Utah Code Title 34, Chapter 39, Section 3 (attached hereto as <u>Exhibit B</u>) ("***Prior Inventions***") into any Invention or otherwise utilizing any such Prior Invention in the course of my employment with the Company; and the Company is hereby granted a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Prior Inventions, without restriction, including, without limitation, as part of or in connection with such Invention, and to practice any method related thereto. I will not incorporate any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or intellectual property rights owned by any third party into any Invention without the Company's prior written permission. I have attached hereto as <u>Exhibit A</u>, a list describing all Prior Inventions or, if no such list is attached, I represent and warrant that there are no such Prior Inventions. Furthermore, I represent and warrant that if any Prior Inventions are included on <u>Exhibit A</u>, they will not materially affect my ability to perform all obligations under this Agreement.

C.     *Moral Rights*. Any assignment to the Company of Inventions includes all rights of attribution, paternity, integrity, modification, disclosure and withdrawal, and any other rights throughout the world that may be known as or referred to as "moral rights," "artist's rights," "droit moral," or the like (collectively, "***Moral Rights***"). To the extent that Moral Rights cannot be assigned under applicable law, I hereby waive and agree not to enforce any and all Moral Rights, including, without limitation, any limitation on subsequent modification, to the extent permitted under applicable law.

D.     *Maintenance of Records*. I agree to keep and maintain adequate, current, accurate, and authentic written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company. The records will be in the form of notes, sketches, drawings, electronic files, reports, or any other format that may be specified by the Company. As between the Company and myself, the records are and will be available to and remain the sole property of the Company at all times.

E.     *Further Assurances*. I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments, and all other instruments that the Company shall deem proper or necessary in order to apply for, register, obtain, maintain, defend, and enforce such rights, and in order to deliver, assign and convey to the Company, its successors, assigns, and nominees the sole and exclusive rights, title, and interest in and to all Inventions, and testifying in a suit or other proceeding relating to such Inventions. I further agree that my obligations under this **Section 4.E** shall continue after the termination of this Agreement.

F.     *Attorney-in-Fact*. I agree that, if the Company is unable because of my unavailability, mental or physical incapacity, or for any other reason to secure my signature with respect to any Inventions, including, without limitation, for the purpose of applying for or pursuing any application for any United States or foreign patents or mask work or copyright registrations covering the Inventions assigned to the Company in **Section 4.A**, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney-in-fact, to act for and on my behalf to execute and file any papers and oaths, and to do all other lawfully permitted acts with respect to such Inventions to further the prosecution and issuance of patents, copyright and mask work registrations with the same legal force and effect as if executed by me. This power of attorney shall be deemed coupled with an interest, and shall be irrevocable.

G. *Exception to Assignments.* I UNDERSTAND THAT THE PROVISIONS OF THIS AGREE-MENT REQUIRING ASSIGNMENT OF INVENTIONS (AS DEFINED UNDER **SECTION 4.A** ABOVE) TO THE COMPANY DO NOT APPLY TO ANY INVENTION THAT QUALIFIES FULLY UNDER THE PRO-VISIONS OF UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 (ATTACHED HERETO AS <u>EXHIBIT B</u>). I WILL ADVISE THE COMPANY PROMPTLY IN WRITING OF ANY INVENTIONS THAT I BELIEVE MEET THE CRITERIA IN UTAH CODE TITLE 34, CHAPTER 39, SECTION 3 AND ARE NOT OTHER-WISE DISCLOSED ON <u>EXHIBIT A</u> TO PERMIT A DETERMINATION OF OWNERSHIP BY THE COM-PANY. ANY SUCH DISCLOSURE WILL BE RECEIVED IN CONFIDENCE.

H. *No Self-Help or Unauthorized Code.* I represent and warrant to the Company, that I will not knowingly infect, incorporate into or combine with any computer system, computer program, software product, database or computer storage media of the Company, except as known to and intended by the Company's senior management, any Self-Help Code or Unauthorized Code (as defined below).

