IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RED CAT HOLDINGS, INC. and TEAL DRONES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> GEORGE MATUS and VECTOR DEFENSE, INC., <br><br> Defendants. | MEMORANDUM DECISION AND ORDER DENYING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND OVERRULING DEFENDANTS' OBJECTIONS <br><br> Case No. 2:25-cv-00646-TS-JCB <br><br> Judge Ted Stewart <br> Magistrate Judge Jared C. Bennett |

This matter comes before the Court on Plaintiffs Red Cat Holdings, Inc. and Teal Drones, Inc's Motion for Preliminary Injunction[1] and Defendants George Matus and Vector Defense, Inc.'s Objections to Plaintiffs' Notice of Filing Supplemental Declarations.[2] For the following reasons, the Court will deny the Motion and overrule the Objections.

I. BACKGROUND

Plaintiffs, Red Cat Holdings, Inc. ("Red Cat") and Teal Drones, Inc. ("Teal") sue George Matus and Vector Defense, Inc. ("Vector") for claims related to Matus' employment and post-employment activities. Red Cat is a holding company that owns drone technology subsidiaries, including Teal.[3] Red Cat's subsidiaries are involved in developing, manufacturing, and deploying a variety of drones for use by the United States military and its allies.[4]

---

[1] Docket No. 2.

[2] Docket Nos. 63, 64.

[3] Docket No. 1 ¶ 3.

[4] *Id.*

In 2014, Matus founded Teal. He later sold it to Red Cat in late 2021.[5] From its founding until he left the company in November 2024, Matus was the Chief Executive Officer ("CEO") of Teal.[6] In addition to being CEO, Matus was also hired as Red Cat's Chief Technology Officer ("CTO"). Matus originally founded Teal to focus on designing, manufacturing, and selling consumer drones. At some point, Teal pivoted to specialize in intelligence, surveillance, and reconnaissance ("ISR") drones.[7] When Red Cat acquired Teal, Matus signed an employment contract, which included a non-solicitation clause, a non-compete clause, and a non-disclosure agreement.

A significant part of Plaintiffs' business involves competing for United States Department of Defense ("DoD") contracts. In 2018, Teal applied to be a contender for the DoD's Defense Innovation Unit ("DIU") and the United States Army's Short Range Reconnaissance Program ("SRR").[8] According to the Complaint, the SRR Program proceeds in phases, beginning with SRR Tranche 1, followed by SRR Tranche 2, and then Next Generation SRR.[9] Teal originally applied for SRR Tranche 1 and was awarded the prototype contract.[10] Teal developed and submitted a drone called Golden Eagle, an SRR drone. The DIU and Army ultimately selected a different company's drone for Tranche 1.[11] However, the DIU added Teal's

---

[5] *Id.* ¶ 4.

[6] *Id.*

[7] *Id.* ¶ 84; Docket No. 2, at 12.

[8] Docket No. 1 ¶ 69; Docket No. 2, at 11.

[9] Docket No. 2, at 11.

[10] Docket No. 1 ¶ 70.

[11] *Id.* ¶¶ 71–72.

2

Golden Eagle to the Blue Unmanned Aircraft Systems ("UAS") Cleared List.[12] To be on the UAS List, drones must be certified as compliant with current military laws and policy.[13]

After the acquisition of Teal, Red Cat and Teal together began to plan for SRR Tranche 2 by planning, designing, and manufacturing a SRR drone called the "Black Widow™."[14] The Black Widow™ was subsequently chosen by the DIU and Army to proceed to the protype phases of SRR Tranche 2, which originally carried with it $1.5 million in research and development funding but subsequently increased to $5–6 million.[15] Matus was involved with the research and development of the Black Widow™, including working with the DIU and Army to identify specific technical requirements. The Complaint alleges that the Black Widow™ is undergoing the process for the Blue UAS Clearance List.[16] The third phase of the DIU and Army's SRR Program, Next Generation SRR, is expected to open within six to nine months.[17]

Building off the Golden Eagle drone, Teal developed and manufactured "Teal 2," a SRR drone for government use, specifically designed for nighttime missions by including electro-optical systems and infrared thermal cameras.[18] Teal 2 is also on the Blue UAS Cleared List.[19]

The Complaint alleges that Matus was also involved with the development of various First-Person View ("FPV") drones with Plaintiffs.[20] It specifically alleges that Matus was

---

[12] *Id.* ¶ 73.

