IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH

| | |
|---|---|
| RED CAT HOLDINGS, INC. and TEAL DRONES, INC.,<br><br>Plaintiffs,<br>v.<br><br>GEORGE MATUS and VECTOR DEFENSE, INC.,<br><br>Defendants. | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT MATUS' MOTION TO DISMISS AND DENYING DEFENDANT VECTOR'S MOTION TO DISMISS<br><br>Case No. 2:25-cv-00646-TS-JCB<br><br>District Judge Ted Stewart<br>Magistrate Judge Jared C. Bennett |

This matter comes before the Court on Defendant George Matus' Motion to Dismiss[1] and Defendant Vector Defense, Inc's Motion to Dismiss.[2] For the reasons discussed below, the Court will grant in part and deny in part Matus' Motion and deny Vector's Motion.

## I. BACKGROUND[3]

Plaintiffs, Red Cat Holdings, Inc. ("Red Cat") and Teal Drones, Inc. ("Teal") sue former employee, George Matus, and Vector Defense, Inc. ("Vector") for claims related to Matus' employment with Vector. Red Cat is a holding company that owns drone technology

[1] Docket No. 56.

[2] Docket No. 55.

[3] The following facts are taken from Plaintiffs' Complaint and are accepted as true for the purposes of this Motion.

subsidiaries, including Teal.[4] Red Cat's subsidiaries are involved in developing, manufacturing, and deploying a variety of drones for use by the United States military and its allies.[5]

In 2014, Matus founded Teal. He sold the company to Red Cat in 2021. From its founding until he left the company in November 2024, Matus was the Chief Executive Officer ("CEO") of Teal. In addition to being CEO of Teal, Matus was also hired as Red Cat's Chief Technology Officer ("CTO") in 2023. In this role, Matus worked on behalf of Red Cat to source, locate, and negotiate mergers and acquisitions benefiting Red Cat's goals, plans, and footing in the competitive drone marketplace,[6] as well as forge strategic partnerships with other drone companies.[7]

Matus and Red Cat entered into an Executive Employment Agreement (the "Agreement") in which Red Cat promised Matus two years of employment and a salary raise, among other benefits, as well as access to the company's secret, proprietary, and confidential information.[8] Matus agreed to devote all his "business time and best efforts" to perform his duties for Red Cat/Teal,[9] and to comply with protective covenants, including a non-compete, non-solicitation, and non-disclosure clause.

Per the non-compete clause, Matus agreed to refrain from certain competitive activity during his Red Cat employment and for twelve months thereafter. The clause provides in part that Matus will not "directly or indirectly engage in any business activity which is similar to the

---

[4] Docket No. 1 ¶ 3.

[5] *Id.*

[6] *Id.* ¶ 37.

[7] *Id.* ¶ 39.

[8] *Id.* ¶ 43.

[9] *Id.* ¶ 45 (internal quotation marks and citation omitted).

business of [Red Cat/Teal] within the same city, county, state, or other defined geographical area."[10] Matus agreed that he would not "solicit, entice, or induce any employee of [Red Cat/Teal] to leave their employment during the same period,"[11] and that he would not disclose or use any of Red Cat/Teal's confidential information, including, but not limited to "client lists, trade secrets, business operations, internal processes,"[12] and "its products, methods, formulas, software code, patents, sources of supply, customer dealings, data, know-how, trade secrets and business plans."[13] Matus further agreed that upon separation of his employment, he would provide Red Cat with "any and all originals and copies, including those in electronic or digital formats, of [c]onfidential [i]nformation."[14]

Red Cat derives significant value from its and its subsidiaries' confidential and trade secret business information and plans, including: budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans.[15] Only Red Cat's key employees, including Matus, had insight and exposure into its business plans. Red Cat dedicates significant time and resources into locating and developing strategic initiatives, business opportunities, and partners.[16] This includes networking and identifying beneficial business partnerships, conducting due diligence, and ultimately negotiating partnerships.[17] Among other

---

[10] *Id.* ¶ 48 (citation omitted).

[11] *Id.* ¶ 49 (citation omitted).

[12] *Id.* ¶ 50 (citation omitted).

[13] *Id.* (citation omitted).

[14] *Id.* ¶ 51 (internal quotation marks and citation omitted)

[15] *Id.* ¶ 56.

[16] *Id.* ¶ 58.

[17] *Id.*

things, Red Cat has put significant research and development resources into "identifying the ideal marriage of its and its subsidiaries' drone components," including for Department of Defense ("DoD") sponsored drones.[18]

Red Cat protects its and its subsidiaries' trade secrets, proprietary, and confidential information through a number of methods, including requiring confidentiality agreements with employees, contractors, consultants, and others as appropriate;[19] following U.S. Government and DoD protocols and policies regarding storing and sharing sensitive information;[20] password protecting devices and systems;[21] and only sharing trade secret, proprietary, and confidential information as necessary.[22]

Matus was involved with the development of various First-Person View ("FPV") drones with Plaintiffs.[23] Plaintiffs and Matus were working on a partnership with Orqa, a Croatian drone company, to incorporate Orqa's hardware and software into their FANG drone. However, in Fall 2024, FANG's development was suspended when the deal collapsed during negotiations with Matus.[24]

Matus was heavily involved with meeting and negotiating with Orqa on behalf of Plaintiffs. In July 2024, Plaintiffs and Orqa entered into a non-binding memorandum of understanding wherein Orqa agreed to send Plaintiffs components to build the drones in the

[18] *Id.* ¶ 61.
[19] *Id.* ¶ 65.
[20] *Id.* ¶ 66.
[21] *Id.* ¶ 67.
[22] *Id.* ¶ 68.
[23] *Id.* ¶ 93.
[24] *Id.* ¶ 94.

United States and Plaintiffs agreed to assemble the drones and sell them in the United States as FANG drones and to help Orqa to attain DoD Blue UAS clearance.[25] The deal "was one of the most important potential business relationships [Plaintiffs] had entertained" and would have resulted in significant financial gain.[26]

In August 2024, Plaintiffs became concerned when Matus stopped updating them on progress with the Orqa deal.[27] After little to no updates, Matus informed Plaintiffs that Orqa was no longer interested in the partnership. Matus did not provide Plaintiffs with any substantive detail or context for the change.[28] Plaintiffs allege that the partnership ended because Matus purposely killed it.