"*Self-Help Code*" means any back door, time bomb, drop dead device, or other illegitimate or harmful routing, code, algorithm or hardware component designed or used: (i) to disable, erase, alter or harm any computer system, computer program, database, data hardware or communications system, automatically with the passage of time, or under the control of, or through some affirmative action by, any person, or (ii) to access any computer system, computer program, database, data, hardware or communications system. "Self-Help Code" does not include any routine, code, algorithm or hardware component which is known to Company management and which is intended by Company management to be incorporated into or combined with any computer system, computer program, software product, database or computer storage media of the Company. For example, computer programs used for legitimate and authorized access to computer systems (e.g., remote access via modem) are not Self-Help Code.

"*Unauthorized Code*" means any virus, Trojan horse, worm, or other illegitimate or harmful routine, code, algo-rithm or hard component designed or used to disable, erase, alter, or otherwise harm any computer system, pro-gram, database, data, hardware or communications system, or to consume, use, allocate or disrupt any computer resources.

5. <u>**CONFLICTING OBLIGATIONS**</u>

A.*Current Obligations.* I agree that during the term of my employment with the Company, I will not engage in or undertake any other employment, occupation, consulting relationship, or commitment that is directly related to the business in which the Company is now involved or becomes involved or has plans to become involved, nor will I engage in any other activities that conflict with my obligations to the Company without prior written authorization from the Company.

B.*Prior Relationships.* Without limiting **Section 5.A**, I represent and warrant that I have no other agree-ments, relationships, or commitments to any other person or entity that conflict with the provisions of this Agreement, my obligations to the Company under this Agreement, or my ability to become employed and perform the services for which I am being hired by the Company. I further agree that if I have signed a confidentiality agreement or similar type of agreement with any former employer or other entity, I will comply with the terms of any such agreement to the extent that its terms are lawful under applicable law. I represent and warrant that after undertaking a careful search (including searches of my computers, cell phones, electronic devices, and documents), I have returned all property and confidential information belonging to all prior employers (and/or other third parties I have performed services for in accordance with the terms of my applicable agreement). Moreover, I agree to fully indemnify the Company, its directors, officers, agents, employees, investors, shareholders, administrators, affiliates, divisions, subsidiaries, predecessor and successor corpora-tions, and assigns for all verdicts, judgments, settlements, and other losses incurred by any of them resulting from my breach of my obligations under any agreement with a third party to which I am a party or obligation to which I am bound, as well as any reasonable attorneys' fees and costs if the plaintiff is the prevailing party in such an action, except as prohibited by law.

6.    **RETURN OF COMPANY MATERIALS**

A.*Definition of Electronic Media Equipment and Electronic Media Systems.* I understand that **"*Electronic Media Equipment*"** includes, but is not limited to, computers, external storage devices, thumb drives, handheld electronic devices, telephone equipment, and other electronic media devices. I understand that **"*Electronic Media Systems*"** includes, but is not limited to, computer servers, messaging and email systems or accounts, and web-based services (including cloud-based information storage accounts), whether provided for my use directly by the Company or by third-party providers on behalf of the Company.

B.*Return of Company Property.* I understand that anything that I created or worked on for the Company while working for the Company belongs solely to the Company and that I cannot remove, retain, or use such information without the Company's express written permission. Accordingly, upon separation from employment with the Company or upon the Company's request at any other time, I will immediately deliver to the Company, and will not keep in my possession, recreate, or deliver to anyone else, any and all Company property, including, but not limited to, Company Confidential Information, Associated Third Party Confidential Information, all Company equipment including all Company Electronic Media Equipment, all tangible embodiments of the Inventions, all electronically stored information and passwords to access such property, Company credit cards, records, data, notes, notebooks, reports, files, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, photographs, charts, any other documents and property, and reproductions of any of the foregoing items, including, without limitation, those records maintained pursuant to **Section 4.D**.

C.*Return of Company Information on Company Electronic Media Equipment.* In connection with my obligation to return information to the Company, I agree that I will not copy, delete, or alter any information, including personal information voluntarily created or stored, contained upon my Company Electronic Media Equipment before I return the information to the Company.