[13] *Id.* ¶ 74; Docket No. 2, at 12.

[14] Docket No. 1 ¶¶ 77–78.

[15] *Id.* ¶¶ 79–80.

[16] *Id.* ¶ 91.

[17] *Id.* ¶ 82.

[18] *Id.* ¶¶ 86–87.

[19] *Id.* ¶ 88.

[20] *Id.* ¶ 92.

involved in the "FANG™" drone, which is "optionally-lethal" and intended to be used with ISR drones, such as Teal 2 to identify and attack a target.[21] Plaintiffs and Matus were working on a partnership with Orqa, a Croatian drone company, to incorporate Orqa's hardware and software into a "white-label" FANG™ drone.[22] However, in Fall 2024, FANG™'s development was suspended when the deal with Orqa collapsed during negotiations. Matus was involved with meeting and negotiating with Orqa on behalf of Plaintiffs,[23] including entering into a non-binding memorandum of understanding wherein Orqa agreed to send Plaintiffs its components to build its drones in the United States and Plaintiffs would assemble them and sell them in the United States as FANG™ drones and helping Orqa to attain Blue UAS clearance.[24] The Complaint alleges that this deal was one of the most important business relationships Plaintiffs had entertained and would have resulted in significant financial gain.[25]

In August 2024, Plaintiffs became concerned when Matus began failing to update them on progress with the Orqa deal.[26] The Complaint alleges that after little to no updates, Matus informed Plaintiffs that Orqa was no longer interested in the partnership and provided no substantive detail or context for the change.[27] Plaintiffs allege that Matus purposely killed the deal. Matus alleges that Orqa decided to go another way with the business in the United States.[28]

---

[21] *Id.* ¶ 93.

[22] *Id.* ¶ 94; Docket No. 62-1 ¶ 15.

[23] Docket No. 1 ¶ 120.

[24] *Id.* ¶¶ 124–25.

[25] *Id.* ¶ 129.

[26] *Id.* ¶ 132.

[27] *Id.* ¶ 133.

[28] Docket No. 38 ¶ 20.

The Complaint alleges after the agreement broke down, Plaintiffs began working on the FANG™ again using a global positioning system ("GPS") and other sensors to maintain the drone's position and altitude, a highly sophisticated development in 2025.[29] The Complaint alleges that Plaintiffs have a "fast pass to FPV drone development" based on their prior work with the DoD, and that in the coming months they intended to submit a bid for applications for DoD contracts and other opportunities, including foreign governments, United States federal, state, and local government agencies, and private United States entities.[30] Plaintiffs state that as of July 2025, FANG™ was ready for marketing and sale. However, in its Supplemental Declarations, Plaintiffs represented that FANG™ was publicly debuted on October 8, 2025, and that it "is currently positioned for production at scale."[31]

In November 2024, Matus resigned as Red Cat's CTO and Teal's CEO.[32] Matus then joined Vector as CTO. He and Vector employees explained to Plaintiffs that Vector's offerings included contracted-for teaching and training on warfare technology offerings, including drones, to military units and sectors, and leasing drones purchased from other companies (including from Plaintiffs) to military units for training and deployment.[33] Based on Matus and Vector's representations concerning Vector and their future business opportunities, Plaintiffs allege that they did not have concerns at the time he left in December 2024 regarding his employment with

---

[29] Docket No. 1 ¶¶ 95–96; Docket No. 62-1 ¶ 32.

[30] Docket No. 1 ¶¶ 99, 101, 103.