After the agreement broke down, Plaintiffs began working on the FANG drone again using a global positioning system ("GPS") and other sensors to maintain the drone's position and altitude, a highly sophisticated development in 2025.[29] The Complaint alleges that Plaintiffs have a "fast pass to FPV drone development" based on their prior work with the DoD. They intended to submit a bid for DoD contracts and other opportunities in the coming months, including with foreign governments; federal, state, and local government agencies; and private United States entities.[30] As of July 2025, FANG was ready for marketing and sale.

In November 2024, Matus resigned as Red Cat's CTO and Teal's CEO. Matus then joined Vector as CTO. He told Plaintiffs that Vector offered contracted teaching and training on

---

[25] *Id.* ¶¶ 124–25.

[26] *Id.* ¶ 129.

[27] *Id.* ¶ 132.

[28] *Id.* ¶ 133.

[29] *Id.* ¶¶ 96, 97.

[30] *Id.* ¶¶ 99, 103.

warfare technology offerings, and leased drones purchased from other companies (including from Plaintiffs) to military units for training and deployment.[31] Based on Matus' representations concerning Vector, and "numerous indications . . . of future business opportunit[ies]" between the two companies, Plaintiffs did not have concerns about Matus' employment with Vector, at the time he left in December 2024.[32] However, in July 2025, they became concerned when Vector announced it had developed a FPV drone for use on the battlefield.[33]

Following Matus' departure, Plaintiffs learned that he deleted all work product, data, and files from his work computer before returning it.[34] Further, from March to June 2025, Red Cat/Teal employees left to join Vector, many of whom were drone engineers and were subject to similar non-compete agreements.[35]

In July 2025, Plaintiffs sent Defendants a letter reminding them of Matus' post-employment obligations under his employment contract.[36] Defendants responded that they were not competing with Plaintiffs and that the drones Vector was developing were different from Plaintiffs' drones, as they were intended to be used for single use, explosive operations.[37] Shortly thereafter, Vector publicly announced its new FPV military drone, called "Hammer."[38] Vector described Hammer as being intended for military deployment at a low cost, similar to Plaintiffs'

---

[31] *Id.* ¶ 106.
[32] *Id.* ¶ 108.
[33] *Id.* ¶ 109.
[34] *Id.* ¶ 139.
[35] *Id.* ¶¶ 147–49.
[36] *Id.* ¶ 314.
[37] *Id.* ¶ 161.
[38] *Id.* ¶¶ 164, 166.

drones.[39] Plaintiffs allege that in order to design, develop, and manufacture Hammer, "Vector likely relied, and will continue to rely, on Matus'[] knowledge of [Plaintiffs'] trade secret and confidential information."[40] And further, that Plaintiffs and Vector will compete in the future for the same contracts.[41]

Based on these allegations, the Complaint asserts the following claims: (1) Trade Secret Misappropriation under the Defend Trade Secrets Act[42] against both Defendants; (2) Trade Secret Misappropriation under the Utah Trade Secrets Act[43] against both Defendants; (3) Breach of Contract, Non-Competition against Matus; (4) Breach of Contract, Non-Solicitation against Matus; (5) Breach of Fiduciary Duty Against Matus; (6) Violation of the Computer Fraud and Abuse Act[44] against Matus; (7) Violation of the Utah Computer Abuse and Data Recovery Act[45] against Matus; (8) Tortious Interference with Actual and Prospective Economic Relations against both Defendants; and (9) Fraudulent Misrepresentation against Matus.

Plaintiffs previously sought a preliminary injunction enjoining both Matus and Vector, which the Court denied.[46] Defendants now seek dismissal of the Complaint for failure to state a claim. Having fully reviewed the parties' briefing and finding that oral argument would not be materially helpful,[47] the Court now rules on the Motions to Dismiss.

---

[39] *Id.* ¶ 173.

[40] *Id.* ¶¶ 178, 182.

[41] *Id.* ¶ 181.

[42] 18 U.S.C. §§ 1836 *et seq.*

[43] Utah Code Ann. § 13-24-1 *et seq*.

[44] 18 U.S.C. § 1030.

[45] Utah Code Ann. § 63D-3-104.

[46] Docket No. 71.

[47] DUCivR 7-1(g).

## II. LEGAL STANDARD

When evaluating a complaint under Federal Rule of Civil Procedure 12(b)(6), the court accepts all well-pleaded factual allegations, as distinguished from conclusory allegations, as true and views them in the light most favorable to the non-moving party.[48] The plaintiff must provide "enough facts to state a claim to relief that is plausible on its face,"[49] which requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation."[50] "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"[51]

## III. DISCUSSION

The crux of Defendants' Motions to Dismiss is that Vector and Plaintiffs are not competitors and, therefore, many of the claims alleged in the Complaint fail. However, "[t]he court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[52]

As the Court stated in its Order denying Plaintiffs' Motion for Preliminary Injunction, "there are significant factual disputes underlying whether the parties are competing"[53] However, the Complaint plausibly alleges that Vector is competing with Red Cat/Teal. It would therefore

---

[48] *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997).

[49] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

[50] *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[51] *Id.* (quoting *Twombly*, 550 U.S. at 555, 557).

[52] *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).

[53] Docket No. 71, at 11.

be improper for the Court to dismiss this matter at this stage based on Defendants' assertions that the parties are not competing.[54]

A. Trade Secret Claims

The Complaint alleges misappropriation of trade secrets against Matus and Vector under both federal and Utah law. The Defend Trade Secrets Act ("DTSA") and the Utah Uniform Trade Secrets Act ("UUTSA") closely resemble each other.[55] To state claim under the DTSA, a complaint must plead "(1) the existence of a trade secret, (2) the trade secret's misappropriation, and (3) that the trade secret implicated interstate or foreign commerce."[56] To state a claim for trade secret misappropriation under the UUTSA, a complaint must plead (1) the existence of a trade secret, (2) communication of the trade secret to the defendant under an express or implied agreement limiting disclosure of the secret, and (3) use of the trade secret that injures the plaintiffs.[57]

Defendants argue that the trade secret claims fail for two reasons: first, the Complaint fails to sufficiently identify any trade secret, and second, the Complaint fails to sufficiently allege misappropriation.