D.*Return of Company Information on Personal Electronic Media Equipment.* In addition, if I have used any personal Electronic Media Equipment or personal Electronic Media Systems to create, receive, store, review, prepare or transmit any Company information, including but not limited to, Company Confidential Information, I agree to make a prompt and reasonable search for such information in good faith, including reviewing any personal Electronic Media Equipment or personal Electronic Media Systems to locate such information and if I locate such information I agree to notify the Company of that fact and then provide the Company with a computer-useable copy of all such Company information from those equipment and systems; and I agree to cooperate reasonably with the Company to verify that the necessary copying is completed (including upon request providing a sworn declaration confirming the return of property and deletion of information), and, upon confirmation of compliance by the Company, I agree to delete and expunge all Company information.

E.*No Expectation of Privacy in Company Property.* I understand that I have no expectation of privacy in Company property, and I agree that any Company property situated on Company premises, or held by third-party providers for the benefit of the company, is subject to inspection by Company personnel at any time with or without further notice. I also understand and agree that as it relates to the Company's desire to protect its confidential and proprietary information, I have no expectation of privacy as to any personal Electronic Media Equipment or personal Electronic Media Systems that I have used for Company purposes. I further agree that the Company, at its sole discretion, may have access to such personal Electronic Media Equipment or personal Electronic Media Systems to retrieve, destroy, or ensure the permanent deletion of Company information from such equipment or systems. I also consent to an exit interview and an audit to confirm my compliance with this **Section 6**, and I will certify in writing that I have complied with the requirements of this **Section 6**.

7.    **TERMINATION CERTIFICATION**

Upon separation from employment with the Company, I agree to immediately sign and deliver to the Company the "Termination Certification" attached hereto as Exhibit C. I also agree to keep the Company advised of my home and business address for a period of three (3) years after termination of my employment with the Company, so that the Company can contact me regarding my continuing obligations provided by this Agreement.

**8.** <u>NOTIFICATION OF NEW EMPLOYER</u>

In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my obligations under this Agreement.

**9.** <u>SOLICITATION OF EMPLOYEES</u>

To the fullest extent permitted under applicable law, I agree that during my employment and for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether voluntary or involuntary, with or without cause, I will not directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment at the Company or take away such employees, either for myself or for any other person or entity. I agree that nothing in this **Section 9** shall affect my continuing obligations under this Agreement during and after this twelve (12) month period, including, without limitation, my obligations under **Section 3**.

**10.** <u>NON-INTERFERENCE WITH BUSINESS</u>. I agree that during the course of my employment and for twelve (12) months following the termination of my relationship with the Company for any reason (the "***Noncompetition Period***"), I will not, either directly or indirectly, whether for my account or for the account of any other person, firm, corporation or other business organization, intentionally interfere with any person who is or during the course of my employment with the Company was a partner, supplier, customer or client of the Company or its affiliates, or solicit, induce or encourage any such person to terminate or change its relationship with the Company or its affiliates, or otherwise interfere with the Company's relationships with its partners, suppliers, customers and clients.

**11.** <u>COVENANT NOT TO COMPETE</u>.

A.*Covenant*. I agree that during the Noncompetition Period, I will not, without the prior written consent of the Company, (i) serve as a partner, employee, consultant, officer, director, manager, agent, associate, investor, or (ii) directly or indirectly, own, purchase, organize or take preparatory steps for the organization of, or (iii) build, design, finance, acquire, lease, operate, manage, invest in, work or consult for or otherwise affiliate myself with any business, (a) in competition with or otherwise similar to the Company's business at the time my relationship with the Company terminated or (b) competing in any other line of business that I knew or had reason to know the Company had formed an intention to enter. This covenant shall not prohibit me from owning less than one percent of the securities of any company that is publicly traded on a nationally recognized stock exchange. The foregoing covenant shall cover my activities in every part of the Territory in which I may conduct business during the term of such covenant as set forth above. "***Territory***" shall mean (i) all counties in the State of Utah, (ii) all other states of the United States of America and (iii) all other countries of the world; *provided that*, with respect to clauses (ii) and (iii), the Company derives at least one percent (1%) of its gross revenues from such geographic area.