[31] Docket No. 62-1 ¶ 5.

[32] Docket No. 1 ¶ 105.

[33] *Id.* ¶ 106.

Vector.[34] However, in July 2025, they became concerned when Vector announced it had developed a FPV drone, named "Hammer," for use on the battlefield.

The Complaint alleges that following Matus' departure, Plaintiffs learned that he deleted all work product, data, and files from his work computer before returning it to them, resulting in a loss of over $5,000.00 in the value of documents, data, and files that he deleted.[35] The Complaint alleges that in violation of his employment contract, Matus solicited twelve employees from Plaintiffs to join Vector, many of whom are drone engineers and were subject to similar non-compete agreements.[36] Matus disputes these assertions, representing that he did not delete anything and that the majority of the documents he created while at Red Cat were located on their own drive and were unaffected by anything he did.[37] Both Matus and Vector also dispute that they solicited employees to leave.[38]

In July 2025, Plaintiffs sent Defendants a letter reminding them of Matus' post-employment obligations under his employment contract.[39] Defendants responded that they were not competing with Plaintiffs and that the drones Vector is developing are different from Plaintiffs' drones as they are intended to be used for single use, explosive operations.[40] Subsequently, Vector publicly announced its "Hammer drone"[41] The Complaint alleges that

---

[34] *Id.* ¶ 108.

[35] *Id.* ¶¶ 139–41.

[36] *Id.* ¶¶ 147–151.

[37] Docket No. 38 ¶¶ 41–42.

[38] *Id.* ¶¶ 38–39.

[39] Docket No. 1 ¶ 158.

[40] *Id.* ¶ 161.

[41] *Id.* ¶¶ 164, 166.

Vector is touting their products as low cost for military deployment, similar to Plaintiffs.[42] It alleges that in order to design, develop, and manufacture Hammer, "Vector likely has relied, and will continue to rely, on Matus'[] knowledge of [Plaintiffs'] trade secret and confidential information."[43] And further, that Plaintiffs and Vector will compete in the future for the same contracts, including for Next Generation SRR.[44] Defendants assert that Matus was not involved in the development of the Hammer drone, and that another employee, Kaleb Ellis, developed it.[45]

Plaintiffs filed a Notice of Supplemental Declarations in Advance of the October 29, 2025 Preliminary Injunction Hearing[46] which included Declarations from Jason Gunter and Geoff Hitchcock, both employees of Plaintiffs. Mr. Gunter states that on October 8, 2025, Plaintiffs publicly debuted FANG™ and it is "currently positioned for production at scale."[47] Additionally, the declaration states that FANG™ has obtained Blue List certification while Hammer has not.[48] Defendants subsequently objected to the Notice and the Declarations. The Court held oral argument for argument concerning the Motion on October 29, 2025.

Plaintiffs assert the following claims against Defendants: (1) Trade Secret Misappropriation Under the Defend Trade Secrets Act[49] against both Defendants; (2) Trade Secret Misappropriation Under the Utah Trade Secrets Act[50] against both Defendants; (3) Breach

---

[42] *Id.* ¶ 173.
[43] *Id.* ¶¶ 178, 182.
[44] *Id.* ¶ 181.
[45] Docket No. 30-3; Docket No. 30-1 ¶ 13.
[46] Docket No. 62.
[47] Docket No. 62-1 ¶ 5.
[48] *Id.* ¶¶ 58–59.
[49] 18 U.S.C. §§ 1836 *et seq.*
[50] Utah Code Ann. §§ 13-24-1 *et seq.*

of Contract, Non-Competition against Matus; (4) Breach of Contract, Non-Solicitation against Matus; (5) Breach of Fiduciary Duty against Matus; (6) Violation of the Computer Fraud and Abuse Act against Matus; (7) Violation of the Utah Computer Abuse and Data Recovery Act against Matus; (8) Tortious Interference with Actual and Prospective Economic Relations against both Defendants; and (9) Fraudulent Misrepresentation against Matus.