---

[54] *Compare Diné Citizens Against Ruining Our Env't v. Jewell*, 839 F.3d 1276, 1281 (10th Cir. 2019) (stating a TRO requires a showing of "a substantial likelihood of success on the merits") *with Ashcroft*, 556 U.S. at 677 (stating a complaint survives dismissal under Rule 12(b)(6) if it is plausible on its face).

[55] *Total Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1210 (D. Utah 2023); *Applied Predictive Techs., Inc. v. Marketdial, Inc.*, No. 2:19-cv-00496-JNP-CMR, 2020 WL 6940736, at *21 (D. Utah Nov. 25, 2020).

[56] *Double Eagle Alloys, Inc. v. Hooper*, 134 F.4th 1078, 1087 (10th Cir. 2025) (internal quotation marks and citation omitted).

[57] *Water & Energy Sys. Tech., Inc. v. Keil*, 1999 UT 16, ¶ 9, 974 P.2d 821.

1. Existence of a Trade Secret

Defendants assert that Plaintiffs "identify only broad categories—business plans, partnership opportunities, and drone design—without tying any allegation to a concrete, protectable trade secret."[58]

The DTSA and UUTSA define "trade secret" as information that (1) "has independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by," other persons "who can obtain economic value from" its disclosure or use, and (2) is subject to reasonable measures to maintain its secrecy.[59] "A plaintiff is not expected to plead its trade secrets in detail because such disclosure would amount to an effective surrender of the trade secret."[60] "The usual notice pleading requirements under Rule 8 apply."[61] As such, the complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."[62]

The Complaint states that Red Cat/Teal derives significant value from confidential and trade secret business information and plans that are not readily ascertainable, which include:

> budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans[;][63]

---

[58] Docket No. 55, at 11.

[59] 18 U.S.C. § 1839(3); Utah Code Ann. § 13-24-2(4).

[60] *Cobalt Flux, Inc. v. Positive Gaming AS*, No. 2:08-CV-185 TS, 2008 WL 4534182, at *3 (D. Utah Oct. 6, 2008) (citation omitted).

[61] *Id.*; *USA Power, LLC v. PacifiCorp*, 2010 UT 20, ¶ 48, 372 P.3d 629 (clarifying that there is no particularity requirement in the UUTSA).

[62] Fed. R. Civ. P. 8(a)(2).

[63] Docket No. 1 ¶ 56.

> locating and developing strategic initiatives, business opportunities, and partners for it and its subsidiaries . . . [including,] identifying, researching into, and assessing potential business opportunities, acquisitions, and partnerships[;][64]
>
> trade secret drone design and development . . . [including,] designs, partnerships, product and component sourcing, manufacture, enhancements, and component combination to increase the competitive value of its and its subsidiaries drones[;][65]
>
> identifying the ideal marriage of . . . drone components . . . [including,] locat[ing] and sourc[ing] DoD-approved drone components, build[ing] prototype drones with such components, test[ing] the prototype drones, identify[ing] deficiencies and areas of improvement with the prototype drones, identify[ing] different and/or additional DoD-approved drone components for testing, rebuild[ing] the prototype drones, retest[ing] the prototype drones, and again work[ing] to identify deficiencies and areas of improvement until the prototype is in its most ideal iteration.[66]

The Complaint also pleads that Plaintiffs protect their trade secret, proprietary and confidential information through requiring employees to agree to protect and keep such information confidential, and by requiring contractors, consultants, strategic partners, and others to enter into confidentiality agreements.[67] It pleads that it follows the U.S. government and DoD's protocols and policies regarding sensitive information, password protects all of its devices and systems, and limits the dissemination of the information as necessary or on a need-to-know basis.[68]

In *LS3 Inc. v. Cherokee Nation Strategic Programs, LLC*,[69] the Tenth Circuit affirmed the district court's dismissal of trade secret misappropriation claims when the complaint lacked allegations identifying the information defendants acquired that may have been a protected trade

---

[64] *Id.* ¶ 58.

[65] *Id.* ¶ 60.

[66] *Id.* ¶ 61.

[67] *Id.* ¶ 65.

[68] *Id.* ¶¶ 66–68.

[69] No. 21-1385, 2022 WL 3440692 (10th Cir. Aug. 17, 2022).

secret.[70] Here, Plaintiffs' Complaint provides more allegations than those in *LS3* by outlining Plaintiffs' drone design and development process.

Defendants cite to *Quest Solutions, Inc. v. Red LPR LLC*,[71] wherein a district court granted summary judgment in favor of the defendants on the plaintiffs' DTSA and UUTSA claims in part for failure to identify trade secrets with sufficient particularity. Defendants latch onto the *Quest* court's statement that "referring to a trade secret by a phrase or category fails" to adequately identify a trade secret.[72] However, the court was applying a summary judgment standard and was concerned with different iterations of the trade secret through complaints, discovery responses, and other filings.[73] This is not the case here.

Instead, the Court looks to cases that instruct on what is sufficient to plead a trade secret under the motion to dismiss standard. For example, in *Geist v. Kansas State University Foundation*,[74] the district court concluded that the allegations about the plaintiff's "unique 'business approaches' [were] insufficiently specific to put any defendant on notice as to what the purported trade secrets [were]."[75] The court dismissed the plaintiff's trade secret claims without prejudice, because it determined that amendment may not have been futile.[76]

[70] *Id.* at *5.

[71] No. 2:19-cv-437, 2023 WL 11910450 (D. Utah Aug. 3, 2020).

[72] *Id.* (citing *IteliClear, LLC v. ETC Glob. Holdings*, 978 F. F.3d 653, 658 (9th Cir. 2020) (describing the requirements under a summary judgment standard)).

[73] *Id.* at *44.