B.*Acknowledgement*. I acknowledge that my fulfillment of the obligations contained in this Agreement is necessary to protect the Company's Confidential Information and to preserve the trade secrets, value and goodwill of the Company. I further acknowledge the time, geographic and scope limitations of my obligations under subsection (a) above are reasonable, especially in light of the Company's desire to protect its Confidential Information and trade secrets, and that I will not be precluded from gainful employment if I am obligated not to compete with the Company during the period and within the Territory as described above.

C.*Severability*. The covenants contained in subsection (a) above shall be construed as a series of separate covenants, one for each county, state and country of any geographic area in the Territory. Except for geographic coverage, each such separate covenants shall be deemed identical in terms to the covenant contained in subsection (a) above. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event the provisions of subsection (a) are deemed to exceed the time, geographic or scope limitations permitted by law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by law.

**12.** <u>**CONFLICT OF INTEREST GUIDELINES**</u>

I agree to diligently adhere to all policies of the Company, including the Company's insider trading policies and the Company's Conflict of Interest Guidelines. A copy of the Company's current Conflict of Interest Guidelines is attached as <u>Exhibit D</u> hereto, but I understand that these Conflict of Interest Guidelines may be revised from time to time during my employment.

**13.** <u>**REPRESENTATIONS**</u>

Without limiting my obligations under **Section 4.E** above, I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent and warrant that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I hereby represent and warrant that I have not entered into, and I will not enter into, any oral or written agreement in conflict herewith.

**14.** <u>**AUDIT**</u>

I acknowledge that I have no reasonable expectation of privacy in any computer, handheld device, telephone, voicemail, email or other technology system that is used to conduct the business of the Company. All information, data, and messages created, received, sent, or stored in these systems are, at all times, the property of the Company. As such, the Company has the right to audit and search all such items and systems, without further notice to me, to ensure that the Company is licensed to use the software on the Company's devices in compliance with the Company's software licensing policies, to ensure compliance with the Company's policies, and for any other business-related purposes in the Company's sole discretion. I understand that I am not permitted to add any unlicensed, unauthorized, or non-compliant applications to the Company's technology systems, including, without limitation, open source or free software not authorized by the Company, and that I shall refrain from copying unlicensed software onto the Company's technology systems or using non-licensed software or websites. I understand that it is my responsibility to comply with the Company's policies governing use of the Company's documents and the internet, email, telephone, and technology systems to which I will have access in connection with my employment.

I am aware that the Company has or may acquire software and systems that are capable of monitoring and recording all Company network traffic to and from any computer, handheld device, telephone, voicemail, email or other technology system I may use to access the Company's internal networks. The Company reserves the right to access, review, copy, and delete any of the information, data, or messages accessed through these systems with or without notice to me and/or in my absence. This includes, but is not limited to, all e-mail messages sent or received, all website visits, all chat sessions, all news group activity (including groups visited, messages read, and postings by me), and all file transfers into and out of the Company's internal networks. The Company further reserves the right to retrieve previously deleted messages from e-mail or voicemail and monitor usage of the Internet, including websites visited and any information I have downloaded. In addition, the Company may review Internet and technology systems activity and analyze usage patterns, and may choose to publicize this data to assure that technology systems are devoted to legitimate business purposes.

**15.**     **MISCELLANEOUS**

       A.        *Governing Law; Consent to Personal Jurisdiction.* This Agreement will be governed by the laws of the State of Utah without regard to Utah's conflicts of law rules that may result in the application of the laws of any jurisdiction other than Utah. I hereby expressly consent to the personal and exclusive jurisdiction and venue of the state and federal courts located in Salt Lake County, Utah for any lawsuit filed against me by the Company.