Plaintiffs seek a preliminary injunction against Defendants. Specifically, Plaintiffs seek a one-year injunction enjoining Matus from working for or collaborating with Vector on the design, development, production, marketing, and sale of any drone technology, and enjoining Vector from (1) manufacturing, marketing, distributing, entering, or competing for contracts, and/or selling any Vector designed, developed, and/or marketed drones and (2) working to identify and/or building business relationships with any external entities or individuals in support its drone design, development, marketing, and/or manufacture efforts. Plaintiffs further seek an injunction prohibiting Defendants from using, disclosing, and/or relying on Plaintiffs' trade secrets and confidential information and a one-year injunction prohibiting Defendants from soliciting any of Red Cat's employees.

## II. LEGAL STANDARD

To obtain a preliminary injunction or a temporary restraining order under Rule 65 of the Federal Rules of Civil Procedures, the movant has the burden of demonstrating: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest.[51]

---

[51] *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007) (citing *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1255 (10th Cir. 2003)).

"[A] preliminary injunction is an extraordinary remedy; it is the exception rather than the rule."[52] Accordingly, "the right to relief must be clear and unequivocal."[53]

"Because the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit has identified "three types of specifically disfavored preliminary injunctions (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits."[54]

An injunction is mandatory "if the requested relief affirmatively requires the nonmovant to act in a particular way, and as a result . . . places the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction."[55] "Because the primary goal of a preliminary injunction is to preserve the pre-trial status quo, courts should be especially cautious when granting an injunction that requires the nonmoving party to take affirmative action—a mandatory preliminary injunction—before the trial on the merits occurs."[56]

---

[52] *Id.* (quoting *GTE Corp. v. Williams,* 731 F.2d 676, 678 (10th Cir. 1984)).

[53] *Beltronics USA, Inc. v. Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coal.*, 321 F.3d at 1256).

[54] *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005) (internal quotation marks and citations omitted).

[55] *Id.* at 1261 (internal quotation marks and citation omitted).

[56] *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208–09 (10th Cir. 2009) (citation omitted).

III. ANALYSIS

A. Irreparable Harm

To be entitled to a preliminary injunction, Plaintiffs must establish irreparable harm absent the issuance of an injunction. "[B]ecause a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered."[57] The "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages."[58] This is "not an easy burden to fulfill."[59] "Purely speculative harm will not suffice."[60] "[S]imple economic loss usually does not, in and of itself, constitute irreparable harm; such losses are compensable by monetary damages."[61]

Plaintiffs assert they have suffered three categories of irreparable harm: (1) unfair competition, (2) diminution of reputation and goodwill, and (3) erosion of business advantage, trade secrets, and innovation.

First, Plaintiffs argue that they are suffering and will continue to suffer irreparable harm to fair competition.[62] They make conclusory assertions that Defendants are using their sensitive business information, strategic plans, submission approach, and strategic relationships, to cut in

---

[57] *Dominion Video Satellite, Inc. v. Echostart Satellite Corp.*, 356 F.3d 1256, 1260 (10th Cir. 2004) (internal quotation marks and citation omitted).

[58] *Greater Yellowstone Coal.*, 321 F.3d at 1258 (internal quotation marks and citation omitted).

[59] *Id.* (citation omitted).

[60] *RoDa Drilling Co.*, 552 F.3d at 1210.

[61] *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted).

[62] Docket No. 50, at 5.

line, causing harm to Plaintiffs' competitive edge and reputation. Plaintiffs provide no evidence of this. Furthermore, there are significant factual disputes underlying whether the parties are competing. In their Reply, Plaintiffs assert that Vector and Red Cat/Teal were competing during the sweeps period, however the Supplemental Declarations and the parties' representations at the hearing did not support this assertion.

"To constitute irreparable harm, an injury must be certain, great, actual and not theoretical."[63] A head start in the marketplace based on a plaintiff's "work, money, and trade secrets" may demonstrate irreparable harm.[64] However, the Court finds that Plaintiffs have failed to show such a certain and actual harm here. Plaintiffs allege only speculative assertions that Defendants gained an improper head start in the marketplace, and the supporting facts are disputed.