[74] *Geist v. Kansas St. Univ. Foundation*, No. 23-01129-JWB, 2023 WL 8088790, at *4 (D. Kan. Nov. 21, 2023) *aff'd* No. 23-3266, 2024 WL 3841828 (10th Cir. Aug. 16, 2024).

[75] *Id.* at *4.

[76] *Id.*

In contrast, in *Vendr, Inc. v. Tropic Technologies, Inc.*,[77] the district court denied dismissal where the complaint alleged that the former employee was privy to "confidential and proprietary information, including, without limitation, data insights, customer lists, and contacts, supplier lists, and contracts, overall business processes and strategies, product plans, and plans for growth."[78] The allegations also stated the employee was aware of the employer's "operations, services, clients, growth and marketing strategies, . . . and other proprietary information and/or commercially sensitive information."[79] The complaint identified the efforts the plaintiff took to maintain the secrecy of this information.[80] In sum, the former employee "knew [the plaintiff's] specific clients and customer and supplier insights, [the plaintiff] derive[d] independent economic value from keeping that information confidential, and [the plaintiff] use[d] reasonable means to maintain the information's secrecy."[81]

The trade secret allegations here are similar to those found sufficient in *Vendr*. Plaintiffs identify their trade secret information as including "budgets, forecasts, market strategies, bidding information, contract considerations, investment methods, contemplated and planned product offerings, funding, division of resources, and growth methods and plans."[82] Plaintiffs also point to their confidential drone design and development system wherein they identify "the ideal marriage of its and its subsidiaries' drone components."[83] Plaintiffs allege that "[t]his

---

[77] No. 2:23-CV-165-DAK-DAO, 2023 WL 8789297 (D. Utah Dec. 19, 2023).

[78] *Id.* at *4.

[79] *Id.*

[80] *Id.*

[81] *Id.*

[82] Docket No. 1 ¶ 56.

[83] *Id.* ¶ 61.

information is not publicly available nor is it easily or readily ascertainable" and that such information "would allow any competitor to skip the line by foregoing grueling hours and financial investment poured into trial and error."[84] The Complaint also sufficiently pleads that these trade secrets were subject to reasonable measures to maintain secrecy.

Defendants argue that because Plaintiffs' FANG drone was developed by Orqa, a third party, Plaintiffs do not own the drone design and therefore the claim fails as a matter of law.[85] However, the Complaint alleges trade secrets beyond those specific to the FANG drone as chronicled above. As such, the Court does not find that the trade secret claims fail for this reason. Viewing the trade secret allegations in the light most favorable to Plaintiffs, the Court concludes that the Complaint sufficiently pleads the existence of a trade secret.

2. Misappropriation

Defendants next argue that the Complaint fails to allege actual or threatened misappropriation. Under both the DTSA and UUTSA, "[m]isappropriation consists of (a) acquisition of a trade secret by a person who knows or should know the secret was improperly acquired or (b) disclosure or use of a trade secret of another without express or implied consent."[86]

The Complaint alleges the following misappropriation: Matus as CTO of Red Cat and CEO of Teal, deleted all data, files, and trade secrets from his computer when he left his employment; he represented that Vector, a company would not compete with Plaintiffs and was

---

[84] *Id.* ¶ 63.

[85] Docket No. 55, at 12–13 (citing *HealthBanc Int'l, LLC v. Synergy Worldwide, Inc.*, 208 F. Supp. 3d 1193, 1201 (D. Utah 2016)).

[86] *Smart Surgical, Inc. v. Utah Cord Bank, Inc.*, No. 2:20-cv-00244-JNP, 2021 WL 734954, at * 6 (D. Utah Feb. 25, 2021) (internal quotation marks and citations omitted); 18 U.S.C. § 1839(5)(A), (B); *Total Quality Sys., Inc.*, 679 F. Supp. 3d at 1210.

not in the business of developing drones; subsequently, a number ofPlaintiffs' employees, the majority of which were drone engineers became Vector employees; and six or so months after Matus left to work for Vector, Vector debuted a drone that it represented as a military drone. The Complaint also alleges that "[f]rom concept to manufacture, it generally takes several months (if not over a year) to develop a drone prototype intended for military and government purposes . . . [which] does not account for the myriad additional months of research and development to test, redesign, and perfect the drone."[87]

In *Surgenex, LLC v. Predictive Therapeutics, LLC*,[88] the plaintiff alleged that a former employee transmitted confidential and proprietary information to the defendant. Without this information, the defendant would not have been able to produce a new competing product.[89] The district court concluded that these allegations were sufficient to plead that the defendant misappropriated trade secrets.[90]

Similar to *Surgenex*, the Complaint supports that Matus' involvement with Vector has enabled Vector to compete in warfare drone development. While the allegations here do not assert Vector makes the exact product as Red Cat/Teal, the allegations support that Vector, at least in part, changed its business and developed a competing drone product after Matus officially joined the company. Notably, the Complaint asserts that prior to leaving his employment with Plaintiffs, Vector was not in the business of drone development.

Similarly, in *Vendr*, the complaint alleged that a former employee downloaded confidential information in the last weeks of his employment, reset his laptop prior to returning

[87] Docket No. 1 ¶ 85.

[88] 462 F. Supp. 3d 1160 (D. Utah 2020).

[89] *Id.* at 1172.

[90] *Id.*

the laptop against company policy, and then joined the defendant company, a competitor, shortly after. The complaint further alleged that the former employee held a comparable position with his new employer to his previous one, and his new employer engaged in a "concerted campaign to recruit [the plaintiff's] employees despite" being aware of their non-compete agreements.[91] The court found that these allegations were sufficient to support an inference of misappropriation.[92]

While there is not an allegation that Matus downloaded confidential information prior to leaving his employment at Red Cat/Teal, the rest of the allegations mirror those in *Vendr*. In addition, the Complaint alleges that Matus had access to Plaintiffs' most coveted trade secrets; prior to leaving Red Cat/ Teal, he misrepresented that Vector would not be competing with Plaintiffs in the drone development space; then developed an alleged competing drone at Vector within a short period of time. Consistent with *Surgenex* and *Vendr*, the Court concludes that Plaintiffs' allegations are sufficient to support a claim for misappropriation.