       B.        *Assignability.* This Agreement will be binding upon my heirs, executors, assigns, administrators, and other legal representatives, and will be for the benefit of the Company, its successors, and its assigns. There are no intended third-party beneficiaries to this Agreement, except as may be expressly otherwise stated. Notwithstanding anything to the contrary herein, the Company may assign this Agreement and its rights and obligations under this Agreement to any successor to all or substantially all of the Company's relevant assets, whether by merger, consolidation, reorganization, reincorporation, sale of assets or stock, or otherwise.

       C.        *Entire Agreement.* This Agreement, together with the Exhibits herein and any executed written offer letter between me and the Company, to the extent such materials are not in conflict with this Agreement, sets forth the entire agreement and understanding between the Company and me with respect to the subject matter herein and supersedes all prior written and oral agreements, discussions, or representations between us, including, but not limited to, any representations made during my interview(s) or relocation negotiations. I represent and warrant that I am not relying on any statement or representation not contained in this Agreement. Any subsequent change or changes in my duties, salary, compensation, conditions or any other terms of my employment will not affect the validity or scope of this Agreement.

       D.        *Headings.* Headings are used in this Agreement for reference only and shall not be considered when interpreting this Agreement.

       E.        *Severability.* If a court or other body of competent jurisdiction finds, or the Parties mutually believe, any provision of this Agreement, or portion thereof, to be invalid or unenforceable, such provision will be enforced to the maximum extent permissible so as to effect the intent of the Parties, and the remainder of this Agreement will continue in full force and effect.

       F.        *Modification, Waiver.* No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in a writing signed by the President or CEO of the Company and myself. Waiver by the Company of a breach of any provision of this Agreement will not operate as a waiver of any other or subsequent breach.

       G.        *Survivorship.* The rights and obligations of the parties to this Agreement will survive termination of my employment with the Company.

Date: <u>JAN 19 2022</u>

<u>Signature</u>

<u>JAY WELGITT</u>
Name of Employee (typed or printed)

George Matus, Jr. - Chief Executive Officer:

<u>George Matus</u>
Signature

9

Date: <u>JAN 19 2022</u>
Signature

# Exhibit B

To Declaration of Geoff Hitchcock



**aerospace** 47G-336400
**DEFENSE** 47G-928110

UT
45 EMPLOYEES

---

A:  14761 FUTURE WAY
    DRAPER
    UT
    USA

40.483378
-111.8925544

LinkedIn

# Vector

VISIT
WEBSITE ↗

Vector is a premiere 21st Century Defense Technology Company aimed at ensuring America's Warfighters are equipped with the most relevant technology at the speed of which is changes on the battlefield. We focus on training, integration and product development across a variety of technologies with a focus on the s-UAS and Counter s-UAS capabilities spectrum. Our team is made up of industry leaders and special operations veterans with unique access to kinetic environments across the globe, where we rapidly import the tactics, techniques and technology to American warfighters.

Our competitive advantage involves our team of uniquely trained and experiences operations, our deep manufacturing leadership experience (former SRR program winner), and relationship with active DoD units.

NATIONAL MEMBER



# LATEST NEWS

01/27/2024

NASA Tech Transfer: Where Public Research Fuels Private Innovation



01/17/2024

Unlocking Federal Funding: An Intro to SBIR and STTR



| TEXTRON SYSTEMS | MAGNIX | PHYSNA | AVEREST | COSMIC AEROSPACE |
|---|---|---|---|---|
| — | — AVIATION AND AEROSPACE… | — | — | — AVIATION & AEROSPACE |
| COCKEYSVILLE, MARYLAND | EVERETT, WASHINGTON | COLUMBUS, OHIO | OGDEN, UTAH | CENTENNIAL, COLORADO |





UTAH
AEROSPACE
& DEFENSE

SIGN UP FOR OUR NEWSLETTER
ENTER EMAIL

SOCIAL
LinkedIn
Twitter

CONTACT
contact@47g.org

Utah is America's Deep Tech Frontier, the world's premier ecosystem for aerospace, defense, and cyber companies.

© 2025 47G          Privacy Policy