Plaintiffs argue that by soliciting their employees to work at Vector, Defendants have irreparably harmed them by giving Vector an unfair advantage. However, the facts underlying whether Defendants improperly solicited Plaintiffs' employees are in dispute. Further, any harm here has already occurred, there are no allegations that Defendants are currently soliciting employees to leave or that any employee has left Red Cat/Teal for Vector since July 2025.[65]

Plaintiffs also argue that they are being harmed through unfair competition because Matus is using his knowledge from Plaintiffs to benefit Vector, and is competing with Plaintiffs in violation of the non-compete clause in his employment contract.[66] Plaintiffs do not provide

---

[63] *Schrier*, 427 F.3d at 1267 (internal quotation marks and citations omitted).

[64] *Xantrex Tech., Inc. v. Advanced Energy Indus., Inc.*, No. 07-cv-02324-WYD-MEH, 2008 WL 2185882, at *16 (D. Colo. May 23, 2008).

[65] Docket No. 62-2 ¶¶ 10–11.

[66] Docket No. 50, at 6.

specific evidence of this other than that Vector is now offering a FPV drone for sale. Further, whether Matus is in breach of the non-compete clause is in dispute.

Second, Plaintiffs assert that their reputation and goodwill is being harmed each time Vector uses it to compete because Matus' reputation was bolstered due to his involvement in the development of Plaintiffs' Black Widow drone program.[67] Defendants argue that Plaintiffs fail to identify any concrete injury and fail to support the laundry list of irreparable harm with specifics.[68]

Although loss of good will and harm to market position are factors that can demonstrate irreparable harm, ultimately "[a] plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain."[69] Plaintiffs do not allege evidence supporting that customers or others have turned to Defendants for FPV drones (or other products) over Plaintiffs or otherwise established how Defendants' alleged actions have harmed its good will and market position or how they are likely to in the future.[70] Plaintiffs also do not support their assertion that Vector has been given opportunities to compete that were earned by Red/Cat Teal. Furthermore, the facts underlying the alleged competition between the products and parties and Matus' non-compete agreement are in dispute.

---

[67] Docket No. 50, at 9.

[68] Docket No. 30, at 17.

[69] *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001); *see also Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir. 1993) (finding a loss of unique position in marketplace evidenced by harm to goodwill and difficulty in calculating damages).

[70] *See Apex Tool Group, LLC v. Wessels*, 119 F. Supp. 3d 599, 609 (E.D. Mich. 2015) ("[P]laintiff has failed to establish how any of defendant's actions harmed its customer goodwill and competitive position in the past, let alone that any such actions are likely to lead to immediate irreparable harm in the future.").

Finally, Plaintiffs assert that they will suffer irreparable harm through erosion of business advantage, trade secrets, and innovation through Matus' knowledge of Plaintiffs' business. Plaintiffs argue that because Matus holds the same role and performs the same job duties as Red Cat/Teal, they are "optimal conditions" "begging" for Matus' insight into Plaintiffs by Vector.[71] They further argue that Matus' alleged misappropriation of trade secrets is also evidence of this harm and that each time Vector sells the Hammer drone, they erode the value of Plaintiffs' trade secrets and innovation and dampen Plaintiffs' competitive vitality.[72]

These arguments suffer from the same issues as those above, namely, the merits of Plaintiffs' allegations are in dispute and they rely on speculative assertions. While "[i]n some cases, a former employee's use of an employer's confidential information could support a finding of irreparable harm to the former employer[,] . . . there must be a causal mechanism to support such a finding."[73] For example, a "former employee's use of confidential information could harm the employer by causing a loss of profits or customer relationships. In such a case, the employer must show the lost profits or lost customer relationships cannot be calculated with any reasonable degree of certainty."[74] Plaintiffs fail to provide any such evidence.