Defendants argue that courts routinely reject claims asserting misappropriation based on deletion of files and cite to three cases finding, under different standards of review and/or distinguishable facts, that deletion of files was not sufficient to infer or find misappropriation.[93]

---

[91] 2023 WL 8789297, at *2.

[92] *Id.* at *4.

[93] *Presidio Holdings Inc. v. People Driven Tech., Inc.*, No. 1:24-CV-02912, 2025 WL 947946, *6 (N.D. Ill. Mar. 30, 2025) (declining to issue a preliminary injunction where the court concluded that it could not infer misappropriation based on the former employee's deletion of over 7,000 files because the plaintiff was able to recover the deleted files and still have access to the employee's browsing history and data); *LifeLinc Anesthesia v. Wolfe,* No. 2:12-cv-02662-JPM-cgc, 2012 WL 13026748 (W.D. Tenn. Nov. 1, 2012) (applying Tennessee law, the court found that deletion of files by itself did not support misappropriation); *Packaging Corp. of Am., Inc. v. Croner*, 419 F. Supp. 3d 1059 (N.D. Ill. 2020) (finding that, under different factual circumstances, "[the employee's] deletions support his claim that he did not use or disclose any

Considering the totality of the allegations and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes that the Complaint sufficiently pleads that Matus and Vector misappropriated Plaintiffs' trade secrets.

Defendants also argue that the Complaint fails to satisfy the requirement under the DTSA that the trade secret implicates interstate or foreign commerce.[94] The Court does not agree based on the Complaint's allegations regarding Plaintiffs' business efforts both nationwide and globally. Furthermore, although Defendants do not challenge the injury requirement under the UUTSA, the Court finds that the allegations in the Complaint are sufficient. Accordingly, the Court will deny the Motion as to both of the trade secret misappropriation claims.

B. Breach of Contract

The Complaint alleges two breach of contract claims against Matus—one for breach of the non-competition clause and one for breach of the non-solicitation clause.

Under Utah law, the elements for a breach of contract are: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[95]

The parties do not dispute that there was a valid contract and that Plaintiffs performed under it. The Court will address the alleged breach of both covenants below.

1. Non-Compete Clause

The Non-Compete clause states:

> The Executive agrees that during the Employment Period and for a period of twelve (12) months immediately following the Termination Date, regardless of the cause

---

trade secrets—he took active steps to ensure he was no longer in possession of confidential materials").

[94] Docket No. 55, at 13 n.5.

[95] *Am. W. Bank Members, L.C. v. State*, 2014 UT 49, ¶ 15, 342 P.3d 224.

> of termination, the Executive shall not directly or indirectly engage in any business activity which *is similar to the business of the Company* within the same city, county, state or other defined geographical area recognized by the Company in which the Executive provided services for the Company, so long as the Company continues to carry on such business in the city, county, state or other defined geographical area.[96]

Matus argues that Plaintiffs fail to plead sufficient facts to support that Vector's drone product competes with Plaintiffs'. He asserts that because the purpose of Vector's drone product, the Hammer, is to "kill" and Plaintiffs' drone, the Black Widow, is to "hunt," and because they are not competing for the same contracts, there is no breach. Matus also argues that the Complaint does not support that Vector's Hammer drone competes with Plaintiffs' "FANG" drone.

Both of these arguments require further facts and analysis that are not available or proper at the motion to dismiss stage. The Complaint pleads that Matus co-founded and joined Vector; that Plaintiffs are in the business of designing, developing, manufacturing and selling military, government and commercial drones;[97] and that Vector is now engineering and manufacturing the Hammer drone for military use in its facility in Utah.[98] The Complaint further alleges that Red Cat/Teal operates in Utah[99] and Matus worked for Red/Cat Teal in Utah.[100] The Court finds these allegations sufficiently plead that Matus breached the terms of the non-compete clause by engaging in similar business in the same geographic area. Therefore, the Court will deny the Motion as to this claim.

---

[96] Docket No. 1-1 ¶ 14 (emphasis added).

[97] *Id.* ¶ 24.

[98] *Id.* ¶ 173.

[99] *Id.* ¶ 18.

[100] *Id.* ¶ 32.

2. Non-Solicitation Clause

The Non-Solicitation clause states

> For a period of twelve (12) months after the Termination Date, the Executive shall not directly or indirectly solicit business from, or attempt to sell, license, or provide the same or similar products or services as are now provided to any customer or client of the Company who was a customer or client of the Company at any time during the Executive's employment with the Company. Further, the Executive shall not solicit, entice, or induce any employee of the Company to leave their employment during the same period.[101]

The Complaint pleads that Matus, as co-founder and CTO of Vector, breached this clause when Vector entered into contracts with government agencies and the DoD and when he solicited employees to leave their employment with Red Cat to join Vector.

Matus argues that Plaintiffs fail to plead sufficient facts to show that Matus solicited employees to join Vector because it only pleads the threadbare legal conclusion that Matus "mined" Plaintiffs' employees. He also argues that there are no facts supporting that Matus had anything to do with securing Vector's government contracts.

The Complaint pleads that twelve Red Cat employees left Red Cat/Teal in the months of March, April, May, and July 2025, and that nine of those employees represented that they were going to work for Vector. It also alleges that the majority of the employees were drone engineers. Beyond these allegations, the Complaint fails to allege any specific facts to support that Matus directly or indirectly solicited any employee of Red Cat/Teal to leave their employment.

Plaintiffs cite to *SRS Acquiom, Inc. v. PNC Financial Services Group, Inc.*,[102] in which the district court concluded the complaint sufficiently alleged breach of a non-solicitation agreement where the defendant employee began talking to the plaintiff's employee shortly after

[101] Docket No. 1-1 ¶ 14.

[102] No. 1:19-cv-02005-DDD-SKC, 2020 WL 3250186 (D. Colo. Mar. 26, 2020).

the defendant resigned from her position with plaintiff, and the defendant's discussions with plaintiff's employee about leaving her employment with plaintiff to join the defendant at the new company continued for months.[103] There are no such allegations here.