Additionally, Plaintiffs fail to present evidence "suggesting that it is impossible to precisely calculate the amount of damages [Plaintiffs] will suffer."[75] Based on the foregoing, the Court finds that Plaintiffs have failed to demonstrate irreparable harm.

---

[71] Docket No. 50, at 10.

[72] *Id.*

[73] *DM Trans, LLC v. Scott*, 38 F.4th 608, 621 (7th Cir. 2022).

[74] *Id.*

[75] *Equifax Servs., Inc. v. Hitz*, 905 F.2d 1355, 1361 (10th Cir. 1990) (internal quotation marks and citation omitted).

B. Substantial Likelihood of Success on the Merits

Plaintiffs argue that they have shown a substantial likelihood of success on the following claims: (1) breach of contract, (2) misappropriation of trade secrets, and (3) tortious interference claims. However, each of Plaintiffs' claims rest upon significant factual disputes, including whether Plaintiffs and Vector are competitors, the circumstances surrounding the development of the FANG™ drone when Mr. Matus was employed at Red Cat/Teal, whether Mr. Matus and Vector solicited employees to leave Red Cat/Teal for Vector, whether Mr. Matus deleted documents containing trade secrets from his computer prior to leaving Red Cat/Teal, and whether Mr. Matus destroyed Plaintiffs' business relationship with Orqa. Further, Plaintiffs fail to present evidence supporting that Defendants otherwise misappropriated any of Red Cat/Teal's trade secrets. After a careful review of the record, the Court is not convinced that Plaintiffs' right to relief is "clear and unequivocal" at this stage based on these disputes. Accordingly, the Court finds that Plaintiffs have failed to demonstrate a substantial likelihood of success on the merits.

C. Balance of Hardships

The Court must balance the hardships to the defendant with the plaintiff's injury to determine whether to issue an injunction.[76] Defendants assert that the balance tips in their favor because Plaintiffs' hardship is speculative and the injunction would "destroy Vector's business."[77] Because Plaintiffs' harm is speculative and disputed, the Court finds that the balance weighs in favor of Defendants.

---

[76] *See Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001).

[77] Docket No. 30, at 21; Docket No. 29, at 24.

D. Public interest

The Court finds that it is not in the public interest to issue an injunctive relief where doing so would interfere with a competitive marketplace.[78] The Court finds that there is a significant public interest that is served through a competitive warfare drone marketplace. Further, it is not in the public's interest to grant injunctive relief where the other factors significantly weigh against it.

Based on the foregoing, the Court finds that Plaintiffs have failed to meet their high burden that the right to relief is clear and unequivocal. Therefore, the Court will deny Plaintiffs' Motion.

E. Objection

Defendants object to Plaintiffs' Notice of Filing Supplemental Declarations on October 23, 2025, before the hearing in this matter. The Court will overrule the Objection as the supplemental declarations pertain to developments in the case since the case was fully briefed. In analyzing the Motion, the Court considered the record before it, including the parties' declarations, briefing, and arguments at the hearing.

---

[78] *Utah Med. Prod., Inc. v. Clinical Innovations Assocs., Inc.*, 79 F. Supp. 2d 1290, 1312 (D. Utah 1999), aff'd, 251 F.3d 171 (Fed. Cir. 2000); *Am. Phytotherapy Rsch. Lab'y, Inc. v. Impact Nutrition, Inc.*, 201 F. Supp. 2d 1145, 1151 (D. Utah 2002) ("Public interest favors competition in its various forms."); *Klein-Becker USA, LLC v. Prod. Quest Mfg., Inc.*, 429 F. Supp. 2d 1248, 1259 (D. Utah 2005) (explaining that the public interest is "best served by competition and the availability of lower priced alternative products").

## IV. CONCLUSION

It is therefore

ORDERED that Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (Docket No. 2) is DENIED.

DATED  November 4, 2025.

                    BY THE COURT:

                    _____
                    TED STEWART
                    United States District Judge