Other courts in this district have found that allegations that the employee "actively encouraged his former coworkers to join him at [the new company] in violation of the non-solicitation clause," to sufficiently support a breach of contract claim.[104] Again, there are no such allegations here.

The Complaint is devoid of any further factual enhancement beyond the conclusory allegations that Matus solicited and caused Red Cat/Teal employees to leave and join Vector.

Additionally, the Complaint does not name any specific customer that Matus allegedly solicited, directly or indirectly, or describe specific efforts that Matus took in making any solicitations. The Complaint merely alleges that Vector entered into government contracts focused on Vector's warfighter-centered offerings and that Red Cat/Teal's customers include "[n]umerous U.S. government agencies as well as well as the DoD."[105] This is not sufficient to plead that Matus breached the customer solicitation clause, without more. Accordingly, the Court will dismiss the breach of contract claim as it pertains to the non-solicitation clause. However, it does appear possible that Plaintiffs could state a plausible claim and as such the Court will allow Plaintiffs leave to file an Amended Complaint to do so.

---

[103] *Id.* at *3.

[104] *Sys. West Performance, LLC v. Farland*, No. 2:14-cv-00276, 2015 WL 4920962, at *6 (D. Utah Aug. 18, 2015).

[105] Docket No. 1 ¶ 259.

C. Breach of Fiduciary Duty

The Complaint alleges that Matus breached his fiduciary duty of loyalty to Plaintiffs by (1) joining and growing Vector while he was employed at Red Cat/Teal, (2) failing to implement agreed-upon business initiatives at Teal and delaying Teal's progress, (3) sharing information with Orqa that vitiated Plaintiffs' bargaining position and caused Orqa to walk away from the deal, and (4) wiping his laptop without permission.[106]

To state a claim for breach of fiduciary duty, a complaint must plead (1) "the existence of a fiduciary relationship;" (2) "breach of the fiduciary duty;" (3) "causation, both actual and proximate;" and (4) "damages."[107] Utah corporate fiduciary duties are codified and require that corporate officers and directors discharge their respective duties "in good faith[,] . . . with the care an ordinarily prudent person in a like position would exercise under similar circumstances[,] and . . . in a manner the director or officer reasonably believes to be in the best interests of the corporation."[108] The Utah Supreme Court has concluded that

> to adequately discharge [their] statutory duty of loyalty, the [officer or] director must subjectively believe [their] actions are in the best interest of the corporation, and [their] subjective belief must be objectively reasonable—the reasonable person in those circumstances would believe that the action would be in the best interests of the corporation.[109]

---

[106] *Id.* ¶¶ 276–79.

[107] *Gables at Sterling Vill. Homeowners Assoc., Inc. v. Castle-wood Sterling Vill., LLC*, 2018 UT 04, ¶ 52, 417 P.3d 95.

[108] Utah Code Ann. § 16-10-840(1)

[109] *Rawcliffe v. Anciaux*, 2017 UT 72, ¶ 19, 416 P.3d 362.

Further, "to breach [the duty of loyalty], the director must take some action that she [or he] either knows is not in the best interests of the corporation, or unreasonably or negligently believes is in the best interests of the corporation."[110]

Matus does not dispute that he owed Red Cat/Teal a fiduciary duty of loyalty but instead argues that the Complaint does not sufficiently plead that he breached his duty. The Court disagrees. While each stated basis may not support a finding of breach of fiduciary duty, Plaintiffs' allegations taken as a whole and given all reasonable inferences are sufficient to survive a motion to dismiss, especially as they relate to Matus' alleged interference with the Orqa deal.

Matus also argues that the allegation that he breached his duty of loyalty by deleting everything on his computer is preempted by the UUTSA. As there are other allegations underlying the fiduciary duty claim that are independent of the alleged deletion of information, the Court need not decide whether this portion of Plaintiffs' breach of fiduciary duty claim is preempted at this juncture.

D. Computer Access

The Complaint pleads computer access claims against Matus pursuant to the federal Computer Fraud and Abuse Act[111] (the "CFAA") and Utah's Computer Abuse and Data Recovery Act[112] (the "UCADRA").[113] The Court will address them in turn below.

---

[110] *Id.*

[111] 18 U.S.C. §§ 1030.

[112] Utah Code Ann. §§ 63D-3-101–106.

[113] Docket No. 1 ¶¶ 282–94, 295–310.

1. CFAA

The CFAA provides both criminal and civil causes of action for various unauthorized access to computers. Here, Plaintiffs sue under 18 U.S.C. § 1030(a)(5)(A), wherein a person is liable who "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

In *Van Buren v. United States*,[114] a Supreme Court decision, the Court considered the scope of the CFAA. In that case, the defendant police officer was convicted under 18 U.S.C. § 1030(a)(2) for using his access to a license plate database to locate a record of an individual after he accepted a bribe to do so. The officer was prosecuted and convicted for "intentionally access[ing] a computer," "exceed[ing] authorized access," and unlawfully obtaining information.[115] The Court reversed the conviction concluding that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer—such as files, folders, or databases—that are off limits to him."[116] Because the police officer was authorized to use the system to retrieve license-plate information, he did not exceed authorized access.

Matus argues that *Van Buren* precludes Plaintiffs' claim. Plaintiffs respond that the Complaint does not assert a claim that Matus exceeded his authorization, but rather that he deleted the information without authorization. This distinction was recognized and discussed in *Van Buren* where the Court recounted the plaintiff's view that "without authorization" "protects

---

[114] 593 U.S. 374 (2021).

[115] *Id.* at 379.

[116] *Id.* at 396.

computers themselves by targeting so-called outside hackers—those who access a computer without any permission at all."[117] Matus argues that the claim fails because it does not allege that he was not authorized to access his computer or that he accessed the computer after he left the company.

The Complaint pleads that Matus knowingly "execut[ed] a wipe of his Red Cat/Teal computer, which erased all of the data, documents, folders, settings, and applications that were previously stored on the device."[118] Plaintiffs allege that this caused impairment to the integrity of the information on the computer, permanently deleted confidential and trade secret information, and was done in violation of Matus' employment Agreement.[119]

Courts in this district have not read the CFAA to include a requirement that a defendant "hacked" the computer in order to bring a claim.[120] Further, Plaintiffs bring their claim under § 1030(a)(5)(A), which does not involve unauthorized access to a computer, but instead is based on executing a command without authorization to a protected computer. The Complaint pleads that Matus did not have authorization to completely "wipe" his computer because his employment Agreement required that

> [u]pon termination of Executive's employment with the Company for any reason, the Executive shall deliver forthwith to the Company any and all originals and copies, including those in electronic or digital formats, of Confidential Information; . . . Executive is aware that all Company property, including physical property, documents, and Confidential Information that Executive receives or creates during employment with the Company, belongs to the Company. Executive understands

---

[117] *Id.* at 389 (internal quotation marks and citations omitted).

[118] Docket No. 1 ¶ 288.

[119] *Id.* ¶¶ 289–90.

[120] *See Speed of Light Ops, LLC v. Elliot*, No. 2:22-cv-00246-DAK-DBP, 2023 WL 2815875, at *4 (D. Utah Mar. 21, 2023); *Vox Mktg. Grp. v. Prodigy Promos*, 556 F. Supp. 3d 1280, 1285 (D. Utah 2021)

> and agrees that Executive has a duty and a responsibility to return all such property upon the Termination date.[121]

Based on this contract language and the Complaint's allegations that Matus' work computer housed confidential and trade secret information, and that he permanently deleted this information, the Court finds the Complaint sufficiently plead a claim under the CFAA.

In his Reply, Matus also argues that the claim fails because the Complaint fails to allege with particularity how the "wipe" of the computer resulted in at least $5,000.00 in damage or loss, as covered by the CFAA. Under the CFAA, "damage means any impairment to the integrity or availability of data, a program, a system, or information."[122] The CFAA extends to "[a]ny person who suffers damage or loss" of "at least $5,000" due to a § 1030 violation.[123] Loss is defined as "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, cost incurred, or other consequential damages incurred because of interruption of service."[124]

The Complaint pleads that Plaintiffs have lost the value of the documents, data, and files Matus permanently deleted from his computer worth in excess of $5,000.[125] The Court finds this sufficiently pleads a loss under the CFAA. Accordingly, the Court will deny the Motion as to this claim.

---

[121] Docket No. 1-1 ¶ 12(b), (c).

[122] 18 U.S.C. § 1030(e)(8).

[123] *Id.* §§ 1030(c)(4)(A)(i)(I), (g).

[124] *Id.* § 1030(e)(11).

[125] Docket No. 1 ¶¶ 141, 294.

2. UCADRA

The Complaint similarly alleges that Matus violated the UCADRA when he wiped his computer when he left Red Cat/Teal. The UCADRA creates a civil cause of action for acts by "unauthorized users" of protected computers. To state a claim under the UCADRA, the Complaint must plead "[a]n unauthorized user of a protected computer . . . knowingly, and with intent to cause harm or damage . . . cause[d] the transmission of a program, code, or command to the protected computer, and, as a result of the transmission cause[d] harm or loss."[126] The Complaint asserts Matus violated the UCADRA because he was not an authorized user and deleted all the information and files on his computer intending and cause damage and successfully causing damage to Red/Cat Teal in excess of $5,000.

Matus asserts that the claim fails because (1) there are not sufficient facts showing Matus was an "unauthorized user" and (2) the Complaint fails to allege that Matus engaged in any prohibited act under the statute.

Under the UCADRA, an

> [u]nauthorized user means an individual who, for a protected computer: (a) is not an authorized user of the computer; *and* (b) accesses the protected computer by: (i) obtaining, without an authorized user's permission, the authorized user's technological access barrier; or (ii) circumventing, without permission of the protected computer's owner, a technological access barrier on the protected computer.[127]

Whether Matus was an authorized user is not necessary for the Court to resolve because the Complaint does not plead that Matus accessed the computer by obtaining an authorized user's password without their permission or by circumventing the password on the protected computer.

---

[126] Utah Code Ann. § 63D-3-104.

[127] *Id.* § 63D-3-102(9).

Accordingly, the Complaint does not plead sufficient facts to state a claim under the UCADRA and therefore, the Court will dismiss this claim.

E. Tortious Interference

Plaintiffs assert tortious interference with actual and prospective economic relations claims against both Vector and Matus. To plead a claim for tortious interference with economic relations, a complaint must plead "(1) that the defendant intentionally interfered with the plaintiff's existing or potential economic relations, (2) for an improper purpose or by improper means, (3) causing injury to the plaintiff."[128] "[T]he tort of intentional interference with economic relations 'protects both existing contractual relationships and prospective relationships of economic advantage not yet reduced to a formal contract.'"[129]

Plaintiffs allege that both Matus and Vector tortiously interfered with their economic relations in three ways. First, Vector interfered with Matus' contract when it hired Matus thereby violating the standards of business ethics and community customs within the military defense contractor industry. Second, Matus interfered with Plaintiffs' economic relations with Orqa when he provided information regarding Blue UAS clearance to Orqa that rendered Plaintiffs' primary leverage to close the deal valueless causing the negotiations to end, violating the law, Matus' fiduciary duties, and military defense contractor industry standards. And third, both Matus and Vector interfered with other Red Cat/Teal employees' contracts by soliciting Plaintiffs' employees to end their employment and join Vector using Matus' knowledge of the terms and conditions of their employment with Plaintiffs to make superior offers. It alleges that this was

[128] *Eldridge v. Johndrow*, 2015 UT 21, ¶ 70, 345 P.3d 553 (internal quotation marks and citation omitted).

[129] *Proctor & Gamble Co. v. Haugen*, 947 F. Supp. 1551, 1556 (D. Utah 1996) (quoting *St. Benedict's Dev. v. St. Benedict's Hosp.*, 811 P.2d 194, 200 (Utah 1991)).

done in violation of Matus' employment contract, in violation of law, and in violation of military defense contractor industry standards.

Vector argues that none of these theories are viable "because Vector and Plaintiffs are not competitors."[130] As noted above, the Court rejects this argument at this stage of the litigation.

Defendants also argue that Plaintiffs fail to plead improper means. "To establish improper means, a plaintiff must show that the defendant's means of interference were contrary to statutory, regulatory, or common law or violated an established standard of a trade or profession."[131] For example, "[a] non-exhaustive list of conduct that may constitute improper means includes violence, threats, or other intimidation, deceit or misrepresentation, bribery, unfounded litigation, defamation, or disparaging falsehoods."[132]

The Complaint alleges a number of improper means as it relates to Vector and Matus: violation of industry standards, violation of the law, and violation of Matus' contractual obligations. The Complaint pleads additional improper means by Matus, including alleged misrepresentations to Orqa and his interference with the Orqa deal. While not all of these allegations may rise to the level of improper means, the Court concludes that Plaintiffs have adequately alleged improper means for this claim to survive dismissal.

Matus argues that the economic loss rule bars the claim as it relates to his solicitation of Plaintiffs' employees because it is based on the breach of his contractual obligations. "The economic loss rule prevents recovery of economic damages under a theory of tort liability when

---

[130] Docket No. 55, at 9.

[131] *Harvey v. Ute Indian Tribe of Uintah & Ouray Rsrv.*, 2017 UT 75, ¶ 71, 416 P.3d 410 (internal quotation marks and citation omitted).

[132] *Top Quality Sys., Inc. v. Universal Synaptics Corp.*, 679 F. Supp. 3d 1196, 1217 (D. Utah 2023) (internal quotation marks and citation omitted).

a contract covers the subject matter in dispute."[133] Here, because the tortious interference claim is supported by allegations other than those based in contract, the Court declines to find at this juncture, that the economic loss rule bars the claim.

F. Fraudulent Misrepresentation

To state a claim for fraudulent misrepresentation, a complaint must plead,

> (1) a representation; (2) concerning a presently existing material fact; (3) which was false; (4) which the representor either (a) knew to be false, or (b) made recklessly, knowing that he had insufficient knowledge upon which to base such representation; (5) for the purpose of inducing the other party to act upon it; (6) that the other party, acting reasonably and in ignorance of its falsity; (7) did in fact rely upon it; (8) and was thereby induced to act; (9) to his injury and damage.[134]

"In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."[135] "[A] complaint stating the 'who, what, where, when, and how' of the alleged fraud gives a defendant the requisite level of notice under Rule 9(b)."[136] The Court must determine whether the Complaint "taken as a whole, sufficiently apprises the defendant of its involvement in the alleged fraudulent conduct."[137]

The Complaint pleads that Matus and the other Vector founders told Red Cat/Teal in May 2024 that Vector had no plans to design, develop, and/or manufacture drones.[138] It also pleads that when Matus resigned in November 2024, he told Red Cat/Teal that Vector "offered contracted-for teaching and training on warfare technology offerings, including drones, to

---

[133] *Reighard v. Yates*, 2012 UT 45, ¶ 14, 285 P.3d 1168.

[134] *Larsen v. Exclusive Cars, Inc.*, 2004 UT App 259, ¶ 7, 97 P.3d 714.

[135] Fed. R. Civ. P. 9(b).

[136] *Clinton v. Sec. Benefit Life Ins. Co.*, 63 F.4th 1264, 1277 (10th Cir. 2023).

[137] *Id.* at 1280 (internal quotation marks and citation omitted).

[138] Docket No. 1 ¶ 112.

military units and sectors."[139] He also talked about "the significant future business opportunities" between the companies.[140] The Complaint also pleads that in December 2024, Matus and another founder represented to Plaintiffs that Vector was not a drone company.[141] The Complaint states that these statements were false because Matus knew Vector either planned on or had already been developing drones. The Complaint pleads that Red Cat/Teal reasonably relied on these statements. Regarding reliance on these statements, Plaintiffs allege that Red Cat/Teal did not enforce Matus' non-compete obligations or pursue relief through litigation and was damaged because Matus was able to compete with the companies for nearly seven months without detection, delay, or hinderance.[142]

Matus argues the claim fails for three reasons, (1) it fails to satisfy Rule 9(b)'s particularity requirements, (2) it fails to plead the representation was false when made, and (3) it fails to allege injury. As to the first contention, the Court rejects this argument. As Plaintiffs outline in their Response, the Complaint contains sufficiently particular allegations to satisfy Rule 9(b)'s requirements.[143]

Turning to Matus' second argument, the Complaint sufficiently pleads that Matus either knew the representations to be false or made them recklessly. The timing of the statements, to when Vector first announced Hammer and its government contracts, coupled with allegations

---

[139] *Id.* ¶ 106.

[140] *Id.*

[141] *Id.* ¶ 138.

[142] Docket No. 1 ¶¶ 340–50.

[143] *See* Docket No. 1 ¶¶ 138, 340–41; *Jensen v. Am.'s Wholesale Lender*, 425 F. App'x 761, 763 (10th Cir. 2011) (explaining that a plaintiff must "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof").

regarding the time it takes for drone development, "give rise to inferences regarding the falsity of the information given."[144]

Lastly, Matus asserts that the claim insufficiently pleads damages because the drones were not competing. As discussed above, the Court will not further address whether the parties are competing at this stage. The Complaint sufficiently pleads that Plaintiffs suffered damage by not enforcing the non-compete for seven months based on Matus' representation. Accordingly, the Court will deny the Motion as to this claim.

## IV. CONCLUSION

It is therefore

ORDERED that Defendant Vector's Motion to Dismiss (Docket No. 55) DENIED; it is further

ORDERED that Defendant Matus' Motion to Dismiss (Docket No. 56) is GRANTED IN PART and DENIED IN PART; it is further

ORDERED that Plaintiffs shall have fourteen (14) days from the date of this Order to file an Amended Complaint as discussed herein.

DATED September 28, 2026.

BY THE COURT:

TED STEWART
United States District Judge

[144] *Rycar Tr. v. Yates Fam. Invs., LLLP*, No. 2:23-cv-00732-TC-DAO, 2024 WL 3540856, at *12 (D. Utah July 25, 2024) (cleaned up) (internal quotation marks and citations omitted).